















USDC SCAN INDEX SHEET

LLS 5/11/99 12:57

3:99-CV-00788 EGL 1 INC V. PORSCHE CARS NORTH

*7*

*OPPM.*

Vern Schooley, State Bar No. 40,301
Russell Pangborn, State Bar No. 174,696
Fulwider, Patton, Lee & Utecht, LLP
200 Oceangate, Suite 1550
Long Beach, California 90802
(562) 432-0453

Daniel G. Lamb, Jr.
Brobeck, Phleger & Harrison
550 West C Street, Suite 1300
San Diego, California 92101
(619) 234-1966

Attorneys for Plaintiff
Egl 1, Inc., d.b.a. Eagle One Industries

FILED
MAY 0 1999
CLERK U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY DEPUTY

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

EGL 1, INC., D.B.A. EAGLE ONE INDUSTRIES, a California corporation,

Plaintiff,

v.

PORSCHE CARS NORTH AMERICA, INC., a Delaware corporation, and DR. ING, h.c.F. PORSCHE AG, a German corporation

Defendants.

PORSCHE CARS NORTH AMERICA, INC., a Delaware corporation, and DR. ING, h.c.F. PORSCHE AG, a German corporation

Counter Plaintiffs,

EGL 1, INC., D.B.A. EAGLE ONE INDUSTRIES, a California corporation,

Counter Defendant.

CASE NO. 99 CV 0788 JM (LSP)

PLAINTIFF'S AND COUNTER-DEFENDANT'S MEMORANDUM IN IN OPPOSITION TO DEFENDANTS' AND COUNTER-PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

DATE: May 24, 1999
TIME: 10:30 AM
COURTROOM 6

## TABLE OF CONTENTS

| | Page |
|---|---|
| I. INTRODUCTION | 1 |
| II. SUMMARY OF THE RELEVANT FACTS | 2 |
| A. Eagle One's Development of Its Polishes and Labels | 2 |
| B. Porsche's Marketing of Car Care Products And Policing of Its Marks | 4 |
| III. ARGUMENT | 6 |
| A. Porsche Is Not Likely to Succeed on the Merits | 7 |
| B. Porsche Fails to Establish Protectable Trademark or Trade Dress Rights to Its Subject Automobile Shape | 7 |
| 1. Porsche Fails to Establish that the Shape of Automobile Depicted on Eagle One's Subject Products is Distinctive | 8 |
| 2. Porsche AG Fails to Identify the Non-Functional Elements that Comprise its Trademark/Trade Dress of the Automobile at Issue | 10 |
| 3. Porsche has Failed to Show It Will Probably Succeed in Establishing a Likelihood of Confusion | 12 |
| a. Comparing the Trademarks/Trade Dress | 13 |
| b. No Evidence of Actual Confusion | 14 |
| c. No Intent To Confuse | 14 |
| 4. The Eagle One Depiction is not a Counterfeit Use of Any Registered Porsche Mark | 15 |
| 5. The Dilution Statute Is Not Retroactive And Porsche AG Has Not Shown Its Automobile Shape To Be Famous As A Trademark | 17 |
| a. The Federal Trademark Dilution Act Is Not Retroactive | 17 |
| b. Porsche AG has Failed to Establish "Fame" in the Subject Depiction or "Actual Harm" | 18 |
| C. Porsche AG Failed to Establish that it Will Likely be Irreparably Harmed | 21 |
| D. The Balance of Hardships Favors No Preliminary Injunction | 21 |
| E. Porsche is Estopped by Laches | 22 |

**TABLE OF CONTENTS (CONTINUED)**

**Page**

IV. MS. PATRICIA BRITTON'S VERIFICATION IS INSUFFICIENT TO SUPPORT PORSCHE'S MOTION AND COUNTERCLAIM . . . . . . . . . . . . . . . . 23

V. CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

## TABLE OF AUTHORITIES

**Page**

CITED CASES

American Greetings Corp. v. Dan-Dee Imports, Inc., 807 F.2d 1136 (3rd Cir. 1986) . . . . . 10

American Passage Media Corp. v. Cass Communications, Inc., 750 F.2d 1470 (9th Cir. 1985) . . . . . 23

AMF Inc. v. Sleekcraft Boats, 599 F.2d 341 (9th Cir. 1979) . . . . . 12

Amstar Corp. v. Domino's Pizza, Inc., 615 F.2d 252 (5th Cir. 1980) . . . . . 23

Atari Games Corp. v. Nintendo of America, Inc., 897 F.2d 1572 (Fed. Cir. 1990), *Reh'g denied* . . . . . 23

Celex Group, Inc. v. The Executive Gallery, Inc., 877 F.Supp. 1114 (N.D. Ill. 1995) . . . . . 24

Coffee Dan's, Inc. v. Coffee Don's Charcoal Broiler, 305 F. Supp. 1210 (N.D. Cal. 1969) . . . . . 6, 21, 22

Computer Care v. Service Systems Enterprises, Inc., 982 F.2d 1063 (7th Cir. 1992) . . . . . 11

Dakota Industries, Inc. v. Ever Best Ltd., 944 F.2d 438 (8th Cir. 1991) . . . . . 6

Daubert V. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993) . . . . . 24

Deere & Co. v. MTD Products Inc., 41 F.3d 39 (2d Cir. 1994) . . . . . 20

Dreamwerks Production Group Inc. v. SKG Studio, 142 F.3d 1127 (9th Cir. 1998) . . . . . 13

Dr. Ing. h.c.F Porsche AG v. Universal Brass, Inc. 34 USPQ2d 1593, 1995 U.S. Dist. LEXIS 7079 (W.D. Wa. 1995) . . . . . 5

Duraco Products, Inc. v. Joy Plastic Enterprises, Ltd., 40 F.3d 1431 (3rd Cir. 1994) . . . . . 9

E-Systems, Inc. v. Monitek, Inc., 720 F.2d 604 (9th Cir. 1983) . . . . . 22, 23

Exxon Corp. v. Exxene Corp., 696 F.2d 544 (7th Cir. 1982), *Reh'g denied* (1983) . . . . . 20

Ferrari S.p.A. Esercizio Fabriche Automobili e Corse v. McBurnie, 11 USPQ2d 1843 (S.D. Cal. 1989) . . . . . 8

Ferrari S.p.A. Esercizio Fabriche Automobili e Corse v. Roberts, 944 F.2d 1235 (6th Cir. 1991) . . . . . 8, 9, 10

Fisher Stoves, Inc. v. All Nighter Stove Works, Inc., 626 F.2d 193 (1st Cir. 1980) . . . . . 8

Genovese Drug Stores, Inc. v. TGC Stores, Inc., 939 F.Supp. 340 (D. N.J. 1996) . . . . . 13

GTE Corp. v. Williams, 731 F.2d 676 (10th Cir. 1984) . . . . . 21

# TABLE OF AUTHORITIES (CONTINUED)

**Page**

Hasbro Inc. v. Internet Entertainment Group, Ltd., 40 USPQ2d 1479 (W.D. Wash. 1996) .... 20

Hewlett-Packard Co. v. Repeat-O-Type Stencil Mfg. Corp., 34 USPQ2d 1450 (N.D. Cal. 1995) .... 13, 15

International Ass'n of Machinists & Aerospace Workers v. Winship Green Nursing Ctr., 103 F.3d 196 (1st Cir. 1996) .... 13

I.P. Lund Trading ApS v. Kohler Co., 163 F.3d 27 (1st Cir. 1998) .... 7, 8, 9, 18, 19

K-2 Ski Co. v. Head Ski Co., 467 F.2d 1087 (9th Cir. 1972) .... 24

Knitwaves, Inc. v. Lollytogs Ltd., 71 F.3d 996 (2nd Cir. 1995) .... 9

Kumho Tire Co., Ltd. v. Carmichael, __ U.S. __, 50 USPQ2d 1177 (1999) .... 24

Le Cordon Bleu S.a.r.l. v. BPC Publishing, Ltd., 327 F.Supp. 267 (S.D. N.Y. 1971) .... 22

Le Sportsac, Inc. v. Dockside Research, Inc., 478 F.Supp. 602 (S.D. N.Y. 1979) .... 23

Liquid Glass Enterprises, Inc. v. Dr. Ing. h.c.F. Porsche AG, 8 F.Supp.2d 398 (D.N.J. 1998) .... 5, 18, 19

Metro Publishing Ltd. v. San Jose Mercury News, 987 F.2d 637 (9th Cir. 1993) .... 6

My-T-Fine Corp. v. Samuels, 69 F.2d 76 (2nd Cir. 1934) .... 22

Nike Inc. v. Nike Securities L.P., 50 USPQ2d 1202 (N.D. Ill. 1999) .... 17

Oakland Tribune, Inc. v. Chronicle Publishing Co., 762 F.2d 1374 (9th Cir. 1985) .... 23

Panavision International, L.P. v. Toeppen, 141 F.3d 1316 (9th Cir. 1998) .... 18, 20

Polo Ralph Lauren L.P. v. Shuman, 46 USPQ2D 1046 (S.D. Tex. 1998) .... 20

Porsche Cars North America, Inc. v. Manny's Porshop, Inc., 972 F.Supp. 1128 (N.D. Ill. 1997) .... 5, 18

Ringling Bros.-Barnum & Bailey Combined Shows, Inc. v. Utah Div. of Travel Development, 170 F.3d 449 (4th Cir. 1999) .... 18, 20

Rolls-Royce Motors Ltd. v. A & A Fiberglass, Inc., 428 F.Supp. 689 (N.D. Ga. 1977) .... 8

Scarves by Vera, Inc. v. Todo Imports, Ltd., 544 F.2d 1167 (2nd Cir. 1976) .... 13

Schmid Laboratories v. Youngs Drug Products Corp., 482 F.Supp. 14 (D. N.J. 1979) .... 14

Schwinn Bicycle Co. v. Ross Bicycles, Inc., 870 F.2d 1176 (7th Cir. 1989) .... 6

## TABLE OF AUTHORITIES (CONTINUED)

**Page**

Stern's Miracle-Gro Products, Inc. v. Shark Products, Inc., 823 F.Supp. 1077 (S.D. N.Y. 1993) . . . . . 12

Tone Brothers, Inc. v. Sysco Corp., 28 F.3d 1192 (Fed. Cir. 1994) . . . . . 10

United Merchants & Mfrs., Inc. v. Miller Bros. Hat Co., Inc., 156 USPQ 61 (N.Y. Sup. Ct. 1967) . . . . . 22

Vision Sports, Inc. v. Melville Corp., 888 F.2d 609 (9th Cir. 1989) . . . . . 8, 21

J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition (4th ed. 1999), . . . . . 7, 15, 21, 22

15 U.S.C. § 1114 . . . . . 7, 12, 16, 17

15 U.S.C. § 1125 . . . . . 7, 12, 17, 19, 20

15 U.S.C. § 1127 . . . . . 15, 20

# I.  INTRODUCTION

Plaintiff/Counter Defendant, Egl 1, Inc., d.b.a. Eagle One Industries ("Eagle One") hereby submits this Memorandum in Opposition to Defendant's Motion for Preliminary Injunction seeking a denial of the Motion for Preliminary Injunction initiated by Defendant/Counter Plaintiffs, Porsche Cars North America ("Porsche NA") and Dr. Ing. h.c.F. Porsche AG ("Porsche AG") (sometimes collectively "Porsche").

Porsche AG's attempt to block Eagle One's sale of its EAGLE ONE WET® product and to seize its inventory must fail. Counter claimant has submitted no evidence on which this court could reasonably rely in finding that Porsche AG would likely prevail at trial. Critical to its Motion is its alleged exclusive rights to the depiction of the front part of the automobile shown in Eagle One's product label. It admits it does not have a patent or trademark registration on the shape of that automobile. It has presented no evidence (1) identifying the distinctive features of the automobile shape or (2) any evidence on which the court could make a finding on the critical issue of functionality.

Even with the benefit of over four years of usage by Eagle One, Porsche AG has still been unable to uncover one single instance of actual confusion stemming from Eagle One's marketing of its product in the accused packaging. It has made no showing that the display of a minuscule shield, questionably identifiable by a customer as a "Porsche Crest", is recognized by the purchasing public as identifying the source or sponsorship of the EAGLE ONE WET® wax product. During its some 55 months of nationwide sales, Eagle One has sold through at least one Porsche distributorship and placed prominent advertisements in national automotive magazines, purportedly policed by Porsche NA. Yet, Porsche AG waited until now to assert its claim and has presented no evidence showing why, despite its delay, this Court should act on such short order. The disruption of Eagle One's business and damage to it and its relationship with its customers by a seizure order would be immeasurable. On this record, Porsche AG's Motion for Preliminary Injunction must be denied.

///

## II. SUMMARY OF THE RELEVANT FACTS

### A. Eagle One's Development of Its Polishes and Labels

Eagle One has for 22 years been in the business of manufacturing and marketing car care products. Its founder and immediate past President Bernard Li has been continuously involved in sales and marketing. By 1994, he elected to adopt the label in use in 1994. By that time, he had extensive knowledge of the custom and practice in the trade to display the likeness of automobiles on product labels. He had no knowledge that Porsche was marketing waxes and polishes. (Li Dec., p. 4, ¶ 13; p. 5, ¶ 16).

In early 1994, Eagle One discovered the beneficial effects of "soft" poly-tetrafluoroethylene ("PTFE") fluoroadditives in automotive polishes and waxes. Concurrently it became involved in the design of a new label. It elected to adopt a label bearing at the top its fanciful EAGLE ONE® trademark incorporating the numeral "1" superimposed on an eagle's head, surmounted over red, orange and yellow horizontal bars and displaying the word "WET" in bold print about two inches high. At that time, Mr. Li owned a bright red, customized, 1992 Turbo Porsche S2 automobile with customized AKT aftermarket wheels (not original equipment). *(Li. Dec. p. 2, ¶ 6, Ex. B thereto) Following the approach of many other suppliers of car care* products, he elected to display a photograph of his automobile in the lower part of the label to suggest the glossy appearance which would be afforded by use of the EAGLE ONE WET® product. He selected a photograph of his automobile taken at a 3/4 profile from the front and lift side tilted at an angle. This view displays the major portion of the front hood, an air spoiler having a pair of horizontal air vents, the left side of the vehicle and the left front bright chrome wheel. (Li Dec., p. 2, ¶ 6). The hood appears to curve upwardly and rearwardly in an aerodynamically efficient fashion. The fenders bulge slightly laterally outwardly. When the photograph was taken, the hood ornament or shield was not removed so it appears in an obscure manner almost as a dot or smudge. A potential purchaser viewing the product label up close could only detect that there was something located centrally on the hood but, without a

///

magnifying glass, could not determine either the shape or any logo displayed thereon. (See Ex. B to Li Dec.).

Mr. Li recalled he had met a Mr. Joel Ewaniak sometime prior to 1994 at a performance driving school hosted by *Road & Track* Magazine. He believed Mr. Ewaniak was Vice President of Marketing at Porsche NA. Mr. Li forwarded him a container in the form of a pail or bucket containing a number of different Eagle One products. Included were packages of the EAGLE ONE WET® products bearing the label displaying Mr. Li's customized Porsche automobile. While the products were sent under a cover letter inviting comment, Mr. Li has been unsuccessful in his endeavor to locate a copy of that letter. (Li Dec., p. 3, ¶ 9; see Ex. D thereto). Eagle One introduced its new product at the nationally attended APAA/SEMA Trade Shows[1] in Las Vegas in November of 1994 and has continuously marketed since, (Li Dec., p. 3, ¶ 8).

The EAGLE ONE WET® wax and polish product has been sold in rectangular squeeze bottles, past wax tins and trigger spray bottles, all being the EAGLE ONE WET® trademark. (Hill Dec., Ex. A)

The EAGLE ONE WET® label showing the Li car has been vigorously promoted in national automobile magazines, such as *Car & Driver, Road & Track, Motor Trend, Automobile,* and others. The products have been continuously sold at national retail outlets, including Auto Zone, Chief Auto Parts, The Pep Boys, Target and Wal-Mart, and at least one Porsche dealer-ship. The product has been regularly featured at major trade shows each year, 1994 through 1998, including the annual AAPA/SEMA Trade Shows. (Li Dec., p. 4, ¶ 11, and Ex. D thereto).

To promote its products, Eagle One has maintained the same general look of its EAGLE ONE WET® label and has expended significant amounts of time, money and effort in developing the goodwill associated therewith. (Hill Dec., pp. 2-3, ¶¶ 6-7.) From 1994 through 1998, Eagle One has expended approximately $4,730,000.00 in the marketing and promotion of the product ranging from 50% - 85% of its annual promotional budget. Further, Eagle One has

///

[1]The AAPA/SEMA Trade Shows are traditionally the largest and arguably most important trade shows in the United States for the automotive aftermarket product industry.

budgeted approximately $1,600,000.00 for the 1999 promotional budget. (Hill Dec., p. 4, ¶ 15., Ex. E)

In spite of Eagle One's national sales of the product and extensive promotion, it never received a complaint from Porsche NA. As noted below, once Eagle One approached Porsche AG, things changed.

### B. *Porsche's Marketing of Car Care Products And Policing of Its Marks*

Porsche AG is a German corporation involved in the manufacture of performance sports car vehicles. There is no evidence it advertises automotive waxes or sells them to the general public outside its dealerships. Porsche NA has operated as Porsche AG's U.S. distributor since 1984 and claims it vigorously polices use of Porsche trademarks in the U.S. market. (Porsche's Counterclaims, p. 1, ¶ 2). Porsche AG obtained some 80 registrations of its word, model and design trademarks for use on automobiles and accessories. It has not been granted any for use on car care products like those in suit. (Pangborn Dec., p. 2, ¶¶ 3 and 4 and Ex. A and B thereto). There is no evidence that it ever sought to register the shape of any of its automobiles as trademarks for either automobiles or polish products.

At some time in 1990 or before, Porsche commenced marketing waxes and polishes in cylindrical cans and bottles bearing labeling distinctly different from Eagle One's packages and labels. As an example, the current container for its wax bears a frontal view of the Porsche Crest about 1-1/4 inches high and clearly visible to the purchaser. Porsche packages its car care products in about five different such cans and bottles which are displayed in a high tech appearing aluminum, hinged storage case available to the public through select Porsche dealerships for nearly $100.00. (Large Dec., p. 2 and Ex. B thereto.) Eagle One has no competitive storage case and, for the most part, does not market its products in direct competition with Porsche.

Ms. Patricia Britton, General Counsel of Porsche NA (Counterclaim p. 1, ¶ 2) notes that Porsche has policed the marketplace and pursued action against various entities infringing various Porsche marks. Examples include a suit against a small repair shop operator Emmanuel Shooshoo under the "Manny's Porshop", one against Myron Lewis of Universal Brass, Inc., which

manufactured trinkets bearing the Porsche Crest and the like, and one against Liquid Glass

Enterprises which apparently advertised its products showing the word mark "PORSCHE"

prominently in conjunction with its glass cleaning products. Porsche Cars North America, Inc. v.

Manny's Porshop, Inc., 972 F. Supp. 1128 (N.D. Ill. 1997); Dr. Ing. h.c.F. Porsche AG v.

Universal Brass, Inc., 34 U.S.P.Q.2d 1593 (W.D. Wa. 1995); Liquid Glass Enterprises, Inc. v. Dr.

Ing. h.c.F. Porsche AG, 8 F. Supp.2d 398 (D.N.J. 1998), In all these prior cases, Porsche waived

its claim to damages.

      Porsche NA claims it has a paralegal who "does nothing but police the use of the

trademark . . . she looks at the Net, she looks at all kinds of trade and car publications". (See

statement by Ms. Patricia Britton in *Corporate Legal Times*, May 1999, attached hereto as Ex. A).

Prior to February of this year, neither Ms. Britton, nor the full time paralegal, ever contacted

Eagle One to suggest that Porsche NA believed Eagle One's use of the automobile depiction was

a trademark use that amounted to infringement. (Li Dec. pp. 5-6, ¶ 17) (Hill Dec., p. 3, ¶ 10).

      The depiction by Eagle One of a Porsche automobile on its packaging for automotive car

products is not unique. Others currently displaying likenesses of a Porsche automobiles on car

care products include Armor All's "Car Wax Diamond Hard Shine" (paste and wax), "Detailer's

Advantage Car Wax", "Spray On Car Polish", and "Car Wash Concentrate" products; Blue

Coral's "Professional Gel Car Wash" and "Professional Gel Protectant"; Meguiar's "Quik Wax"

and "Clear Coat Paint Protectant"; Turtle Wax's "Quick Magic Rinse Off Car Polish", and Zymol

Enterprises "Natural Cream Zymol Auto Polish" and "Natural Liquid Zymol Auto Polish". (Li

Dec. at p. 5, ¶ 14 and Ex. H thereto.)

      The purchasing public is accustomed to seeing advertising and packaging bearing the

likenesses of automobiles not manufactured by the maker of the product advertised. (Ex. D, Hill

Dec.) As can be seen from the advertisements in Ex. D thereto, typically the hood emblems are

not removed from the cars shown.

      In February of 1999, Eagle One voluntarily brought Porsche AG's attention to the

depiction on its labeling. Porsche AG came to understand that Eagle One had inventory of

product being marketed in the USA and objected. It seized the moment. It demanded that Eagle

One disgorge 25% of its past and future gross sales revenue for the product. (Porsche Counterclaim Ex. J.) While insisting it was not infringing, Eagle One did offer some concession in an effort to avoid litigation. It was unsuccessful in persuading Porsche AG to take any reasonable approach. Believing that its use was not a trademark use, Eagle One took the precaution of instituting suit for declaratory judgment. Porsche's motion for preliminary injunction is based on a verified counterclaim.

## III. ARGUMENT

"To obtain a preliminary injunction, [Porsche] must demonstrate either (1) a combination of probable success on the merits ***and*** the possibility of irreparable injury if the preliminary injunction is not granted, or (2) the existence of serious questions going to the merits and that a balance of hardships tips sharply in its favor." Metro Publishing Ltd. v. San Jose Mercury News, 987 F.2d 637, 639 (9th Cir. 1993).

A preliminary injunction is an extraordinary and far-reaching remedy. Coffee Dan's, Inc. v. Coffee Don's Charcoal Broiler, 305 F. Supp. 1210, 1212 (N.D. Cal. 1969). Because of its drastic nature, a preliminary injunction should be granted only where the moving party makes a clear and convincing showing of need. Id. at 1213; *see also*, Schwinn Bicycle Co. v. Ross Bicycles, Inc., 870 F.2d 1176, 1180-81 (7th Cir. 1989) ("The granting of a preliminary injunction is an exercise of a very far-reaching power, never to be indulged in except in a case clearly demanding it.") (citations omitted). "The burden of demonstrating that a preliminary injunction is warranted is a heavy one where, as here, granting the preliminary injunction will give [the moving party] substantially the relief it would obtain after a trial on the merits." Dakota Industries, Inc. v. Ever Best Ltd, 944 F.2d 438, 440 (8th Cir. 1991) (citations omitted).

///

///

///

///

### A. Porsche Is Not Likely to Succeed on The Merits

Porsche has alleged trademark infringement under Section 32(1) of the Lanham Act, 15 U.S.C. § 1114(1), false designation of origin and trade dress infringement under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), and trademark/trade dress dilution under Section 43(c) of the Lanham Act, 15 U.S.C. § 1125(c).

Infringement and dilution share three common elements before the analyses diverge. These elements are that the marks at issue: (a) must be used in commerce, (b) must be non-functional, and (c) must be distinctive (either inherently distinctive or have acquired secondary meaning). I.P. Lund Trading ApS v. Kohler Co., 163 F.3d 27, 36 (1st Cir. 1998).

In its Motion, Porsche attempts to obfuscate matters by broadly claiming trademark rights in its irrelevant registrations on word marks and model numbers. *See*, (Porsche Memorandum, pp. 4-5); (Counterclaims at p 5, ¶ 11). Porsche refers to its various word trademarks, service marks, and asserted trade dress of various automobiles not at issue. It carefully avoids introducing evidence of any trademark/trade dress rights in Mr. Li's 1992 Turbo Porsche S2 with custom aftermarket AKT alloy wheels (not standard Porsche wheels). The fascinating aspect of Porsche's Motion is that it asks this court to grant it exclusive rights in the shape of Mr. Li's automobile, all without the scrutiny of any patent examiner or trademark attorney in the USPTO. Yet, it fails to present evidence which any such patent examiner or trademark attorney would want to see before granting any such rights. It cannot expect the court to act without the supporting evidence.

### B. Porsche Fails to Establish Protectable Trademark or Trade Dress Rights to Its Subject Automobile shape

Professor McCarthy, Porsche's own cited authority on several pertinent issues, provides:

> Some courts and commentators draw a line between product shapes and other trade dress formats such that product shape is never inherently distinctive (and hence always requires proof of secondary meaning) while other formats such as packaging could be. Some courts have expressed skepticism that product shapes,

> vis-a-vis word marks, containers and packaging, will often serve the trade dress role of identifying and distinguishing source. J. Thomas McCarthy, 1 McCarthy on Trademarks and Unfair Competition § 8:12 (4th ed. 1999).

Porsche, as the party asking this Court to grant it perpetual rights in a car shape, has the burden of showing it can prove "'its trade dress is protectable and that [Eagle One's] use of [purportedly] the same or similar trade dress is likely to confuse consumers.'" Vision Sports, Inc. v. Melville Corp., 888 F.2d 609, 613 (9th Cir. 1989) (citation omitted).

**1. Porsche Fails to Establish that the Shape of Automobile Depicted on Eagle One's Subject Products is Distinctive**

Porsche has the burden to establish that the claimed Automobile shape is sufficiently distinctive (either inherently distinctive[2] or acquired secondary meaning) to receive trademark or trade dress protection. I.P. Lund, 163 F.3d at 39.

Trade dress protection has extended, in certain cases, from packaging to product configuration itself[3]. The recent tendency has been to require a more rigorous standard in

---

[2]One of the most difficult challenges in product configuration trademark/trade dress infringement cases is to develop a workable concept of "inherent distinctiveness" as applied to a product configuration, as opposed to a product's packaging. At the preliminary injunction stage of this matter, where Porsche has failed to even address the non-functionality of its purported "mark", Eagle One will not attempt to present an analysis on the split between circuits on the appropriate test in this instance. Suffice it to say that current cases "require a more rigorous standard for determining inherent distinctiveness of product design than they do for determining the inherent distinctiveness of more traditional forms of trade dress." I.P. Lund, 163 F.3d at 39.

[3] In the various cases pertaining to product configuration trade dress/trademark infringement, the purported configurations at issue on pertain to use by the parties on both sides of the dispute. *See, e.g.*, I.P. Lund, 163 F.3d 27 (1st Cir. 1998) (plaintiff's faucet configuration v. defendant's faucet configuration); Ferrari S.P.A. Esercizio Fabriche Automobili e Corse v. Roberts, 944 F.2d 1235 (6th Cir. 1991) (plaintiff's Ferrari automobile design v. defendant's kit car replicas of Ferrari automobiles); Fisher Stoves, Inc. v. All Nighter Stove Works, Inc., 626 F.2d 193 (1st Cir. 1980) (plaintiff's stove configuration v. defendant's stove configuration); Ferrari S.p.A. v. McBurnie, 11 U.S.P.Q.2d 1843 (S.D. Cal. 1989) (plaintiff's Ferrari automobile design v. defendant's kit car replicas of Ferrari automobiles); (Rolls-Royce Motors Ltd. v. A & A Fiberglass Inc., 428 F. Supp. 689 (N.D. Ga. 1977) (aspects of plaintiff's Rolls-Royce automobile design v. defendant's customizing kits of Rolls-Royce grill and hood ornament).

considering the distinctiveness of a product configuration. *See, e.g.*, I.P. Lund, 163 F.3d 27 (1st Cir. 1998); Knitwaves, Inc. v. Lollytogs Ltd., 71 F.3d 996 (2nd Cir. 1995); Duraco Products v. Joy Plastic Enterprises, Ltd., 40 F.3d 1431 (3rd Cir. 1994).

Porsche merely tells the Court that all of its automobiles and trademarks are distinctive and famous without substantiation. (Porsche Memorandum at p. 12: 13-14 and 16 - 18). As shown in Exhibit C attached to the Pangborn Declaration, sports cars having a shape similar to that shown on the Eagle One label are quite common. Porsche AG has elected not to put in evidence anything to show how its car design is distinctive in the marketplace for polishes and waxes.

Porsche cites Ferrari S.p.A. Esercizio Fabriche Automobili e Corse v. Roberts, 944 F.2d 1235, 1240 (6th cir. 1991), in which the Ferrari TESTAROSSA was found to have protectable trade dress rights in the exterior design as appropriated by Roberts in his replica. Porsche fails to note that Ferrari, in fact, discharged its burden of submitting proof to show that its car had acquired secondary meaning in the minds of the buying public, that there was a likelihood of confusion and that the distinctive features of the subject Ferrari automobile were non-functional. That court stated:

> "To acquire a secondary meaning in the minds of the buying public, an article of merchandise when shown to a prospective customer must prompt the affirmation. 'That is the article I want because I know its source,' and not the negative inquiry as to 'Who makes that article?'" Id. at 1239.

In that case, Ferrari submitted survey evidence and testimony of car magazine editors and others to show distinctiveness of the subject Ferrari shape and likelihood of confusion, as well as testimony from the developer of Ferrari's subject car. Id. at 1246.

Porsche AG claims it "has extensively employed and caused to be advertised and publicized throughout the world, including the United States, the Porsche Marks," that its automobiles (not the specific customized Porsche S2 at issue) are "immediately identifiable" and that it has "spent millions of dollars" in advertising the Porsche Products and services. (Porsche Memorandum at pp. 4-6). It does not, however, proffer any evidence showing what portion, if any,

---

In this instance, however, Porsche attempts to overextend any trademark and trade dress rights it may have by claiming (without adequate support) its automobile shape configuration is infringed by product packaging that is not the least similar in configuration.

of the expenditure was directed to the vehicle shape in issue. It has failed to submit any evidence that any car shape has ever been promoted by it as a source identifier. It submits only three advertisements from editions of *Excellence* magazine (1998 and 1999 issues), a magazine that promotes itself as a "Magazine About Porsche." (Porsche Counterclaims, Exhibits A-C ). None of the subject advertisements portray the particular model of the automobile depicted on the subject EAGLE ONE WET® product labels. None of these advertisements were ever published prior to the adoption of the subject depiction by Eagle One. Tone Brothers, Inc. v. Sysco Corp., 28 F.3d 1192, 1202 (Fed. Cir. 1994).

To the extent Porsche would point to the testimony of its General Counsel Patricia Britton, it will be recognized that she has no expertise enabling her to make a determination as to inherent or acquired distinctiveness of the instant automobile design. (*See,* Plaintiff Eagle One's Evidentiary Objections). Consequently, Porsche's proof fails totally on the issue of distinctiveness thus highlighting the fact it has not shown probable success on the merits.

**2. Porsche AG Fails to Identify the Non-Functional Elements that Comprise its Trademark/Trade Dress of the Automobile at Issue**

In the Ferrari case, it was recognized that "[t]rademark law does not protect the functional features of products because such protection would provide a perpetual monopoly of features which could not be protected... A product feature is functional '. . . if it affects the cost or quality of the article." Ferrari, 944 F2d at 1246 (citations omitted). The issue to be decided by the trier of fact considering the merits is "whether a particular design (automobile shape) yields a utilitarian advantage. American Greetings Corp. v. Dan-Dee Imports, Inc., 807 F.2d 1136, 1142 (3rd Cir. 1986). Porsche AG has made no case on this issue. As stated in *American Greetings*, the evidence must focus on the functional features so the court does not run "afoul of the functionality doctrine." Id. at 1144 (citation omitted).

Porsche AG has not presented admissible expert testimony and design documents showing that the purported distinctive features depicted on Eagle One's label are non-functional. The

///

reason it has not is simple. Porsche could not find a qualified expert who would take such a position, one that would be contrary to the documented facts.

A couple of publicly available documents demonstrate this point. An article published in *Car & Driver* magazine (May 1995 issue) identified several external aspects of the Porsche 911 Turbo Carrera automobile that were designed for functional purpose. The article entitled "Porsche 911 Turbo" by Peter Robinson, reports that the"fixed rear wing has subtly curved fins on either edge, and ***was designed in the wind tunnel to reduce lift***" and that the vents on the front spoiler/bumper function to cool the brakes. (Exhibit B hereto) (emphasis added). Another article in this publication entitled "Porsche 911 GT2[4] - From the factory to the racetrack" by Barry Winfield, espouses the aerodynamic design of the front hood as serving to provide down force performance allowing for good "front-end" grip. (*See*, Exhibit B hereto). The shape of the hood of this model of Porsche is quite similar to that of Mr. Li's car, even to the untrained eye.

Another article appearing in *Road & Track* magazine (July 1995 issue) profiled Porsche Turbos through the years. Regarding the 1991-92 models, it reported that the "wider and taller (17-in. diameter) wheels and super-low-profile tires" provided better handling and "the grip to match the get-up-and-go." This could explain the reason for the bulged out fenders of Mr. Li's car. (Exhibit C hereto).

Had Porsche AG had confidence in its claim, it could have supplied the court with technical test documents to show what features are functional and which are non-functional. Rather, it tells this Court this case is "identical" to the Liquid Glass case. It is not. That case did not even involve the shape of an automobile as a trademark. There the trademark PORSCHE® was displayed prominently in the advertisement. (*See* Fig. 2, *infra*). The shape of the car and its functionality were not in issue. The very case relied on by Porche's counsel recognizes that "a trade dress feature is 'functional' and therefor not protectable if it is ". . . (like the hood [of a car]). . . ." Computer Care v. Service Systems Enterprises, Inc., 982 F.2d 1063, 1071 (7th Cir. 1992) (citations omitted).

---

[4] According to the noted article, the Porsche 911 GT2 "is just a specially modified version of Porsche's new 911 Turbo street car." (*See*, Exhibit B hereto).

Thus, with both the law and the facts against it, Porsche AG turns to the testimony of its General Counsel but Ms. Britton merely seeks to certify to the court that, as to all Porsche AG automobiles, "These distinctive shapes function as trademarks." (Verified Counterclaim, p. 4, ¶ 9). Her testimony on this issue is not credible. She fails to identify the distinctive feature of the car in issue or the non-functional aspects thereof. Should Porsche AG elect to present testimony at the hearing, it is doubtful that she could qualify to testify on these issues. If Porsche AG had faith in the merits of the case, would it not have introduced pertinent evidence from a qualified expert, rather than endeavoring to mislead this Court into believing this critical issue had been previously litigated? By failing to do so, it essentially concedes this element so critical to its case.

**3. Porsche has Failed to Show It Will Probably Succeed in Establishing a Likelihood of Confusion**

Porsche has failed to present evidence showing that it can probably prove that the purported design trademark or trade dress has been infringed, or that confusion as to source exists.

As Porsche notes, the "focal point" of trademark infringement (common law or statutory), counterfeiting (under Section 32(1) of the Lanham Act, 15 U.S.C. § 1114(1)), or false designation of origin/trade dress infringement (under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)), require a showing of likelihood of confusion. (Porsche Memorandum at p. 15: 6-10). In the Ninth Circuit, the factors to be considered in determining a likelihood of confusion are set forth in AMF Inc. v. Sleekcraft Boats, 599 F.2d 341 (9th Cir. 1979). The factors are: (1) the strength of the mark; (2) the proximity or relatedness of the competing goods; (3) the similarity of the sight, sound and meaning of the marks; (4) evidence of actual confusion; (5) marketing channels used; (6) type of goods and the degree of care likely to be exercised by the purchaser; (7) the defendant's [or accused infringer's] intent in adopting the mark; and (8) likelihood of expansion of product lines. Id. at 348-49. "The likelihood of confusion issue is always one that is unique to each set of facts." Stern's Miracle-Gro Products, Inc. v. Shark Products, Inc., 823 F. Supp. 1077, 1089 (S.D.N.Y. 1993) (citation omitted). The Ninth Circuit has previously advised that the "focus" should remain on "pivotal" factors, disregarding factors that "don't provide much insight in this case and thus

carry little weight." Dreamwerks Production Group Inc. v. SKG Studio, 142 F.3d 1127, 1130 n.6 (9th Cir. 1998).

The likelihood of confusion must be to an appreciable number of ordinarily prudent customers in order to subject one to liability for infringement or unfair competition for false designation of origin. *See*, Scarves by Vera, Inc. v. Todo Imports Ltd., 544 F.2d 1167, 1175 (2nd Cir. 1976); International Ass'n of Machinists & Aerospace Workers v. Winship Green Nursing Ctr., 103 F.3d 196, 201 (1st Cir. 1996).

Porsche notes that there are three methods for proving a likelihood of confusion: "(1) survey evidence; (2) evidence of actual confusion; and/or (3) argument based on a clear inference arising from a comparison of the conflicting marks and the context of their use in the marketplace." Hewlett-Packard Co. v. Repeat-O-Type Stencil Mfg. Corp., 34 U.S.P.Q.2d 1450, 1453 (citing McCarthy § 23:20[2]] at 23-133, 3rd ed. 1994). Since Porsche provided no survey evidence or evidence of actual confusion, it is forced to rely on mere argument.

**a. Comparing the Trademarks/Trade Dress**

Porsche's own case authority, Genovese Drug Stores, inc. v. TGC Stores, Inc., 939 F. Supp. 340 (D.N.J. 1996), notes the importance of considering the respective marks as a whole when examining any purported confusing similarity. Id. at 346. Eagle One's trade dress depicted on its label is far more than the photograph of Mr. Li's customized car. It includes Eagle One's traditional trade dress black packaging bearing its distinctive federally registered EAGLE ONE® logo underscored by its fanciful red, orange, and yellow stripes (the COLORED STRIPES DESIGN™), all set above a prominent word "WET". (Li Dec., pp. 2-3, ¶ 6 and Exhibit B thereto); (Hill Dec., p. 3, ¶ 6). *See*, Genovese, 939 F. Supp. at 346 (the court "has consistently refused to allow a plaintiff to focus on an abbreviated mark when analyzing confusing similarity.").

Eagle One in this Opposition provides the court with the testimony of Messrs. Bernard Li and Walter Arnold, two businessmen with combined experience of more than 60 years in automotive aftermarket appearance and accessory sales. They advise that use of automobiles likenesses on appearance care products do not generally serve as source indicators. (Li Dec., pp. 4-

5, ¶ 13); (Arnold Dec. pp. 2-3, ¶ 7). In light of the commonality of such practice, ordinarily prudent consumers viewing the EAGLE ONE WET® product packaging would not perceive a depiction of an automobile thereon to be an indicia of source. Contrarily, it has been held that prospective purchasers will focus on the brand name of the product. *See*, Schmid Laboratories v. Youngs Drug Products Corp., 482 F. Supp. 14, 18-19 (D.N.J. 1979).

To the extent Porsche offers automobile care products (Ex. E to Porsche Counterclaims and Ex. B to Large Dec.) it does not display any automobile as a trademark. (*See*, Fig. 1 *infra*). Porsche admittedly limits distribution of its polishes and waxes through its "Porsche dealer network", thus limiting any direct competition. (Porsche Counterclaims, Ex. I). Clearly Porsche AG is not well known as a maker of polishes and waxes. Eagle One's label is distinctively different and displays a totally different trademark. Consequently, it is apparent that even the most unsophisticated of consumers would not be confused.

**b. No Evidence of Actual Confusion**

Despite more than four years of concurrent usage Porsche has failed to provide any evidence of actual confusion. Mr. Li and Mr. William Hill, Executive Vice President of Eagle One, verify that Eagle One has experienced no actual confusion. (Li Dec., pp. 5-6, ¶17) (Hill Dec., p. 3, ¶ 10). *Since neither party has experienced confusion with some 55 months of concurrent* usage, it is clear there is no likelihood Porsche AG can prove confusion at trial.

**c. No Intent to Confuse**

There is no evidence that Mr. Li adopted the subject label with the intention of causing confusion. Several factors bore on Eagle One's selection of the overall trade dress of its EAGLE ONE WET® product line. Its election to portray an automobile thereon was nothing unusual in the industry. *See*, (Li Dec., pp. 4-5,¶ 13); (Arnold Dec., pp. 2-3: ¶ 7). Messrs. Li and Hill verify that the selection of Mr. Li's automobile served appropriate ornamental desires for the packaging due to the prominent "reflections and contrasts" exemplifying the "wet-looking" shine desired from the

use of the EAGLE ONE WET® products.[5] (Li Dec., pp. 2-3,¶ 6); (Hill Dec., p.2, ¶ 6). Mr. Arnold further attests that sports cars are preferred by wax and polish manufacturers because the contours of such cars highlight the beneficial effects of the product. (Arnold Dec. at p. 2: ¶8).

Eagle One prominently displayed its famous EAGLE ONE® logo and traditional multi-colored striping for this product line. Its extensive advertising campaign was supported by a significant percentage of its annual advertising budget. (Hill Dec., p.4, ¶ 14). It was Eagle One who brought the subject label to the attention of Porsche AG. These are hardly the acts of a party who has endeavored to confuse.

Weighing the likelihood of confusion factors, Porsche has fallen well short of demonstrating that it is likely to succeed on the merits on its infringement claims.

**4. The Eagle One Depiction is not a Counterfeit Use of Any Registered Porsche Mark**

Counterfeit is a non-issue. Ms. Britton recklessly verifies in the Verified Complaint that Eagle One is guilty of counterfeiting. (Porsche Memorandum at p. 12-13). Section 45 of the Lanham Act defines "counterfeit" as a spurious mark which is identical with, or substantially indistinguishable from, a registered mark. 15 U.S.C. §1127. In commenting on the act of counterfeiting, Professor McCarthy provides:

> Counterfeiting is the act of producing or selling a product with a sham trademark that is an intentional and calculated reproduction of the genuine trademark. . . . [C]ounterfeit merchandise is made so as to imitate a well-known product in all details of construction and appearance so as to deceive customers into thinking that is identical with, or substantially indistinguishable from, the genuine merchandise. Thus, counterfeiting is "hard core" or "first degree" trademark infringement and is the most blatant and egregious form of "passing off". 4 McCarthy § 25:10 (4th ed. 1999).

---

[5] Mr. Li's automobile maintained the shield hood ornament in the photograph ultimately used on Eagle One's subject packaging. However, its small illegible appearance is clearly not utilized as a indicia of source for the products at issue. In Hewlett-Packard Co. v. Repeat-O-Type Stencil Mfg. Corp., 34 U.S.P.Q.2d 1450 (N.D. Cal. 1995), a case cited by Porsche, the court noted "'When the mark [of another] is used in such a way that does not deceive the public we see no such sanctity in the [mark] as to prevent its being used to tell the truth. It is not taboo.'" Id. at 1454 (citation omitted).

Section 32 of the Lanham Act provides in relevant part: "Any person who shall without the consent of the registrant — (a) use in commerce any reproduction, counterfeit, copy or colorable imitation of a registered[6] mark in connection with the sale . . . of any goods . . . shall be liable. . . ." 15 U.S.C. §1114(1).

A side-by-side portrayal of respective automotive cleaning preparations of the respective parties best exemplifies the error in Porsche's testimony on this claim:

Fig. 1

Porsche

Eagle One

[6] Although Porsche's confusing allegations do not so specify, its counterfeit claim under Section 32(1) of the Lanham Act, 15 U.S.C. § 1114(1) must be limited to any purported use of the "Porsche Crest" by Eagle One, since the language of the act limits counterfeit claims to "***registered*** mark."

Even then, Porsche's U.S. registrations on the "Porsche Crest" (Exhibit D to its Verified Counterclaims) do not claim use on automobile care products.

It is apparent that Eagle One does not display the registered "Porsche Crest" in trademark fashion on its product packaging. Eagle One merely portrays an accurate picture of Mr. Li's subject automobile which appears to bear, in indistinguishable fashion, a hood ornament which might be shield shaped. Even if it could be so distinguished, Porsche AG must recognize that it does not have a registration on the shape in respect to the subject goods. In fact, shape of a shield is used by others. (*See*, Ferrari shield, on Exhibit D hereto). The fact that a shield appears as a hood ornament on the subject automobile depiction does not equate to trademark usage, nor is it even legible as used. Thus, such shield, as it illegibly appears on the subject automobile depicted on Eagle One's packaging, is not "likely to cause confusion, or to cause mistake, or to deceive", so could not be the basis for counterfeit, infringement, or false designation of origin under 15 U.S.C. §1114(1) and/or 15 U.S.C. 1125(a).

**5. The Dilution Statute Is Not Retroactive And Porsche AG Has Not Shown Its Automobile shape To Be Famous As a Trademark**

**a. The Federal Trademark Dilution Act Is Not Retroactive**

The Federal Trademark Dilution Action (FTDA) provides in pertinent part: "The owner of a famous mark shall be entitled . . . to an injunction against another person's commercial use in commerce of a mark . . ., if such use begins after the mark has become famous and causes dilution of the distinctive quality of the mark." 15 U.SC. §1125(c).

In a recently decided case before the Norther District of Illinois, it was held that the FTDA should not be retroactively applied. Nike Inc. v. Nike Securities L.P., 50 U.S.P.Q.2d 1202 (N.D. Ill. 1999). The FTDA became effective on January 16, 1996, more than a year after Eagle One had commenced use of the subject Porsche depiction. To allow a retroactive Dilution Act claim could require Eagle One to abandon its investment and accompanying goodwill associated with its earlier adopted trade dress for the product. Eagle One invested significant amounts of money in the promotion of the subject product line, with expenditures in excess of $1.3 million in the 1994 - 1995 period for the promotion of the pertinent EAGLE ONE WET® products (which excludes

additional point of sale end cap cooperative advertising expenditures which further serve to promote the products). (Hill Dec., p. 4, ¶ 15, Exhibit E).

**b. Porsche AG has Failed to Establish "Fame" in the Subject Depiction or "Actual Harm"**

In order to prove a violation of the FTDA, Porsche must show that (1) the subject mark is famous; (2) Eagle One is making a commercial use of the mark in commerce; (3) Eagle One's use began after the mark became famous; and (4) Eagle One's use of the mark dilutes the quality of the mark by diminishing the capacity of the mark to identify and distinguish goods and services. Panavision International, L.P. v. Toeppen, 141 F.3d 1316, 1324 (9th Cir. 1998); *see also*, Ringling Bros.-Barnum & Bailey Combined Shows, Inc. v. Utah Div. Of Travel Development, 170 F.3d 449 (4th Cir. 1999).

Porsche has not shown it can prove "fame" in the subject automobile shape to support a finding of "dilution." I.P. Lund, 163 F.3d at 45. Porsche would have this court believe that its automobile shape has already been found famous in a contested proceeding. (Porsche Memorandum at p. 10: 17) (citing Liquid Glass Enterprises, Inc. v. Dr. Ing. h.c.F. Porsche AG, 8 F. Supp.2d 398, 405 (D.N.J. 1998) and Porsche Cars North America, Inc. v. Manny's Porshop, Inc., 972 F. Supp. 1129, 1132 (N.D. Ill. 1997)). Even the briefest review of these cases, however, reveals this fact is not accurate. Neither the automobile shape nor fame of any mark was at issue in either case. *See, e.g.*, Liquid Glass, 8 F. Supp.2d at 402 ("Liquid Glass [did] not dispute that Porsche's marks are famous."). Further, in Manny's Porshop, the mark at issue was the PORSCHE word trademark (which was also undisputed), not the automobile shape. Manny's Porshop, 972 F. Supp. at 1130.

In a desperate attempt to bootstrap its automobile shape claim into a legitimate trademark claim, Porsche AG attempts to bundle that shape with its registered work and logo marks referring to them collectively as its "Porsche Marks". (*See generally*, Porsche Memorandum and Porsche Counterclaims). What it does not tell the court is that in its Liquid Glass case, the issue involved the word trademark PORSCHE. This mark was displayed in an advertisement which portrayed

"provocatively-dressed women applying Liquid Glass car polish to a Porsche 911 vehicle with the trademark "PORSCHE" prominently displayed on the car." Liquid Glass, 8 F. Supp.2d at 400. Figure 2, *infra*, is a color copy of the ad at issue in the Liquid Glass case, taken from the May 1994 issue of *Road & Track* magazine:

Fig. 2

REVOLUTIONARY
ANTI-AGING
LIQUIDS
LIQUID GLASS

Eagle One neither displays scantily-clad women in conjunction with any depiction of the automobile depiction at issue, nor does Eagle One legibly portray any registered trademark of Porsche. See (Exhibits B and C to Li Dec.); (Exhibits A and B to Hill Dec.).

The additional protection afforded by the FTDA requires that a mark go beyond what is required for ordinary Lanham Act protection. Only those marks which are "distinctive and famous" are protected. 15 U.S.C. § 1125(c)(1). As set forth in the 1987 Trademark Review Commission Report, the precursor of the 1996 Act, this language reflected "the policy goal that to be protected, a mark had to be truly prominent and renowned. [citation omitted]." I.P. Lund, 163 F.3d at 46.

In this instance, Porsche once again falls well short of its burden to establish "fame" in the Automobile shape (its alleged "mark") or its "Porsche Crest". The FTDA directs courts to consider the following non-exclusive factors in deciding whether a mark is famous:

(a) the degree of inherent or acquired distinctiveness of the mark;

(b) the duration and extent of use of the mark in connection with the goods or services with which the mark is used;

(c) the duration and extent of advertising and publicity of the mark;

(d) the channels of trade for the goods or services with which the mark is used;

(e) the degree of recognition of the mark in the trading areas and channels of trade used by the marks' owner and the person against whom the injunction is sought;

(f) the nature and extent of use of the same or similar marks by third parties; and

(g) whether the mark was registered ...

15 U.S.C. 1125 (c).

To succeed on a federal dilution claim, Porsche must also show that actual harm has resulted from Eagle One's use of the Automobile Depiction. "Dilution" is defined as "the lessening of the capacity of a famous mark to identify and distinguish goods or services". 15 U.S.C. § 1127. The legislative history of the FTDA makes clear that Congress intended the act to "protect famous trademarks from subsequent uses that *blur* the distinctiveness of the mark or *tarnish* or disparage it." H.R. Rep. 374, 104th Cong., 1st Sess. 3 (1995), *reprinted in* 1996 USSCAN 1029, 1030 (emphasis added). Tarnishment has been generally interpreted by courts as offensive uses of a famous mark that link it to drugs, sex, or in other unwholesome contexts, which is clearly not at issue in this instance. *See*, Polo Ralph Lauren L.P. v. Schuman, 46 U.S.P.Q.2d 1046, 1048 (S.D. Tex. 1998); Hasbro Inc. v. Internet Entertainment Group Ltd., 40 U.S.P.Q.2d 1479, 1480 (W.D. Wash. 1996).

As for "blurring", this is a concept that has been somewhat more difficult for courts to define. Various definitions have included: (1) the use or modification of a famous marks "to identify the defendant's goods. . . ." Deere & Co. v. MTD Products Inc., 41 F.3d 39, 43 (2nd Cir. 1994) (emphasis omitted); (2) "a 'whittling away' of the selling power of the mark" Panavision International, L.P. v. Toeppen, 945 F. Supp. 1296, 1304 (C.D. Cal. 1996), *aff'd*, 141 F.3d 1316 (9th Cir. 1998); (3) a use that causes the famous mark to "no longer . . . call to mind" the plaintiff's goods or services. Exxon Corp. v. Exxene Corp., 696 F.2d 544, 550 (7th Cir. 1982), *reh'g denied* (1983). Regardless of the definition utilized, the language of the FTDA "proscribes and provides

remedy only for actual, consummated dilution and not for the mere 'likelihood of dilution'". Ringling Bros., 170 F.3d 449. Porsche has not provided any evidence that the selling power of its alleged automobile shape "mark" has been harmed by Eagle One selling wax and polish products. Id.

### C. Porsche AG Failed to Establish that it Will Likely be Irreparably Harmed

Porsche AG's showing is so wanting, it is questionable whether the court even need consider this issue. This is particularly true given the fact that Porsche AG is content to simply argue that its showing of likelihood of confusion gives rise to a presumption that it will suffer irreparable harm if injunctive relief is not granted. (Porsche Memorandum p. 20: 9-10 (citing Vision Sports, 888 F.2d at 612 n.3)). In addition to being plagued by its failure to make a strong showing of likelihood of confusion, its unexplained long delay in bringing this suit would rebut any presumption that could have arisen. *See*, 5 McCarthy, § 31:32. Its four year delay "undercuts any presumption that infringement alone has caused irreparable harm *pendente lite*..." GTE Corp. v. Williams, 731 F.2d 676, 678 (10th Cir. 1984).

### D. The Balance of Hardships Favors No Preliminary Injunction

One of the primary goals sought by courts in determining whether a preliminary injunction should be granted is whether the issuance thereof will maintain the status quo. 5 McCarthy, § 30:31; *See also*, Coffee Dan's, 305 F. Supp. at 1216 ("The primary purpose of a preliminary injunction is to preserve the status quo *ante litem* . . . that state being defined as the last uncontested status which preceded the pending controversy."). In the instant case, the status quo will only be preserved if the preliminary injunction is not granted.

Eagle One has continuously sold and heavily promoted its subject wax and polish products bearing the Automobile depiction for more than four years, all without objection from Porsche NA. Over that 58- month span, Eagle One has steadily increased its inventory and promotional budget for this commercially successful product line. (Hill Dec., p. 4, ¶ 15 and Ex. E thereto). Should it be preliminarily enjoined from distribution and sale of its subject EAGLE ONE WET® product, its

top selling line of waxes and polishes, the resulting harm would be extreme. Such a restraint would render it unable to meet the expectations of its valuable customers for EAGLE ONE WET® products, would render a great portion of its promotional material worthless, would damage Eagle One's reputation in the industry, and would prevent Eagle One from realizing the benefit of the goodwill it has built up in connection with the product in the relevant market. Coffee Dan's, 305 F. Supp. at 1217.

By way of contrast, the business of Porsche NA would remain essentially unaffected by continuing the current status quo. On the facts presented, the requested injunction or seizure would work an undue hardship on Eagle One amounting to severe punishment. 5 McCarthy, § 31:32. The balance of the hardships tips decidedly in the favor of Eagle One.

**E. Porsche is Estopped by Laches**

From an equitable standpoint, Porsche should be estopped from immediately securing a preliminary injunction or seizure. E-Systems, Inc. v. Monitek, Inc. 720 F.2d 604, 607 (9th Cir. 1983) (holding laches is defense to injunctive relief in trademark actions where delay in enforcing plaintiff's rights is due to plaintiff's own lack of diligence); *See also*, My-T-Fine Corp. v. Samuels, 69 F.2d 76, 78 (2nd Cir. 1934); (in which Judge Learned Hand noted, "delay alone may be enough" to "defeat a preliminary injunction."); United Merchants & Mfrs. Inc. v. Miller Bros. Hat Co., 156 U.S.P.Q. 61 (N.Y. Sup. Ct. 1967) (three years' inaction held to bar preliminary injunction); Le Cordon Bleu S.a.r.l. v. BPC Publishing Ltd., 327 F. Supp. 267 (S.D.N.Y. 1971) (13-week delay held sufficient to bar preliminary injunction).

Porsche provides no evidence of actual confusion and it is clear from a review of Eagle One's label that no likelihood of confusion exists. Hence, the maxim that "laches should not trump public confusion" is inapplicable in this instance. The long delay by Porsche in suing for infringement clearly weakens its argument that a serious likelihood of confusion is created by Eagle One's actions. 5 McCarthy §31:11. "A long period of delay for suing for alleged infringement in a less than clear-cut case of confusion will cause [Porsche's] rhetoric about protecting the public to smack of convenient afterthought." Id. Porsche made its allegations of

infringement and dilution after more than four years of being expressly notified by Eagle One of its intended use. If Porsche (particularly Porsche NA) strongly believed that its customers were being deceived, it would hardly have remained idle for such an extended period of time. *See*, E-Systems, 720 F.2d at 607 ("It would be 'inequitable' to force [defendant] to abandon the name completely in light of the extended period over which [plaintiff] could have discovered [defendant's] use" when "[p]laintiff ought to have discovered defendant's use sooner had it been diligently seeking to enforce its mark."); Amstar Corp. v. Domino's Pizza, Inc., 615 F.2d 252 (5th Cir. 1980), *cert. denied*, 449 U.S. 899.

As one court noted in commenting on the plaintiff's one-year delay in bringing suit, "Delay of this nature undercuts the sense of urgency that ordinarily accompanies a motion for preliminary relief and suggests that there is, in fact, no irreparable injury." Le Sportsac, Inc. v. Dockside Research, Inc., 478 F. Supp. 602, 609 (S.D.N.Y. 1979) (delay caused balance of hardships to tip in defendant's favor; preliminary injunction denied).

## IV. MS. PATRICIA BRITTON'S VERIFICATION IS INSUFFICIENT TO SUPPORT PORSCHE'S MOTION AND COUNTERCLAIM

Though not generally recommended, a preliminary injunction may be granted on affidavits. Atari Games Corp. v. Nintendo of America, Inc., 897 F.2d 1572, 1575 (Fed. Cir. 1990), *reh'g denied* (applying Ninth Circuit law, stating that "[a]s a general rule, a preliminary injunction should not issue on the basis of affidavits alone."). However, vague and/or conclusory affidavits are insufficient, and will lead to a denial of preliminary injunction. American Passage Media Corp. v. Cass Communications, Inc., 750 F.2d 1470, 1473 (9th Cir. 1985) (reversing grant of preliminary injunction because plaintiff's affidavits found to be "conclusory and without sufficient support in facts" to show irreparable injury); Atari, 897 F.2d at 1575 (stating that "a district court should be wary of issuing an inunction based solely upon allegations and conclusory affidavits submitted by plaintiff."); Oakland Tribune, Inc. v. Chronicle Pub. Co., 762 F.2d 1374, 1377 (9th Cir. 1985).

///

Further, the court has a duty to act as a "gatekeeper" to ensure the relevance and reliability of all expert testimony. Kumho Tire Co. v. Carmichael, ___ U.S. ___, ___, 50 U.S.P.Q.2d 1177, 1182 (1999) (interpreting Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993), as applying Court's duty under FRE 702 to all expert testimony, not merely to "scientific" testimony). The trial judge has the responsibility to determine whether the offered testimony has a "'reliable basis in the knowledge and experience'" of the relevant field of expertise. Id. at 1183 (quoting Daubert, 509 U.S. at 592).

Porsche's only support for all factual assertions is the Verification signed by Patricia R. Britton, General Counsel for Porsche NA, who states in blanket fashion "that to the best of her knowledge, information, and belief" the allegations of the Verified Counterclaim (and, presumably, the Motion for Preliminary Injunction as well) are true and correct.

On its face, her proffered testimony reveals she does not have personal knowledge of the facts asserted or the qualifications to give opinions on customer reaction and functionality issues. Indeed, Ms. Britton's Verification states no basis for her to speak to the truth of any of Porsche's allegations. This court has the duty to require Porsche to make a sufficient evidentiary showing. K-2 Ski Co. v. Head Ski Co., 467 F.2d 1087, 1088-89 (9th Cir. 1972) (holding preliminary injunction should be denied, absent further showing by movant, when unsupported allegations of verified complaint are "substantially controverted by counter-affidavits. . . ."); *see also*, Celex Group, Inc. v. The Executive Gallery, Inc., 877 F. Supp. 1114, 1139-40 (N.D. Ill. 1995) (requiring evidentiary hearing in trade dress infringement case to further develop facts pertaining to distinctiveness, functionality, and plaintiff's advertising practices before ruling on motion for preliminary injuction). From the evidence of record, it is clear that Porsche AG cannot show it would likely prevail at trial. However, should the court be of the opinion Porsche has made any type of threshold showing, Eagle One requests that it set an evidentiary hearing so testimony can be taken on the critical issues. It is believed that before any injunction or seizure order should issue, the court should hear "additional evidence relating to (1) whether the trade dress of the products at issue is inherently distinctive or has acquired distinctiveness through secondary meaning; (2) whether the trade dress is functional. . . ." Id. at 1139.

From the present record, it would appear Porsche's counsel, in bringing on the instant motion, may not have had a good faith belief that Porsche AG had, in fact, established exclusive rights in any non-functional features of the trademark shape in issue. Eagle One respectfully reserves the right to bring the issue before the court in a subsequent motion should the record continue to suggest a lack of support for the motion.

## V. CONCLUSION

Porsche AG has failed to present evidence showing its automobile appearance is distinctive or that any such distinctive features are non-functional. It has failed to show it can likely prove that customers recognize the depiction of such automobile on Eagle One's labels as a trademark. The hood ornament of Mr. Li's car on the label is not legible as a trademark and is not used as a trademark for waxes and polishes. Eagle One utilizes a label having an appearance totally different from the labeling incorporated on Porsche's wax and polish products. It prominently displays its own federally registered trademarks EAGLE ONE® and EAGLE ONE WET®. In the past nearly five years of usage, no one has been confused. Consequently, Porsche AG has failed to show it will likely prevail on the merits. Accordingly, its Motion for Preliminary Injunction and Seizure should be denied.

Submitted by,

FULWIDER PATTON LEE & UTECHT, LLP

Date: May 10, 1999

By: ______________________
Vern Schooley, Esq.
Russell Pangborn, Esq.
Attorney for Egl 1, Inc. d/b/a Eagle One Industries
Plaintiff and Counter Defendant

# Porsche Drives Its Trademark Protection with Lawsuit

## Internet Domains, Not Registrants, Targeted

**BY BRUCE RUBENSTEIN**

INFRINGEMENT on the Internet places a large burden on the owners of famous trademarks.

"Choosing to ignore those infringements is not an option," explains Patricia R. Britton, general counsel of Porsche Cars North America Inc., Atlanta.

"Trademark law requires the owner of a mark to police its use. If you ignore violations, not only is the value of your mark diluted, but in an extreme case, the U.S. Patent and Trademark Office can take it away from you."

Porsche North America, the American arm of the Stuttgart, Germany-based auto manufacturer, is a small company with an enormously valuable trademark, which epitomizes its sports cars. Thus, more than one-quarter of its law department's time is spent protecting the mark.

Britton heads a department that includes another attorney and two paralegals.

"One of our paralegals does nothing but police the use of the trademark, particularly on the Internet," says Britton. "She looks at the Net, she looks at all kinds of trade and car publications. She does anything she can to figure out how other people are using our mark. Some of its use is authorized, but most is not."

Britton spends some of her time in the same type of activity, and she enlists business people to do so as well. "They keep their eyes open and send us stuff all the time," she says.

Internet infringers range across a spectrum from near-legitimacy to hard-core pornographers. There are a few discussion forums for Porsche enthusiasts that the company is considering licensing, because the forums provide a service for customers. It is moving aggressively against the rest.

**"Porsche has spent many years and millions of dollars promoting the goodwill associated with its trademarks," says Patricia R. Britton, general counsel, Porsche Cars North America Inc. "They are Porsche's crown jewels and they must be protected."**

### OFFSHORE CORPORATIONS

In January, Porsche North America filed an unusual lawsuit in U.S. District Court, Richmond, Va. The suit was filed there because Internet domain names and registry certificates are filed with a company called Network Solutions Inc., headquartered in Herndon, Va.

"We filed against 129 infringers *in rem*," says Gregory D. Phillips, a partner at Howard Phillips & Andersen, Salt Lake City. Phillips is Porsche's outside trademark enforcement and litigation counsel.

"An *in rem* suit is one in which, instead of suing a corporation or a person, you sue 'the thing itself,'" Phillips explains. "We haven't sued any of the registrants of these domain names that use Porsche, we've sued the domain names themselves." Of those 129, more than 50 have already agreed to cancel their Internet domain names and have been dismissed from the suit.

The complaint reads *Porsche North America v. Porsch.com* and 128 other domain names. Among them are web sites such as *Porschegirls.com*, a pornography site, and *LAPorsche.com*, a specialty repair shop in Los Angeles. There are many after-market distributors' sites advertising parts for Porsches and other high-performance automobiles.

"There are people who traffic in these sites," says Phillips. "They buy up domain names and then go around to repair shops, for example, and sell the name. There are sites that sell counterfeit Porsche parts and unlicensed Porsche products such as t-shirts, for example. And many of them use the Porsche name and image to sell completely unrelated products."

According to Phillips, there are good reasons for proceeding *in rem*. Not ... are the domains guilty of wrongdoing, but as a practical matter, it is impossible to go around the world personally serving site operators. Internet infringers do all the things that other people do to hide assets in order to shield themselves from litigation.

"Many of them provide false addresses and contact addresses when they file with Network Solutions," says Phillips. "And many of them set up offshore corporations to insulate themselves from process.

"We found one domain name registered to a person in the United States and the registration is owned by a company in Teheran, Iran. A law firm in Seattle has been setting up Honduran companies that are used as registrants. So *in rem* is really the best way to proceed."

The suit does not ask for damages. The relief it seeks is forfeiture of the domain names.

The Court is being asked to allow Porsche to give notice to the registrants of each domain name that they have an opportunity to appear in court and explain why they should be allowed continued use of the name. If no one appears, or if an explanation is deemed inadequate, the Court is requested to delete the domain name or transfer it to Porsche North America.

"Hopefully this will solve our problem," says Phillips. He notes that registration of a domain name costs about $80 for two years and requires some small amount of paperwork. "If the operators see that we're going to aggressively render that investment of time and money valueless, maybe they'll quit."

Many of those who agreed to cancel their names were very understanding, once he explained how they might be degrading the trademark, no matter how inadvertently, says Phillips. "Some of them are very pro-Porsche," he says.

Others have simply gotten bad legal advice. The case law is clear that domains are not simply addresses, but can be protected like a business name, he says. "And as the case law becomes more established, people will become more educated," he says.

And while Phillips expects others to willingly cancel their domain names, he has no illusions that all of them will. It is clear some of those infringers are merely trying to capitalize on a famous name. He describes one defendant in the suit, who also has registered domain names that play off other famous automakers.

"We know it's unrealistic that everyone will cancel," he says. "We expect to end up litigating."

Meanwhile, Britton and her staff will keep searching for infringements. "Porsche has spent many years and millions of dollars promoting the goodwill associated with its trademarks," she says. "They are Porsche's crown jewels and they must be protected."

**Porsche Cars North America Inc. encourages people to take its cars, like this Boxster, for a spin. But it's fighting in court to stop illegal use of its name when webmasters do the same on the Internet.**

PORSCHE'S NEW 400-HP, 180-MPH 911 TWIN-TURBO!

# CAR AND DRIVER

MAY 1995 • CANADA $3.95 UK £1.95 US $2.95

## THE NEXT BIG THING!

# MINI-UTES

Suzuki's new X90...
X90
...and the Toyota RAV4, Chrysler Back Pack, Ford Fusion, Hyundai HCD III.

**COMPARED:** Six $25,000 mid-sized V-6 family sedans.
**FIRST DRIVES:** Acura TL, Infiniti I30, Volvo T-5R.
**TESTED:** Chevy Tahoe, Pontiac Grand Am, Toyota Tercel.

05
06275
0 272751 8





# Porsche 911 Turbo

## You could think of it as $15,000 per turbo—or F40-fast.

BY PETER ROBINSON

When Porsche began work on a new 911 at the end of the Eighties, there were no plans for a *turbocharged version. The old Carrera* 2–based 3.6-liter, introduced in 1993 and killed off little more than a year later, was to be the last 911 armed with a turbo.

Porsche was busy readying the 989 model—a four-door, four-seater V-8 that was later abandoned. And it was hurrying through final development of the 968 in an attempt (futile, as it turned out) to revive sales of the four-cylinder model. There was time for one last evolution of the ageless *911 before it would be replaced by the mid-*engined 996, due in 1996. But no Turbo.

Except that inside the Weissach factory and in the showroom, the Turbo's enthusiastic supporters refused to let it die. Now, 20 years since Porsche unveiled its first production supercar, the Turbo is back.

The desire to extract even more power meant discarding the old K-Jetronic fuel injection, replacing it with the latest electronic engine-management technology (*which Porsche calls Digital Motor Electronics*), increasing the compression ratio from 7.5:1 to 8.0:1, and employing the two turbos. The result is a mammoth 400 hp at 5700 rpm, 45 hp up on the old Turbo, plus a blistering 398 pound-feet of torque at 4500 rpm, making this the most powerful regular-production Porsche ever built. And

all thi engine cylind bank.

Wi megac Zuffer and 1 ican s legal ment.

Of profit tem t the w powe visco uses with and 4 eratio

Fo first T The r

PHOTOGRAPHY BY TIM WREN



all this hellfire comes from a flat-six engine that's still limited to two valves per cylinder and a single overhead cam per bank.

What of the 959, you ask? Yes, the megadollar 959 unshackled 444 hp, but Zuffenhausen only built 283 between 1987 and 1988, and the car was illegal on American streets. Think of the new Turbo as a legal 959 and you won't get an argument.

Of course, the new Turbo also profits from an all-wheel-drive system that on paper seems flawless in the way it automatically apportions power between the two axles via a viscous coupling, and the way it uses a limited-slip rear differential, with 25 percent locking under load and 40 percent locking under deceleration, to improve stability.

Four gears were sufficient for the first Turbo, five for the 3.3 Turbo. The new model has six. The lower three ratios match those on the normally aspirated 911, the top three are higher; sixth goes out to 0.75—compared with 0.82, on the same 3.44 final-drive ratio. Porsche says this allows the Turbo to reach 180 mph, a 6-mph hike over the old model.

Visually, the Turbo conforms to the revisions that make the latest Carrera the best-looking 911 ever. Of course, there's the mandatory whale-tail—a 911 Turbo needs this visual symbol to make room for the engine's massive intercoolers. This fixed rear wing has subtly curved fins on either edge and was designed in the wind tunnel to reduce lift.

In fact, the exhaust system, with its catalytic converters and silencers, is a miracle of packaging, requiring a wider and deeper rear bumper bar, which also helps house the gorgeous new 18-inch aluminum wheels. These have hollow rims and spokes, the two sections fused by friction welding. Instead of weighing 29 pounds each, the new wheels hit the scales at only 22 pounds apiece, a noteworthy savings in unsprung weight and one of the reasons the new Turbo only weighs about 3300 pounds, just 120 pounds more than the Carrera 4. The wheels also sit under bigger rear fenders, which add 2.4

29

inches to the Carrera's width.

At the nose, the modifications are limited to a deeper front spoiler-cum-bumper bar with extra vents for brake cooling. While the front fenders are identical to the 911's, the Turbo employs Bosch's new Litronic HID headlights to give an essential increase in lighting strength, even if the blue light is disagreeable to oncoming traffic. The rocker sills, pressed as part of the rear fenders, merge into the wider wheel arches. And there's now a small roofline extender that fits across the top of the rear window that serves as a high-mounted brake-light bracket.

New hollow wheels save 7 pounds each.

The result may lack the visual balance of normally aspirated Carreras, but Turbo fanatics will love the car's bulky hips and the massive tail that others see disturbing the harmony of the base 911's profile.

Porsche's decision to give each bank of three cylinders its own smaller turbo, rather than use one large turbo as before, means the buildup in power and boost is even more progressive than in the recent Turbo 3.6. It's immediately apparent to anybody familiar with the Jekyll-and-Hyde personality of early Turbos.

The Turbo now feels almost quiet and bereft of the wonderful mechanical sound of the normally aspirated Carreras. Yet at 3500 rpm, with the thrust surging urgently as the two turbos extract even more torque from the engine, the Porsche erupts. So although the boost is no longer clearly "on" or "off," there are still two modes of operation.

Porsche, which is typically conservative with performance claims, says the new Turbo reaches 62 mph in 4.5 seconds and is 0.3 second quicker than the Turbo 3.6—which we drove to 60 mph in 4.0 seconds. When you're hanging on to the steering wheel for support, punched back into the seat, the new 911 Turbo seems at least that swift. This is fast—as in Ferrari F40–fast, but not quite McLaren F1–fast.

Porsche's new chassis gives the Turbo far more predictable handling than the old model had, with the control-arm rear suspension extending the limits of roadholding way beyond those of the old car. Yes, it will still snap sideways, especially if the suspension and body are coping with an uneven surface just as all that torque hits home. But the firmness of the suspension and those ultralow profile tires mean the ride, while improved, is taut and noisy, especially on a coarse autobahn surface, and hard braking produces a lot of front-end hunting.

The new 911 Turbo brakes harder, corners better, and goes faster, with far more linear acceleration, than any of its predecessors. In character, this is almost (but not quite) a tamed animal. Yes, its performance is still electric, and nothing else at the same price is as quick. Yet for all its equipment and grunt, at an expected premium of $30,000 over the brilliant new Carrera 4, you'll have to be a committed Turbo groupie to see the value. •

**Vehicle type**: rear-engine, four-wheel-drive, 2+2-passenger, 2-door coupe

**Estimated price as tested**: $100,000

**Major standard accessories:** power steering, windows, seats, locks and sunroof, A/C, cruise control, rear defroster and wiper

**Sound system:** Blaupunkt Munich RD104 AM/FM stereo radio/cassette/CD player, 10 speakers

**ENGINE**

| | |
|---|---|
| Type | twin-turbocharged and intercooled flat 6, aluminum block and heads |
| Bore x stroke | 3.94 x 3.00 in, 100.0 x 76.4mm |
| Displacement | 220 cu in, 3596cc |
| Compression ratio | 8.0:1 |
| Engine-control system | Bosch M5.2 with port fuel injection |
| Emissions controls | 3-way catalytic converter, feedback fuel-air-ratio control, auxiliary air pump |
| Turbochargers | 2 KKK K16 |
| Waste gates | Porsche |
| Valve gear | chain-driven single overhead cams |
| Power (SAE net) | 400 bhp @ 5700 rpm |
| Torque (SAE net) | 398 lb-ft @ 4500 rpm |
| Redline | 6600 rpm |

**DRIVETRAIN**

| | |
|---|---|
| *Transmission* | *6-speed* |
| Final drive ratio | 3.44:1, limited slip |

**DIMENSIONS AND CAPACITIES**

| | |
|---|---|
| Wheelbase | 89.4 in |
| Track, F/R | 55.5/59.2 in |
| Length | 167.1 in |
| Width | 70.6 in |
| Height | 50.6 in |
| Curb weight | 3300 lb |
| Fuel capacity | 19.4 gal |
| Oil capacity | 12.2 qt |

**CHASSIS/BODY**

| | |
|---|---|
| Type | unit construction |
| Body material | welded steel stampings |

**INTERIOR**

| | | |
|---|---|---|
| SAE volume | front seat | 43 cu ft |
| | rear seat | 13 cu ft |
| | luggage space | 3 cu ft |
| Front seats | | bucket |
| Restraint systems | front | manual 3-point belts, driver and passenger airbags |
| | rear | manual 3-point belts |

**SUSPENSION**

| | |
|---|---|
| F | [illegible] strut located by [illegible] arm, [illegible] springs, anti-roll bar |
| R | [illegible] lower control arm with 1 lateral link, 1 diagonal link, and 2 toe-control links per side, coil springs, anti-roll bar |

**STEERING**

| | |
|---|---|
| Type | rack-and-pinion, power-assisted |
| Turns lock-to-lock | 2.5 |
| Turning circle curb-to-curb | 38.5 ft |

**BRAKES**

| | |
|---|---|
| F | 12.7 x 1.3-in vented disc |
| R | 12.7 x 1.3-in vented disc |
| Power assist | hydraulic with anti-lock control |

**WHEELS AND TIRES**

| | |
|---|---|
| Wheel size | F: 8.0 x 18 in, R: 10.0 x 18 in |
| Wheel type | cast aluminum |
| Tires | Bridgestone Expedia S-02; F: 225/40ZR-18, R: 285/30ZR-18 |

**MANUFACTURER'S PERFORMANCE RATINGS**

| | |
|---|---|
| Zero to 62 mph | 4.5 sec |
| Top speed (drag limited) | 180 mph |

**PROJECTED FUEL ECONOMY**

| | |
|---|---|
| Steady 56 mph | 29 mpg |
| Steady 75 mph | 24 mpg |
| European city cycle | 11 mpg |

**Porsche's power output and price remind us of, say, a Ferrari F355. And when we got the two together, we felt a comparison test coming on. As they say, "Watch this space."**



PHOTOGRAPHY BY RICHARD DOLE

# Porsche 911 GT2

## From the factory to the racetrack.

BY BARRY WINFIELD

When Dave Maraj of Champion Porsche in Pompano Beach, Florida, ordered a new GT2 race car from the Weissach factory, he told the Germans it would be raced at Daytona. (Based on the latest Porsche 911 Turbo, the GT2 is eligible for IMSA GTS-1, SCCA World Challenge, and GT2 races such as Le Mans.) So the technicians at Porsche simply plugged the car's performance data into a computer model of the Daytona trioval and outfitted its six-speed transmission and final drive with ratios based on their calculations. They also sent tech representative Roland Kussmaul to chaperone the GT2 at its inaugural U.S. event.

During practice for the Daytona 24-Hour sports-car race, the drivers—Hans Stuck, Bill Adam, Harold Grohs, and SCCA Trans-Am champ Dorsey Schroeder—discovered that the Porsche would actually enter the back straight on the famous trioval so fast in sixth gear that its tachometer warning light would flicker red, just a few electrons short of rev-limiter interference. Was the gearing too short, they wondered?

*Nein*, insisted Kussmaul. The ratios were right for the race, and should be retained. Instead, he changed the engine-management chip, allowing a few more revolutions before the limiter stepped in. It seemed to do the trick. The GT2 ran fast enough straight out of the box that it was leading the GT class and running seventh overall (against dedicated WSC race cars) at Daytona when an accident shortened its promising debut. The Porsche was about seven hours into the 24-hour race, with Stuck at the wheel, when actor Craig T. Nelson's Nissan spun, causing all the cars behind it to hit the brakes. Then Jeremy Dale's Spice-Oldsmobile WSC car plowed into the back of Stuck's Porsche. Although the impact spun the car, the damage wasn't extensive. But it was enough to injure the ignition electronics, snuffing the sparks and ending the car's fine first run.

Disappointing as it was to the team, Daytona is still a predictor of the car's potential. Remember, the GT2 Porsche is just a specially modified version of Porsche's new 911 Turbo street car. Despite the add-on fender flares, the full roll cage, the extinguishers, the airjacks,







the fuel cell, the flamboyant paint job, and the wide racing tires on three-piece BBS wheels, the GT2 wears unmistakable traces of its production-car heritage—details like the fan and fog-light switches, a complete glovebox, and instrumentation just like that on any 911 road car. And when you look past the Recaro racing seat and the anti-roll-bar adjustment lever (a $4500 option), down in the footwell, you see the familiar Porsche rubber pedals.

Like the new 911 Turbo, the GT2 is powered by a twin-turbocharged and intercooled flat six displacing 3.6 liters. It makes considerably more power than the road car. Porsche's conservative estimate is 450 horsepower, a number that driver Bill Adam thinks is probably 100 shy of reality. It achieves 100 mph in 6.5 seconds, 2.7 seconds quicker than the 911 Turbo we tested in the May 1993 issue. Quite unlike the road car, the GT2's hood and doors are aluminum, its side and rear window glass are paper-thin, its rear wing is adjustable, and it's rear-drive rather than all-wheel-drive.

Adam is clearly enthusiastic about the new car. "The twin-turbo is much more progressive than any of the previous racing 911 Turbos I've driven," he says. "It doesn't feel at all like a turbocharged car above 4500 rpm, because throttle on-off transitions have no trace of lag. The torque is actually quite good as low as 3500 rpm, and the power builds predictably. I can remember racing older 911 Turbos where you'd have to be hard on the throttle as soon as you'd finished braking to get boost out of the corner. Then the old car would come in with a bang, and you were never sure exactly when."

The GT2 wears the new 911 Turbo's multilink rear suspension, a mechanism that Adam thinks adds considerably to improved handling. "Not only is the car less tail-happy than any 911 of recent memory," he says, "but front-end grip is so good that we actually had to reduce turn-in for Daytona. We plan to restore that after we have the rear end rebuilt with solid bushings for Sebring."

The brakes, Adam says, are incredibly good. There are huge 15-inch rotors up front (a $6800 item on Porsche's price list), straddled by beefy calipers and managed by Bosch ABS V with race calibration. Other trick race-ready gadgets on the Champion car include adjustable front shock absorbers ($3400), a reserve pump setup ($950), and appropriate engine electronics ($3600). These little extras drive the price of the GT2 to about double what a new 911 Turbo will cost you, but people who've paid for race cars in the past will tell you it's as good a bargain as you can get. ●

Intakes and slots on whale-tail wing feed the induction system and intercooler. Stock dashboard and shifter knob are reminders of street origins.

**Vehicle type:** rear-engine, rear-wheel-drive, 1-passenger, 2-door coupe
**Price as tested:** $203,351 (base price: $182,000)
**Engine type:** twin-turbocharged and intercooled SOHC 12-valve flat 6, aluminum block and heads, Bosch engine-control system with port fuel injection

| | |
|---|---|
| Displacement | 220 cu in, 3596cc |
| Power (mfr's est) | 450 bhp @ 5800 rpm |
| Transmission | 6-speed |
| Wheelbase | 89.4 in |
| Length | 167.0 in |
| Curb weight | 2447 lb |
| Zero to 60 mph | 3.1 sec |
| Zero to 100 mph | 6.5 sec |
| Zero to 130 mph | 10.9 sec |
| Zero to 150 mph | 15.4 sec |
| Standing 1/4-mile | 11.0 sec @ 131 mph |
| Top speed (governor limited) | 197 mph |

# ROAD & TRACK®

JULY 1995 $2.95 CANADA $3.95 UK £1.95

# TURBO!

WE TEST PORSCHE'S HIGH-FLYING 400-BHP SUPERCAR

PLUS: Porsche Turbos Through the Years

ALSO TESTED: LOTUS ESPRIT S4S—Stunning 4-Cylinder Performance

DODGE NEON SPORT COUPE—Inexpensive Fun

07
06416
0 274161 5

## *1991-1992*

The third-generation Turbo. Porsche used the so-called Type 964 platform, which sported the new Carrera's reengineered, coil-spring suspension, stiffer chassis and restyled body. Although the 3.3-liter engine was fundamentally unchanged, minor revisions increased horsepower and torque and added a bit of sizzle to the Turbo's performance. And while the Carrera Turbo's acceleration may be only marginally better, handling was vastly improved, thanks not only to the car's new suspension, but also to its wider and taller (17-in.-diameter) wheels and super-low-profile tires that gave the Turbo ill the grip to match its get-up-and-go.

Rear .

PHOTO BY DEAN SIRACUSA





  Automobili Ferrari

Intro

Design

Chassis

Engine

Specs

***Introduction***

In the early days of its activity, almost fifty years ago, Ferrari built cars which could be used, with only a few minor alterations, for Formula 1 or Sport events or for everyday use.

However, as Formula 1 cars evolved, it became impossible for someone who was not a team driver or a collector capable of passing a series of private tests on the track, to take the wheel of a racing Ferrari. Today Ferrari has decided to give all its clients once again the possibility of experiencing this emotion. And here is its response to this technological challenge: the F50. The fruit of research based exclusively on Ferrari's vast experience in this field which has produced in its history, 45 racing models and endless Granturismo and Sport models, the F50 adopts the same constructional criteria as a Formula 1, putting it at the service of our roads and their constraints.

The carbonfibre monocoque which encloses the aeronautical rubber fuel tank, the V12 engine that acts as a bearing structure for the gearbox-differential-rear suspension assembly, the pushrod suspension, and separate band braking system reproduce the basic principles of a racing car. But the project was interpreted so as to bring the outstanding concept of this sophisticated engineering into the dimension of normal, safe use in all situations.







The outcome of this work by Ferrari engineers is a car with a specific power output of 109 HP/litre (SAE) and an extraordinary chassis, that combines unbeatable performance with pinpoint handling and total safety even in unexpected or extraordinary circumstances.

© 1998 Ferrari North America. All rights reserved.

Trademark Examining Attorney reinstates the potential Section 2(d) refusal of Tamarkin's application, and Tamarkin is unable to overcome that potential refusal (*e.g.*, by submitting a properly drafted and persuasive consent agreement between Tamarkin and Seaway),[11] then proceedings herein will be resumed and Tamarkin will be allowed time to show cause why the opposition should not be dismissed in view of its failure to present any evidence in support of its claim. Conversely, if the potential Section 2(d) refusal of Tamarkin's application is not reinstated by the Trademark Examining Attorney upon remand, or if the potential refusal is overcome by Tamarkin and its mark is approved for publication, it is likely that the parties may agree that this opposition proceeding can be dismissed, resulting in registration of Seaway's mark for the services recited in the application, including trade channel limitations incorporated therein.

If, during the suspension period, either of the parties or their attorneys should have a change of address, the Board should be so informed.

In summary, IT IS HEREBY ORDERED THAT:[12]

1. Applicant's motion to amend its application Serial No. 74/186,692 to one seeking a concurrent registration is denied, and the proposed amendment is rejected.

2. Proceedings herein are suspended pending the outcome of ex parte prosecution of opposer's application Serial No. 74/342,667, subject to the right of either party to request resumption of proceedings at any time prior thereto.

---

**U.S. District Court**
***Western District of Washington***

Dr. Ing. h.c.F. Porsche AG v. Universal Brass Inc.

No. C94-792C

Decided February 23, 1995

## TRADEMARKS AND UNFAIR TRADE PRACTICES

**1. Infringement; conflicts between marks — Likelihood of confusion — Particular marks — In general (§335.0304.01)**

**Infringement; conflicts between marks — Passing off (§335.07)**

Defendant's unauthorized use of plaintiff's "Porsche" marks on its automobile accessories does not warrant summary judgment of likelihood of confusion as to source, even though marks are strong and plaintiff makes its own "Porsche" automobile accessories, since evidence supports claim that many of defendant's products carry indication that they are manufactured by defendant; summary judgment of likelihood of confusion as to sponsorship or authorization is granted, however, in view of evidence of actual confusion and defendant's placement of trademark registration symbol next to "Porsche" crest on its products.

**2. Acquisition, assignment, and maintenance of marks — Scope of trademark — Expansion of goods/territory (§305.0206)**

**Acquisition, assignment, and maintenance of marks — Acquisition through use — Priority of use (§305.0503)**

Defendant's unauthorized use of "Porsche" marks on its products prior to *plaintiff's registration of marks did not give* defendant superior rights in marks, since business expansion doctrine protects plaintiff not only for product lines for which "Porsche" mark was registered, but also for product lines within range of plaintiff's natural business expansion, and since infringing line of automobile accessories is within that range.

**3. Infringement; conflicts between marks — Defenses — Laches or limitations period (§335.1005)**

Plaintiff's claim for infringement of its "Porsche" marks is not barred by laches, since marks are strong, since plaintiff has diligently enforced its rights to marks, since *defendant did not use its plaintiff's marks in* good faith, and since harm to plaintiff from defendant's continued unauthorized use of marks outweighs any harm to defendant from delay.

**4. Types of marks — Trade dress as mark — Functionality (§327.0706)**

Doctrine of aesthetic functionality is inapplicable in action alleging infringement of

---

[11] *See, e.g., In re E. I. DuPont DeNemours & Co.*, 476 F.2d 1357, 177 USPQ 563 (CCPA 1973); *Bongrain International (American) Corp. v. Delice de France, Inc.*, 811 F.2d 1479, 1 USPQ2d 1775 (Fed. Cir. 1987).

[12] This decision is interlocutory in nature. Appeal may be taken within two months after the entry of a final decision in the case. *See Copelands' Enterprises Inc. v. CNV Inc.*, 887 F.2d 1065, 12 USPQ2d 1562 (Fed. Cir. 1989).

plaintiff's "Porsche" trademarks, since application of doctrine is disfavored, since plaintiff employs its "Porsche" marks primarily to designate origin or sponsorship of goods, and since application of doctrine in present case would improperly permit aesthetic appeal of marks to overtake such primary function.

---

Action by Dr. Ing. h.c.F. Porsche AG and *Porsche Cars North America Inc. against* Universal Brass Inc., Myron Lewis and Jane Doe Lewis, for trademark infringement and false designation of origin under 15 USC 1114(1) and 15 USC 1125(a), and unfair competition under state law. On plaintiffs' motion for partial summary judgment. Granted in part and denied in part.

Michael Ramsey Scott, of Hillis, Clark, Martin & Peterson, Seattle, Wash.; Gregory D. Phillips and Scott R. Ryther, of Kimball, Parr, Waddoups, Brown & Gee, Salt Lake City, Utah, for plaintiffs.

James W. Feltus, of McGravick Graves, Tacoma, Wash., for defendants.

**Coughenour, J.**

This matter comes before the Court on the motion of Dr. Ing. h.c.F. Porsche AG and Porsche Cars North America (henceforth "Porsche") for partial summary judgment.[1]

## I. FACTS

Porsche AG is a German company located in Stuttgart. Its sole U.S. licensee and distributor is Porsche Cars North America, located in Reno, Nevada. Porsche deals with a network of about 210 independent Porsche car dealerships, which are the sole authorized sellers of new Porsches and genuine Porsche parts and accessories. Porsche has registered its trademarks for use with automobiles and a large variety of accessories, including key cases, key fobs, luggage, sport bags, coasters, domestic utensils, and others.[2]

Universal Brass, Inc. (UBI) is wholly owned and operated by Myron Lewis. UBI manufactures and sells automobile accessories, such as key chains, license plate frames, valve stem caps, paper weights, and others. Many of these items start out as brass "blanks," which UBI engraves with various clichés and logos. UBI sells its products to auto dealerships and boutiques. UBI also sells through catalog retailers.

*There is no dispute that UBI copies registered* Porsche trademarks on the items it manufactures. UBI began making and selling accessories with the trademarked Porsche name and the Porsche crest in 1980 or 1981. When Porsche became aware of the infringement in 1986, it sent letters, dated November 11, 1986 and January 6, 1987, demanding that UBI cease using the Porsche marks. UBI wrote back claiming that it did not manufacture any items using the Porsche trademarks.

In continuing correspondence of this sort, UBI consistently responded that it was not selling products with the Porsche logo, when in fact it was. In 1987, UBI attempted to obtain a licensing agreement or to become an authorized supplier of Porsche products. Porsche declined the offer. Then, in 1992, UBI offered to manufacture certain items for resale by Porsche and its authorized dealers. *Porsche provided UBI with images* of its trademarks for the purpose of having UBI make samples of the proposed products. Porsche, after receiving the samples, declined to license UBI as an authorized Porsche supplier. UBI nevertheless began using the trademark images to manufacture unauthorized counterfeits of Porsche trademarks. UBI admits that it obtained the trademark images from Porsche.

On some of its products, UBI reproduces not only the Porsche crest and the Porsche name logo, but also reproduces the ® mark. Certain UBI products identify UBI as the

---

[1] Porsche styles its motion as one for summary judgment. However, Porsche has not briefed any issues related to the relief sought. Therefore, the Court construes the motion as one for partial summary judgment on the issue of liability.

[2] The Porsche registered trademarks include the following: (1) U.S. Reg. No. 618,933 (1956) for the underlined, stylized word "Porsche," for use with automobiles and automobile parts; (2) U.S. Reg. No. 1,279,014 (1984) for the stylized word "Porsche," for use with pill boxes, vases, flasks, small domestic utensils and containers, glass, porcelain and earthenware, beverageware, dinnerware, brushes, combs, and leather coasters, (3) U.S. Reg. No. 1,280,748 (1984) for the stylized word "Porsche," for use with articles of leather or imitation leather, including luggage, suitcases, handbags, briefcases, key fobs, key cases, key pouches, wallets, purses, all-purpose sports bags, parasols, and umbrellas; (4) U.S. Reg. No. 618,932 (1956) for the Porsche crest, for use in connection with automobiles and automobile parts; (5) U.S. Reg. No. 1,292,862 (1984) for the Porsche crest, for use on articles of leather or imitation leather, including luggage, suitcases, handbags, briefcases, key fobs, key cases, key pouches, wallets, purses, all-purpose sports bags, *parasols, and umbrellas.*

(JBI) is wholly
ron Lewis. UBI
mobile accesso-
ise plate frames.
hts, and others.
t out as brass
ves with various
its products to
ques. UBI also
rs.
BI copies regis-
on the items it
making and sell-
trademarked
he crest in 1980
me aware of the
it letters, dated
nuary 6, 1987,
sing the Porsche
ning that it did
sing the Porsche

nce of this sort,
that it was not
sche logo, when
I attempted to
or to become an
sche products.
Then, in 1992,
certain items
its authorized
BI with images
pose of having
posed products.
samples, de-
an authorized
rtheless began
o manufacture
Porsche trade-
obtained the
che.
JBI reproduces
nd the Porsche
es the ® mark.
fy UBI as the

with articles of
luding luggage,
key fobs, key
ses, all-purpose
rellas; (4) U.S.
Porsche crest.
obiles and auto-
292,862 (1984)
ticles of leather
gage, suitcases,
key cases, key
se sports bags.

manufacturer. For example, some UBI key chains bear a "mint mark" on the reverse side which indicates that UBI manufactured the object. License plate frames and paperweights have UBI stickers on the reverse side. Also, UBI's current brochures, which are distributed to retailers of UBI products, advise the retailer that Porsche does not approve, authorize, or sponsor UBI's products.

## II. STANDARD OF REVIEW

Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions, together with affidavits, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(c). Under the Rule, summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552 (1986).

## III. LANHAM ACT CLAIMS

Porsche moves for summary judgment on its Lanham Act claims for trademark infringement and false designation of origin. The trademark provision of the Lanham Act prohibits the use in commerce of a "reproduction, counterfeit, copy, or colorable imitation of a registered mark" in connection with the sale or distribution of goods when such use is likely to cause confusion or mistake, or to deceive. 15 U.S.C. § 1114(1). The false designation of origin provision of the Lanham Act prohibits the use in commerce of "any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin" which is likely to cause confusion or mistake, or to deceive "as to the origin, sponsorship, or approval of his or her goods. . . ." 15 U.S.C. § 1125(a).

There is no dispute that UBI is using registered Porsche trademarks on its products in connection with the sale and distribution of its goods. UBI argues that it is not liable because (1) there is no likelihood of confusion, (2) UBI used the marks prior to registration by Porsche, (3) the doctrine of laches prevents Porsche from claiming infringement, and (4) the trademarks are aesthetically functional.

### A. Likelihood of Confusion

The gravamen of any trademark infringement or false designation claim is the factual inquiry into whether the defendant's use of a mark is likely to confuse the public. The Court considers the following factors in determining likelihood of confusion: (1) strength of the mark; (2) proximity or relatedness of the goods; (3) similarity of the sight, sound, and meaning of the marks; (4) evidence of actual confusion; (5) degree to which the marketing channels converge; (6) type of goods and degree of care consumers are likely to exercise in purchasing them; (7) intent of the defendant in selecting the infringing mark; and (8) likelihood that the parties will expand their product lines. *E. & J. Gallo Winery v. Gallo Cattle Co.*, 967 F.2d 1280, 1290 [21 USPQ2d 1824] (9th Cir. 1992). The presence or absence of a particular factor does not necessarily drive the determination of a likelihood of confusion. *Id.* at 1290-91.

[1] Confusion as to source is the initial focus of the "likelihood of confusion" inquiry. A trademark owner has a property right insofar as it is necessary to prevent consumer confusion as to who produced the goods and to facilitate differentiation of the trademark owner's goods. *International Order of Job's Daughters v. Lindeburg & Co.*, 633 F.2d 912, 919 [208 USPQ 718] (9th Cir. 1980), *cert. denied*, 452 U.S. 941 [213 USPQ 1056] (1981). Although the Porsche marks are strong and Porsche makes accessory products of its own, the Court concludes that Porsche has not presented sufficient evidence to warrant summary judgment on the claim of confusion as to source. In particular, the Court notes that evidence of inquiries by dealers and evidence of UBI's use of the ® mark, are more indicative of confusion as to sponsorship than of confusion as to source. In addition, there is evidence to support UBI's claim that many of its products indicate that UBI, not Porsche, is the manufacturer. Porsche has thus failed to meet its burden of proving that no genuine issue of material fact exists regarding likelihood of confusion as to the source of UBI's accessories.

However, the Court concludes that there is no genuine issue of material fact on the issue of confusion as to sponsorship. Porsche may prevail on its Lanham Act claims by demonstrating confusion as to sponsorship or authorization of the goods. *HMH Publishing Co. v. Brincat*, 504 F.2d 713, 716 [183 USPQ 141] (9th Cir. 1974); *see also Boston Professional Hockey Ass'n v. Dallas Cap & Emblem Mfg., Inc.* 510 F.2d 1004, 1012 [185 USPQ 364] (5th Cir. 1975); *Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd.*, 604 F.2d 200, 204-05 [203 USPQ 161] (2d Cir. 1979). In the context of sponsorship confusion, the central issue is

whether the public believes the product bearing the infringing marks is sponsored, endorsed, or authorized by the owner of the marks. *National Football League Properties, Inc. v. Wichita Falls Sportswear, Inc.*, 532 F.Supp. 651, 659 [215 USPQ 175] (W.D. Wash. 1982).

The Court finds that Porsche has provided ample evidence that UBI's use of Porsche's trademarks would likely confuse the public regarding Porsche's sponsorship or authorization of UBI's use of the marks. As noted above, Porsche has submitted evidence that UBI received inquiries from customers as to whether UBI is authorized to sell genuine Porsche products. In addition, Porsche submitted evidence that UBI places the trademark registration symbol, ®, next to the Porsche crest. The Court concludes that the evidence of *actual* confusion as to authorization, coupled with UBI's use of the ® symbol, make it such that no rational trier of fact could find that confusion as to Porsche's sponsorship is unlikely. Thus, no *genuine* issue of material fact remains on the issue of confusion as to sponsorship. Porsche is therefore entitled to summary judgment on its Lanham Act claims of trademark infringement and false designation of origin.

B. Prior Use

[2] UBI argues that it used the "Porsche" mark on certain products prior to registration of the mark by Porsche for those types of products, and that therefore, its claim to the trademark for purposes of these product lines is superior to Porsche's. This claim deserves little attention. Under the business expansion doctrine, a trademark owner is protected not only for the product lines for which the mark was registered, but also for product lines within the owner's natural business expansion. *Jaguar Cars Ltd. v. Skandrani*, 771 F.Supp. 1178, 1184-85 [6 USPQ2d 1478] (S.D. Fla. 1991) (citing *Rodeo Collection, Ltd. v. West Seventh*, 812 F.2d 1215, 1219 [2 USPQ2d 1204] (9th Cir. 1987)). UBI has no superior claim to Porsche marks for UBI's product lines, all of which are within the natural business expansion of Porsche.

C. Laches

UBI argues that Porsche is barred by the doctrine of laches from enforcing its infringement claims. In evaluating a claim of laches, the Court considers (1) the strength and value of the trademark rights asserted; (2) plaintiff's diligence in enforcing the mark; (3) harm to the senior user if relief is denied, (4) good faith ignorance by the junior user; (5) competition between the senior and junior users; and (6) he extent of harm suffered by the junior user because of the senior user's delay. *E-Systems, Inc. v. Monitek, Inc.*, 720 F.2d 604, 607 [224 USPQ 115] (9th Cir. 1983).

[3] On balance, these factors tip in favor of Porsche. The strength and value of Porsche's mark is unquestioned. Porsche diligently enforced its rights to the mark, writing several times to UBI only to be met with blanket denial by UBI of its use of the Porsche marks. UBI did not use the mark in good faith; rather, UBI relies on its theory of aesthetic functionality as a defense to its open use of marks it knew were registered by another. The Court also concludes that the harm to Porsche outweighs the harm to UBI. Porsche faces dilution of its mark by UBI's use, and finds itself in competition with UBI in accessory lines. UBI, on the other hand, continued to use the marks after repeated requests by Porsche to cease. UBI is in no position now to claim that it will lose its business investments if ordered to cease using Porsche marks. UBI's claim of laches is therefore rejected.

D. Aesthetic Functionality

UBI argues that its use of Porsche's trademarks is not infringement because the marks are "aesthetically functional." UBI relies on *International Order of Job's Daughters v. Lindeburg & Co.*, 633 F.2d 912 [208 USPQ 718] (9th Cir. 1980). In *Job's Daughters*, the defendant sold jewelry and related items bearing the insignia of the Job's Daughters organization. Since its establishment in 1921, Job's Daughters had been using its name and emblem as collective marks. The court held that the defendant's use of the Job's Daughters' name and emblem were not actionable since they were simply functional aesthetic components of the jewelry. *See also Pagliero v. Wallace China Co.*, 198 F.2d 339 [95 USPQ 45] (9th Cir. 1952).

[4] The Court is persuaded, however, that the doctrine of aesthetic functionality is inapplicable here. First, the doctrine has been limited, if not rejected, in this circuit. *First Brands Corp. v. Fred Meyer, Inc.*, 809 F.2d 1378, 1382, n.3 [1 USPQ2d 1779] (9th Cir. 1987) (citing *Vuitton Et Fils S.A. v. J. Young Enterprises, Inc.*, 644 F.2d 769, 773 [210 USPQ 351] (9th Cir. 1981) and *Fabrica Inc. v. El Dorado Corp.*, 697 F.2d 890, 895 [217 USPQ 698] (9th Cir. 1983)

Second, the doctrine has been rejected or criticized, with good reason, by several other courts and commentators. *See e.g., American Greetings Corp. V. Dan-Dee Imports, Inc.*, 807 F.2d 1136 [1 USPQ2d 1001] (3rd Cir. 1986); *Sicillia Di R. Biebow & Co. v.*

*Cox*, 732 F.2d 417 (5th Cir. 1984); *Ferrari s.p.a. Esercizio Fabriche Automobile E Corse v. Roberts*, 944 F.2d 1235 [20 USPQ2d 1001] (6th Cir. 1991); *In re D.C. Comics, Inc.*, 689 F.2d 1042 [215 USPQ 394] (C.C.P.A. 1982); *University of Georgia Athletic Ass'n v. Laite*, 756 F.2d 1535, 1546 [225 USPQ 1122] (11th Cir. 1985); McCarthy on Trademarks § 7.26 [5]. *But cf. Wallace Int'l Silversmiths, Inc. v. Godinger Silver Art Co.*, 916 F.2d 76 [16 USPQ2d 1555] (2d Cir. 1990); Alex Kozinski, *Trademarks Unplugged*, 68 N.Y.U. L. Rev. 960 (1993).

Third, *Job's Daughters* and its ancestor *Pagliero* are inapposite on their facts. The *Job's Daughters* court addressed the use of a collective mark, an emblem the sole purpose of which was to identify association with, or membership in, the organization. The Job's Daughters organization was not a producer of goods using the emblem to identify the source or sponsorship of goods. Similarly, the court in *Pagliero* analyzed the functional use of decoration on hotel china. Again, the sole purpose of the "trademark" pattern was to appeal to the aesthetic sensibility of the consumer. Here, however, Porsche employs its trademark primarily to designate the origin of goods or its sponsorship of goods produced by others. In this context, the aesthetic appeal of the mark cannot be allowed to overtake the primary function of the mark as a designation of origin or sponsorship. Even the *Job's Daughters* court recognized that an appropriator's right to use the owner's mark was subject to the proviso that it not be "accomplished by confusing the public into mistakenly purchasing the product in the belief that the product is [that] of the [trademark owner]." *Job's Daughters*, 633 F.2d at 919. As noted above, Porsche has established confusion as to sponsorship and UBI has done little to counter the potential for confusion resulting from its precise copying of Porsche's marks and its use of the ® mark on the UBI counterfeits. UBI cannot, therefore, invoke aesthetic functionality, whatever might remain of the doctrine, to avoid liability.

## IV. UNFAIR COMPETITION

Under Washington unfair competition law, a person may not use a name which is the distinctive feature of a trade name already in use by another, if such use by the one person tends to confuse, in the public mind, the business of such person with that of the other. *Money Savers Pharmacy, Inc. v. Koffler Stores (Western), Ltd.*, 37 Wash. App. 602, 606-07, 682 P.2d 960, 963 (1984) (quoting *Holmes v. Borden Brokerage Co.*, 51 Wash. 2d 746, 750-51, 321 P.2d 898 [116 USPQ 539] (1958)). This likelihood of "confusion of business entity" test is essentially a confusion as to source test. The Court concludes, for the reasons discussed above, that Porsche has failed to demonstrate that there are no genuine issues of material fact on the issue of confusion as to source. Therefore, summary judgment on this claim must be DENIED.

## V. CONCLUSION

Porsche's motion for summary judgment on the issues of trademark infringement and false designation of origin is GRANTED. Porsche has demonstrated the requisite likelihood of confusion as to sponsorship necessary to meet the elements of both claims. Porsche's motion for summary judgment on the issue of unfair competition is DENIED. Porsche's request for oral argument is DENIED. *See Dredge Corp. v. Penny*, 338 F.2d 456, 462 (9th Cir. 1964); *Houston v. Bryan*, 725 F.2d 516, 517-18 (9th Cir. 1984).

SO ORDERED.

---

**U.S. Court of Appeals**
**Federal Circuit**

ABB Robotics Inc. v. GMFanuc Robotics Corp.

No. 94-1334

Decided April 21, 1995

**PATENTS**

**1. Infringement — Defenses — Estoppel; laches (§120.1103)**

Threat of immediate enforcement of patent by plaintiff, followed by period of silence, is not sole manner in which silence can be misleading action supporting finding of estoppel; in present case, plaintiff's long period of inaction following defendant's denial of infringement accusation, combined with other factors, including relationship between plaintiff and defendant's parent corporation and defendant's knowledge that plaintiff was not losing sales to alleged infringement, led defendant to reasonably conclude that plaintiff did not intend to enforce patent in suit.

**2. Infringement — Defenses — Estoppel; laches (§120.1103)**

Federal district court deciding issue of estoppel in patent infringement action did

tract provisions, under which Amgen exercised its right to sue alone and keep all damages, would control *regardless* of whether or not Ortho had an exclusive license. We conclude that the right to sue clause has no effect in this case.

First, a licensee with sufficient proprietary interest in a patent has standing regardless of whether the licensing agreement so provides. Express covenants may, of course, regulate the duties between the licensor and licensee to implement the rights of the parties. *Independent Wireless Co.*, 269 U.S. at 469; *Abbott Labs.*, 1995 WL 50152, at *7. However, a contract cannot change the statutory requirement for suit to be brought by the "patentee." By the same token, a right to sue clause cannot negate the requirement that, for co-plaintiff standing, a licensee must have beneficial ownership of some of the patentee's proprietary rights. A patentee may not give a right to sue to a party who has no proprietary interest in the patent. *Crown Die & Tool Co. v. Nye Tool & Machine Works*, 261 U.S. 24, 44 (1923); *see also Lifetime Doors, Inc. v. Walled Lake Door Co.*, 505 F.2d 1165, 1167-68, 184 USPQ 1, 2 (6th Cir. 1974) (bare licensee has no right to be *in suit* or to appeal; such authorization by patentee has no effect); *Overman Cushion Tire Co. v. Goodyear Tire Rubber Co.*, 59 F.2d 998, 14 USPQ 104 (2d Cir.), *cert. denied*, 285 U.S. 545 (1932) (nonexclusive licensee has no right to sue or be joined in suit); *Philadelphia Brief Case Co.*, 145 F. Supp. at 429-30, 111 USPQ 180, 183 (contract clause cannot give right to sue where licensee would *otherwise have* no such right). Here, being only a nonexclusive licensee, Ortho has no inherent or implied right to sue which the clause regulates as between the parties. Thus, we conclude the right to sue clause has no effect on Ortho's standing, one way or the other.

Secondly, under the cited precedent, the requirement that a licensee sue in the name of the patentee is not merely a *formality. The* patentee is brought into the suit for substantive reasons, namely, to protect its own interests in connection with the charged acts of infringement and "to enable the alleged infringer to respond in one action to all claims of infringement for his act." *Independent Wireless Co.*, 269 U.S. at 468.

A licensee cannot stand by until a patentee's suit is concluded and then seek to vindicate its rights in a second suit. As stated in *Birdsell v. Shaliol*, 112 U.S. 485, 486-87 (1884):

> [W]hen a suit . . . has been brought and prosecuted, in the name of the patentee alone, with the licensee's consent and concurrence, to final judgment from which, if for too small a sum, an appeal might have been taken in the name of the patentee, we should hesitate to say merely because the licensee was not a formal plaintiff in that suit, that a new suit could be brought to recover damages against the same defendant for the same infringement.

While Ortho sought to become part of Amgen's suit at trial, on appeal Ortho seeks approval of an independent second suit in the *name* of Amgen against the same infringer for the same acts of infringement, namely, Genetics use of the patented '008 technology in the United States, which was the subject of Amgen's suit. Ortho does not claim it was a necessary or indispensable party to Amgen's suit, did not appeal the denials of intervention therein, and did not appeal the order deconsolidating this suit from Amgen's. *Moreover*, the parties advised the court at the hearing that the Amgen/-Genetics litigation has been settled. Thus, Ortho has effectively consented and concurred to suit in the name of the patentee alone.

## IV. CONCLUSION

For the foregoing reasons, the judgment is *AFFIRMED*.

---

**U.S. District Court**
**Northern District of California**

Hewlett-Packard Co. v. Repeat-O-Type Stencil Manufacturing Corp.

No. C-92-3330 DLJ

Decided February 7, 1995

### TRADEMARKS AND UNFAIR TRADE PRACTICES

**1. Infringement; conflicts between marks — Likelihood of confusion — Particular marks — Confusion likely (§335.0304.03)**

**Infringement; conflicts between marks — Likelihood of confusion — Relatedness of goods or services — Similar (§335.0305.03)**

Summary judgment of trademark infringement is warranted against defendants that modified plaintiff's inkjet print cartridges and repackaged them for sale in plaintiff's boxes, since accused products bear

plaintiff's marks and logos and thus easily mislead consumers, since plaintiff's registered "Hewlett-Packard" marks are strong, since parties' products are in close proximity and use similar marketing channels, since consumers are not likely to exercise high degree of care in purchasing print cartridges, and since defendants' intentional use of plaintiff's marks suggests intent to deceive consumers.

### PATENTS

**2. Infringement — In general (§120.01)**

**Infringement — Defenses — Permissible repair (§120.1115)**

Defendants have not infringed plaintiff's patents for ink jet printhead and ink jet pen by replacing ink in ink reservoirs of plaintiff's inkjet print cartridges, since neither ink nor reservoir cap, which is modified by defendants to allow refilling of reservoir, are elements of patents in suit, which claim certain components of print cartridges but not cartridges themselves, and since defendants thus have not made or remade anything on which plaintiff holds patent.

**Particular patents — Electrical — Ink jet printing**

4,827,294, Hanson, thermal ink jet printhead assembly employing beam lead interconnect circuit, summary judgment of non-infringement granted.

4,931,811, Cowger, Nielsen, Dion, thermal ink jet pen having a feedtube with improved sizing and operational with a minimum of depriming, summary judgment of non-infringement granted.

-----

Action by Hewlett-Packard Co. against Repeat-O-Type Stencil Manufacturing Corp. and Fred Keen, for trademark and patent infringement. On parties' cross-motions for summary judgment on patent infringement issue and on plaintiff's motion for partial summary judgment on trademark claims. Partial summary judgment for plaintiff granted on trademark claims; summary judgment for defendant granted on patent infringement claim.

Bruce W. Schwab of Townsend and Townsend Khourie and Crew, San Francisco, Calif., and Morgan Chu of Irell & Manella, Los Angeles, Calif., for plaintiff.

Edward F. O'Connor of Poms, Smith, Lande & Rose, Irvine, Calif., for defendant Repeat-O-Type Stencil Manufacturing Corp., and David A. Gauntlett of Callahan & Gauntlett, Irvine, for defendant Fred Keen.

**Jensen, J.**

On November 23, 1994, the Court heard arguments on plaintiff's and defendants' cross-motions for summary judgment on plaintiff's patent claims and plaintiff's motion for summary judgment on the trademark claims. Bruce W. Schwab of Townsend and Towsend Khouria and Crew and Morgan Chu of Irell & Manella appeared on behalf of plaintiff Hewlett-Packard Company. Edward F. O'Connor of Poms, Smith, Lande & Rose appeared on behalf of defendant Repeat-O-Type Stencil Manufacturing Company. David A. Gauntlett of Callahan & Gauntlett appeared on behalf of defendant Fred Keen. Having considered the arguments of counsel and the papers submitted, the Court hereby GRANTS plaintiff partial summary judgment on the the issue of liability for the trademark claims and GRANTS defendants summary judgment on the patent claims.

## STATEMENT OF FACTS

On August 19, 1992, plaintiff Hewlett-Packard Company ("Hewlett-Packard") filed this action alleging trademark infringement, false designation, description and representation, and unfair competition and deceptive trade practices by Repeat-O-Type Stancil Manufacturing Company ("Repeat-O-Type"). In its Third Amended Complaint filed July 21, 1994, Hewlett-Pack added Fred Keen, president of Repeat-O-Type, as an additional defendant, and added patent claims against the defendants.

Plaintiff's claims arise from the sale by Repeat-O-Type of two modified Hewlett-Packard print cartridges. Repeat-O-Type purchased two types of Hewlett-Packard inkjet cartridges, the HP 51608A inkjet print cartridge (the "Stanley cartridge") and the HP 51625A inkjet print cartridge (the "Kukla" cartridge), from authorized Hewlett-Packard distributors. Repeat-O-Type converted the Stanley cartridge to contain colored ink rather than the original black ink. Repeat-O-Type converted the Kukla cartridge by breaking the seal of the cap and replacing the cap with shims so that the cap could be removed and the cartridge refilled by the consumer. Repeat-O-Type put the modified cartridges back in the original

Hewlett-Packard boxes. The original Hewlett-Packard boxes, now housing the modified cartridges, along with a supply of refill ink, were put inside an outer package with a see-through plastic "window" and sold by Repeat-O-Type as refill kits. Repeat-O-Type generally placed its name on the flap of the outer package, although certain packages were sold without the Repeat-O-Type logo anywhere on the product.[1] The original Hewlett-Packard instructions were removed from the package and replaced with Repeat-O-Type's own instructions.

Hewlett-Packard claims that Repeat-O-Type's modifications infringe Hewlett-Packard's patent rights, and that Repeat-O-Type's use of *Hewlett-Packard's trademarks* creates confusion as to the product's source.[2] In its Amended Complaint, Hewlett-Packard claims violations of 11 of its patents, but for purpose of summary judgment, Hewlett-Packard restricts its argument to two of its patents, Patent No. 4,827,294 ("the '294 patent") *and Patent* No. 4,931,811 ("the '811 patent").

## PROCEDURAL BACKGROUND

In August 1992, Hewlett-Packard filed a complaint alleging trademark infringement in violation of the Lanham Act, 115 U.S.C. § 1051 *et seq.* Two days later, United States District Court Judge Fern M. Smith granted plaintiff's simultaneously filed application for an order directing the U.S. Marshal to seize and impound all reproductions, counterfeits or copies of [p]laintiff's federally registered "HEWLETT-PACKARD," "HP," and "DeskJet" trademarks and "hp" logo. August 21, 1993 Order, at 3. In the same Order, defendants were directed to show cause why a preliminary injunction should not issue enjoining defendants from infringing plaintiff's trademarks and "misrepresenting in any way to the public their affiliation, sponsorship or relationship to [p]laintiff and the nature and quality or source of origin of the good that they are advertising, promoting, offering for sale, selling, and/or distributing." *Id.* During the TRO hearing, Judge Smith made the following comments concerning Repeat-O-Type's activities:

> *I have to say to the defendants, it's been* a long time since I've seen a more blatant, what I think, copying of somebody else's logo. . . . You have modified the product as far as I can tell. Whether you've modified it to make it better or worse, I don't know. But people, I think, are understandably *very likely to be confused. If I were buying* that, I would assume that it was authorized in some way by Hewlett-Packard, if not made by Hewlett-Packard.

Pending plaintiff's application for a preliminary injunction, the Court issued a broad TRO preventing the manufacture or disposal *of any potentially infringing goods. The* seizure authorized by the Order took place on August 28, 1992.

On September 18, 1992, a hearing on the Order to Show Cause regarding the preliminary injunction was held before the Honorable Fern M. Smith. Judge Smith deferred *ruling on the application for preliminary* injunction and encouraged the parties to undergo further settlement negotiations. Judge Smith also dissolved her previous Order of Seizure and Impound as to items not bearing permanent, non-deletable Hewlett-Packard Trademark and logos. Order of September 29, 1992. *The Court continued its TRO and* Order of Seizure and Impound as to the remaining items.

The case was subsequently transferred to this Court. Defendants filed supplemental briefing on the pending motion for preliminary injunction. The Court granted plain*tiff's motion for a preliminary injunction in* an Order dated April 1, 1994.

## DISCUSSION

### THE STANDARD FOR SUMMARY JUDGMENT

Under Rule 56(c) of the Federal Rules of Civil Procedure, a district court may grant summary judgment when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to *any material fact and that the moving party* is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

Recognizing that summary judgment motions can contribute significantly to the resolution of litigation when there are no factual issues, the Supreme Court and the Ninth *Circuit have established the following* standards for consideration of such motions: "If the party moving for summary judgment meets its initial burden of identifying for the court those portions of the materials on file that it believes demonstrates the absence of *any genuine issues of material fact,*" the burden of production then shifts so that "the nonmoving party must set forth, by affidavit or as otherwise provided in Rule 56, '*specific facts* showing that there is a genuine issue for trial.'" *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987) *(quoting* Fed. R. Civ. P. 56(a) (emphasis added) and citing *Kaiser Cement Corp. v. Fischbach & Moore, Inc.*, 793 F.2d 1100, 1103-04 (9th Cir.), *cert. denied*, 107 S. Ct. 435 (1986) and *Celotex Corp. v. Catrett*, 106 S. Ct. 2548, 2553 (1986)). With respect to these specific facts *offered by the non-moving party*, the court does not make credibility determinations or weigh conflicting evidence, and is required to draw all inferences in a light most favorable to the non-moving party. *T.W. Elec. Serv.*, 809 F.2d at 630-31 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 106 S. Ct. 1348, 1356 (1986)).

Rule 56(c) nevertheless requires this Court to enter summary judgment, "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, *and on which that party will bear the burden* of proof at trial." *Celotex*, 106 S. Ct. at 2552. The mere existence of a scintilla of evidence in support of the non-moving party's position is insufficient: "[T]here must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson v. Liberty Lobby, Inc.*, 106 S. Ct. 2505, 2512 (1986). This Court thus applies to either a defendant's or plaintiff's motion for summary judgment the same standard as for a motion for directed verdict: "[W]hether the evidence presents a sufficient disagreement to require submission to a jury or whether it *is so one-sided that one party must prevail* as a matter of law." *Id.*

## TRADEMARK CLAIMS

### *The Standard for Finding Trademark Infringement Under the Lanham Act*

Trademark infringement is established when there is a likelihood of confusion, mistake, or deception among the public as to the source of the parties' goods and/or services or the existence of some sponsorship or affiliation between the parties. 15 U.S.C. § 1114 (1). Hewlett-Packard bears the burden of proving by a preponderance of evidence that a likelihood of confusion exists. J. Thomas McCarthy, *McCarthy on Trademarks*, § 23.20[1], at 23-132 (3d ed. 1994) (citing *David Sherman Corp. v. Heublein, Inc.*, 340 F.2d 377 [144 USPQ 249] (8th Cir. 1965)). There are three elements that must be proven by the plaintiff in a trademark case: (1) ownership by the plaintiff of a valid trade*mark; (2) use of the mark in commerce* by the defendant without the owner's consent; and (3) use of the mark by the defendant in a manner likely to cause confusion, mistake or deception.[3] The first two elements are not at issue in the case. The question is whether or not the mark was used in a manner likely to cause confusion, mistake, or deception.

The Ninth Circuit has identified a number of factors as relevant to a determination of whether the defendant's use of another's registered mark is likely to cause confusion, mistake or deception. These factors are: (1) strength of the plaintiff's marks; (2) proxim*ity of the goods; (3) similarity of the marks;* (4) evidence of actual confusion; (5) marketing channels used; (6) type of goods and the degree of care likely to be exercised by the purchaser; and (7) defendant's intent in selecting the marks; and (8) likelihood of expansion of the product lines. *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348 [204 USPQ 808] (9th Cir. 1979). Every trademark case is unique, however, and must be decided on its own facts, so the relative significance of these factors varies from case to case. *Century 21 Real Estate Corp. v. Sandlin*, 846 F.2d 1175, 1179 [6 USPQ2d 2034] (9th Cir. 1988).

The three evidentiary methods for proving that a likelihood of confusion exists are (1) survey evidence; (2) evidence of actual confusion; and/or (3) "argument based on an inference arising from a judicial comparison of the conflicting marks themselves and the *context of their use in the marketplace.*" McCarthy, § 23.20 [2], at 23-133.

[1] ROT claims that these products were sold only outside the United States, and that it was intended that the buyer would place its own name on the flap prior to resale.

[2] Plaintiff seeks to protect its federally registered "HEWLETT-PACKARD," "HP," "DeskJet," and "DeskWriter" names and trademarks and the "hp" logo (also a name and registered trademark and service mark of plaintiff).

[3] Thus, unauthorized use of a trademark is not itself sufficient to constitute a violation; the use must be confusing or deceptive as well. Defendants argue that the court at the original hearing misunderstood the law of trademarks. "The court appeared to believe that a trademark was an inherent property right and that the owner of the trademark has a right to prohibit others from using that mark, in much the same manner as an owner of a copyright has the right to prohibit reproduction of the copyrighted material." This Court disagrees with defendant's characterization. The court at the original hearing found likelihood of confusion as well as unauthorized use of the marks.

*Analysis*

*Applying the undisputed facts to these* factors, it is clear that a likelihood of confusion, mistake, or deception exists. A comparison of the conflict in the marks themselves and the context of their use in the marketplace establishes trademark infringement. *See* McCarthy, § 23.20 [2], at 23-133.

**[1]** It is undisputed that Repeat-O-Type uses Hewlett-Packard's logos on its products and that Repeat-O-Type packages its products in Hewlett-Packard boxes. Thus, the marks are "similar." The fact that the cartridge has been "modified" by Repeat-O-Type is only indicated in small lettering. In a certain percentage of the products, Repeat-O-Types's name is not even on the product flap. Defendants cite cases indicating that a product may mention the name of another product in its packaging. In *Prestonettes, Inc. v. Coty*, 264 U.S. 359 (1924), for example, the Supreme Court held that a manufacturer of compacts that used Coty's face powder *was allowed to use the Coty name in its* packaging. "When the mark is used in such a way that does not deceive the public we see *no such sanctity in the word as to prevent its* being used to tell the truth. It is not taboo." *Id.* at 368. This reasoning may suggest that Repeat-O-Type should be allowed to mention on its packaging that its product is modified from an original Hewlett-Packard cartridge. Repeat-O-Type, however, has done much more than that. Repeat-O-Type has used Hewlett-Packard's own logos and has packaged its cartridge in a Hewlett-Packard box, thus easily misleading consumers into thinking it is a Hewlett-Packard product.

Furthermore, Hewlett-Packard's registered trademarks are very strong marks. As Repeat-O-Type's products can only be used with Hewlett-Packard's printers, there is also proximity of Hewlett-Packard and Repeat-O-Type's goods. Thus, these factors *support a finding of likelihood of confusion.*

Hewlett-Packard has provided some evidence of "actual confusion." Hewlett-*Packard says that although it does not track* evidence of confusion by customers, the company has encountered confusion by customers *who have telephoned and written letters* to Hewlett-Packard thinking that Hewlett-Packard is the source of or sponsor of the Repeat-O-Type products. Hewlett-Packard has submitted a letter from a customer who believed that Repeat-O-Type's refill ink was a Hewlett-Packard product. On the other hand, Repeat-O-Type and Fred Keen have *provided letters from consumers saying that* they were not confused.

Evidence or lack of evidence of actual confusion is relevant, but is not determinative of whether there is a likelihood of confusion. *See, e.g., E. & J. Gallo Winery v. Gallo Cattle Co.*, 967 F.2d 1280, 1292 [21 USPQ2d 1824] (9th Cir. 1992). In this case, in which Hewlett-Packard was granted a TRO and preliminary injunction against Repeat-O-Type soon after Repeat-O-Type began selling its products, evidence of actual confusion is less likely to exist. Thus, this factor weighs less heavily than in many cases.

The marketing channels used by Repeat-O-Type *are similar to those used by* Hewlett-Packard, further contributing to a likelihood of confusion. Additionally, the *cost of the print cartridges* is small compared to the cost of the printer; this suggests that less care is put into the cartridge purchasing decision and that buyers will be confused by Repeat-O-Type's products. Finally, although Hewlett-Packard need not demonstrate that Repeat-O-Type intended to deceive the public for it to prevail, *see E. & J. Gallo Winery v. Gallo Cattle Co.*, 967 F.2d 1280, 1293 [21 USPQ2d 1824] (9th Cir. 1992), Repeat-O-Type's intentional use of Hewlett-Packard's mark suggests that Repeat-O-Type intended the public to believe that Hewlett-Packard manufactured, *or at least authorized and* approved, Repeat-O-Type's product. *See AMF*, 599 F.2d at 354.

*The undisputed facts presented to the* Court clearly establish that Hewlett-Packard has met its burden of proof on its claim that defendants have infringed Hewlett- Packard's federally registered trademarks. Therefore, Hewlett-Packard is entitled to summary judgment regarding defendants Repeat-O-Type and Fred Keen's liability on the trademark claims.

*The Remedy*

Hewlett-Packard has asked for a jury trial, compensatory damages and punitive damages. Although liability has been established, the issue of damages remains to be resolved. *Hewlett-Packard* has also requested a permanent injunction. The scope of the injunction remains to be resolved.

PATENT CLAIMS

*Introduction*

In addition to trademark infringement, Hewlett-Packard claims that Repeat-O-Type has infringed its patents. As Hewlett-Packard would have it, "The single question of law presented by this motion is whether the modification of plaintiff Hewlett-Packard Company ("Hewlett-Packard") ink-jet cartridges by Repeat-O-Type ("ROT") is: (1) it is of worn or spent components, *and* (b) the modifications are to keep the cartridges in use for its life as intended by the patent owner; or (2) an impermissible reconstruction, and thus an infringement of Hewlett-Packard's patents." Hewlett-Packard argues that Repeat-O-Type modifies Hewlett-Packard's product *before* there are *any worn or spent parts; therefore, the modification* cannot be permissible "repair" and so must be impermissible "reconsruction."

The Court does *not* agree with Hewlett-Packard's characterization of the issue. "Repair" versus "Reconstruction" is not a means of establishing infringement of patents. Rather, the doctrine of repair is an exception to an otherwise established patent infringement. In other words, Hewlett-Packard must first establish that a patent infringement exists before the question whether the product is a permissible repair is reached.

*Repair Versus Reconstruction*

A patent gives the owner of the patent the right to exclude others from making, selling, or using an item within the scope of that *patent. As Hewlett-Packard concedes*, a lawful purchaser of a product (which Repeat-O-Type is) has the right to use or resell the lawfully purchased cartridge. *See United States v. Univis Lens Co.*, 316 U.S. 241, 250 [53 USPQ 404] (1942). This basic principle is known as the "first sale doctrine." The "permissible repair" doctrine permits a purchaser to repair or replace an unpatented element of a patented combination to "preserve its fitness for use so far as may be affected by wear or breakage." *Leeds & Catlin Co. v. Victor Talking Machine Co.*, 213 U.S. 325, 336 (1909), *overruled on other grounds*, *Mercoid Corp. v. Mid-Continent Inv. Co.*, 320 U.S. 661, 668 [60 USPQ 21] (1944).

Hewlett-Packard terms the "permissible repair" doctrine a limitation on a purchaser's *ability to use or resell a product. In the* Court's opinion, the doctrine instead provides an exception to the general ban on a purchaser's ability to make a product. That is, a purchaser can *use or resell* a product without it being a violation of the creator's patent rights. However, a purchaser normally cannot *remake* the same product without it being a violation of the creator's patent rights. Courts have created a "permissible repair" exception to this principle, however. When a patent owner has a combination patent on a product which is composed of a number of unpatented elements, it is permissible for the purchaser or another to "fix" or "make" certain component parts without violating the patent owner's rights. For example, in *Aro Mfg. Co. v. Convertible Top Replacement Co.*, 365 U.S. 336, 345-46 [128 USPQ 354] (1961), the Court held that it did not violate a patent owner's rights for a defendant to provide replacement fabric for a convertible top.

**[2]** In the instant case, Hewlett-Packard does not have a combination patent on its Stanley and Kukla cartridges -- only on certain elements of the cartridges. Thus, by *changing certain nonpatented elements* of the cartridges, Repeat-O-Type is not mak or remaking anything that Hewlett-Pack *has a patent on.*

> The law entitles the purchasers of a patented apparatus to repair and replace worn or broken parts, but replacement that amounts to a second creation of the patented entity is not permissible.

*Lummus Industries, Inc. v. D.M. & E. Corp.*, 862 F.2d 267, 272 [8 USPQ2d 1983] (quoting *Aro*, 365 U.S. at 345-46). Hewlett-Packard has not presented evidence that Repeat-O-Type has recreated anything that Hewlett-Packard has a patent on; in fact, what Hewlett-Packard seems to be complaining about is that Repeat-O-Type is making an entirely new product, not that Repeat-O-Type is making a component that Hewlett-Packard has a patent on

*The Scope of Hewlett Packard's Patent Rights*

For the above reasons, the Court does *find Hewlett-Packard's argument that* dispositive issue is "repair-versus-reconstruction" availing. As a purchaser, Repeat-O-Type *cannot be liable for patent infringe*ment for using or selling Hewlett-Packard's products. Therefore, Repeat-O-Type can only be liable for making a product that is patented by Hewlett-Packard. Hewlett-Packard has not established that Repeat-O-Type has made a product that Hewlett-Packard has a patent on.

It is important to note that Hewlett-Packard's patents are not for the Stanley and Kukla cartridges themselves; they are for certain elements which are in the cartridges. Specifically, Hewlett-Packard claims that the Stanley and Kukla cartridges read on Hewlett-Packard's '811 patent and '294 patent, and that Repeat-O-Type's modifications infringe these patents.

Patent '811 is for a "thermal ink jet pen having a feedtube with improved sizing and operational with a minimum of depriming." The two claims for this patent are "in combination, an ink jet pen having an ink reservoir and an ink jet thin film printhead and a standpipe interconnecting said reservoir and said printhead and having an air accumulating section adjacent said reservoir, said printhead has an orifice plate therein with orifii openings . . ." and "a thermal ink jet pen including an ink reservoir therein, and a thin film printhead interconnected to said reservoir by way of a standpipe . . ."

Components of the Stanley inkjet cartridge are covered by Hewlett-Packard Patent '811, claim 2. Contrary to Hewlett-Packard's assertion, however, replacing the ink in the ink reservoir does not constitute infringement, because ink is not a patented/material element of claim 2, and Hewlett-Packard does not have a combination patent on the cartridge itself. In fact, ink does not even appear to be an "element" of claim 2.[4] Therefore, Repeat-O-Type's actions in replacing the ink in the Stanley inkjet cartridge do not constitute patent infringement. Hewlett-Packard cites no case for the proposition that changing a non-patented component that "relates to" a claimed element of a patented component constitutes impermissible "reconstruction."

Patent '294 is for a "thermal ink jet printhead assembly employing beam lead interconnect circuit." It contains three claims: "An ink jet printhead assembly adapted for insertion into a printhead carriage, said assembly including in combination: (a) a printhead substrate . . . (b) a plurality of thin conductors disposed atop said substrata and electrically connected to a plurality of transducer elements therein, and (c) a beam lead interconnect circuit having a plurality of beam leads bonded, respectively, to said plurality of thin conductors . . ." (2) the assembly defined in claim 1 wherein said beam leads are resiliently extended away from said chosen surface of said header member. . . (3) An ink jet pen including in combination: (a) a pen body housing having an ink storage compartment therein and an ink flow port adjacent one surface thereof and further having outer surfaces which are contoured to mate with adjacent surfaces of a pen carriage member, (b) a thin film printhead . . . (c) a flexible electrical circuit member . . ." Ink is not an element of the patent.

Components of the Stanley and Kukla print cartridges are probably covered by claim 3 of Hewlett-Packard patent '294. Even if the same cartridges, if made by someone other than Hewlett-Packard without permission, would not literally infringe '294, they might well infringe under the Doctrine of Equivalents, provided that the cartridges work the same way to perform substantially the same function to achieve the same result. *See Jonsson v. Stanley Works*, 903 F.2d 812, 821 [14 USPQ2d 1863] (Fed. Cir. 1990). However, even if various components of the cartridges are covered by the '294 patent, the cap is not a patented element of claim 3. Thus, Repeat-O-Type's breaking the seal of the cap and replacing the cap with shims so that the cap could be removed and the cartridge refilled by the consumer, does not constitute impermissible "reconstruction."

For these reasons, Hewlett-Packard has not presented evidence sufficient to create a genuine issue of material fact that Repeat-O-Type has infringed its patents. Defendants Repeat-O-Type and Fred Keen are entitled to summary judgment on the patent claims.

## CONCLUSION

For the above reasons, the Court grants plaintiff partial summary judgment on the issue of liability for the trademark claims. The Court grants defendants' motion for summary judgment on the patent claims.[5] Defendants' request for Rule 11 sanctions is denied. Plaintiff Hewlett-Packard is to submit a proposed form of injunction by February 24, 1995. Plaintiff is also to provide a copy of that proposal by February 24, 1995 to defendants. Defendants may submit comments on the proposal to the Court by March 10, 1995.

IT IS SO ORDERED.

[4] The Court does not accept HP's argument that a court should read into the claim that ink is an "implied" element of the claim.

[5] Because the Court grants defendants' motion for summary judgment on the patent claims, the Court denies plaintiff's motion for summary judgment on the patent claims.

---

**U.S. Court of Appeals**
**Tenth Circuit**

Stanfield v. Osborne Industries Inc.

No. 94-3020

Decided April 11, 1995

**TRADEMARKS AND UNFAIR TRADE PRACTICES**

**1. Acquisition, assignment and maintenance of marks — Assignments, licenses and franchises (§305.06)**

**Infringement; conflicts between marks — Defenses — Abandonment (§335.1007)**

Agreement permitting defendants to use plaintiff's name "Stanfield" in their trademarks constituted "naked" or uncontrolled license by which plaintiff abandoned mark, since agreement did not give plaintiff right to supervise operations of defendants' business in any manner, and gave defendants sole discretion in designing marks, since plaintiff exercised no actual control over defendant licensees, and since there was no special relationship between parties that would permit plaintiff to justifiably rely on defendants' quality control as substitute for his own control as licensor.

**2. Infringement; conflicts between marks — Passing off (§335.07)**

**Unfair and false advertising — Lanham Act Section 43(a) (§390.05)**

**JUDICIAL PRACTICE AND PROCEDURE**

**Parties; standing (§410.07)**

Plaintiff lacks standing to bring suit alleging that defendants' use of name "Stanfield" in their marks constitutes false advertising and false designation of origin or endorsement under 15 USC 1125(a), since plaintiff is not presently, and has never been, in competition with defendants, and thus cannot allege competitive injury necessary for false advertising claim, and since plaintiff abandoned all rights to name through "naked" license, and thus lacks commercial interest in marks necessary for claim of false association.

**TRADEMARKS AND UNFAIR TRADE PRACTICES**

**3. Practice and procedure in Patent and Trademark Office -- Fraud or inequitable conduct (§325.07)**

Federal district court properly granted summary judgment for defendants on claim that they fraudulently procured registration of trademarks in violation of 15 USC 1120, since plaintiff produced no evidence that individual defendant signed application oath with knowledge that plaintiff retained rights to marks in question, and since that individual could have reasonably believed that plaintiff had waived all rights to marks in licensing agreement between parties.

Appeal from the U.S. District Court for the District of Kansas, Rogers, J.; 30 USPQ2d 1842.

Action by Phillip W. Stanfield against Osborn Industries Inc., Stanley M. Thibault and Ronald Thibault, for trademark infringement, disparagement, slander, misappropriation of name, unfair competition, and fraudulent procurement of federal trademark registration. From grant of summary judgment for defendants, plaintiff appeals. Affirmed.

Dorsey L. Baker, Lubbock, Texas and Don W. Noah, of Noah & Harrison, Beloit, Kan., for appellant.

James D. Oliver and John J. Murphy, of Foulston & Siefkin, Wichita, Kan., for appellees.

Before Anderson and Tacha, Circuit Judges, and Campos, Senior District Judge (of the District of New Mexico, sitting by designation).

**Tacha, J.**

Plaintiff Phillip W. Stanfield brought this action against defendants Osborne Industries, Inc. (OII), Stanley M. Thibault, and Ronald M. Thibault alleging two claims under the Lanham Act, 15 U.S.C. §§ 1051-1128, and various state common law claims. Plaintiff's claims arise from OII's use of two trademarks containing the word "Stanfield." The district court granted defendants' motion for summary judgment as to the Lanham Act claims and declined to exercise supplemental jurisdiction over the remaining state law claims. *Stanfield v. Osborne Indus., Inc.*, 839 F. Supp. 1499, 1508 [30 USPQ2d 1842] (D. Kan. 1993). Plaintiff appeals the district court's order to this court. We have jurisdiction pursuant to 28 U.S.C. § 1291 and affirm.

### I. Background

In 1972, plaintiff developed several agricultural products including a fiberglass heating pad for newborn hogs.[1] He presented

[1] We have summarized the factual background of the parties' dispute in this opinion. For a more complete explication of the facts, *see Stanfield*, 839 F. Supp at 1501-03, or *Stanfield v. Osborne Indus., Inc.*, 643 P.2d 1115, 1118-20 (Kan. Ct. App. 1982).

relationship between the parents and subsidiaries as it bears on [the cause of action] is the proper subject of . . . inquiry"). On the facts of the instant case, the relevant question is whether the alleged principal (the Delaware corporation) directed the specific actions of the alleged agent (the Oklahoma corporation) which resulted in infringement of Mobil's patents.

The Court concludes that the Oklahoma corporation could not have acted as the Delaware corporation's agent in infringing Mobil's patents. The Oklahoma corporation began making and selling the accused stretch film in 1980, and has continued to do so nonstop ever since. The Delaware corporation was not even formed until five years later in 1985. It is inconceivable that the Oklahoma corporation served as an agent for the subsequently-formed Delaware corporation in making and selling the accused stretch film. Mobil's argument that the Delaware corporation directed the alleged infringement by the Oklahoma corporation is simply a conclusion without factual basis.

Analysis of the agency issue in this case resembles that in Mabon, Nugent & Co. v. *Texas american Energy Corp.*, [1987–1988 Transfer Binder] Fed.Sec.L. Rep. (CCH) ¶93,674 (Del.Ch. Jan. 27, 1988). In *Mabon, Nugent v. Texas American Energy*, defendant Texas American Oil issued debentures in 1979. The following year, defendant Texas American Energy was formed as the parent company for Texas American Oil. Subsequently, in 1986, Texas American Oil defaulted on the debentures.

The bondholders in *Mabon, Nugent v. Texas American Energy* sought to hold the corporate parent liable for the subsidiary's default. The Delaware Court of Chancery denied plaintiffs any recovery against the parent corporation under the agency theory:

> To the extent that plaintiffs' claim is based upon the agency theory, I find it to be deficient. The debentures were issued by [the subsidiary] before [the parent] came into existence. Thus, I do not see how it can be said that [the subsidiary] was the agent of [the parent] when the debentures were issued.[14]

*Id.* at p. 98,092 (footnote added). Identical logic applies in the instant case.

Thus the Court concludes that Mobil's third theory for holding the defendant Delaware corporation liable, like its first two theories, must fail. Consequently, summary judgment will be entered in favor of the Delaware corporation on Mobil's infringement claim.

## III. *RULE 25(c) MOTION*

In addition to defendants' summary judgment motion, there is a second motion presently before the Court. Plaintiff has moved to add the Oklahoma corporation as a party defendant, pursuant to Rule 25(c), Fed.R. Civ.P. (D.I. 56.) At oral argument, plaintiff's counsel indicated that as an alternative to *adding* the Oklahoma corporation, Mobil moved to *substitute* the Oklahoma corporation as a party defendant in place of the Delaware corporation. (D.I. 77 at 13.)

Rule 25(c) provides:

> In case of any transfer of interest, the action may be continued by or against the original party, unless the court upon motion directs the person to whom the interest is transferred to be substituted in the action or joined with the original party.

Rule 25(c) requires a "transfer of interest." In the instant case, such a transfer of interest occurred with the July 15, 1988 merger of the defendant Delaware corporation into the nonparty Oklahoma corporation. Plaintiff's Rule 25(c) motion is thus premised not upon the close relationship of the two Linear corporations during the time of the Delaware corporation's existence, but rather, upon the merger of the Delaware corporation (the transferor) into the Oklahoma corporation (the transferee) which occurred after this lawsuit was brought.

Authorities reveal that joinder or substitution under Rule 25(c) does not alter the substantive rights of the parties; it is merely a procedural device designed to facilitate the conduct of litigation. *See, e.g.*, Minnesota Mining & Mfg. v. Eco Chem, 757 F.2d at 1263–64 [225 USPQ at 354–356]; Matter of Covington Grain Co., 638 F.2d 1362, 1364 (5th Cir. 1981); Television Reception Corp. v. Dunbar, 426 F.2d 174, 178 (6th Cir. 1970) (joinder under Rule 25(c) does "not alter the respective substantive rights of the transferor or the transferee . . . and, regardless of whether the transferee was made a party to the action, its rights . . . depend[ ] on the outcome of the litigation between [the plaintiff] and the transferor"); Federal Deposit Ins. Corp. v. Tisch, 89 F.R.D. 446, 448 (E.D.N.Y. 1981) ("[t]he decision to order substitution or joinder is to be made by considering how the conduct of the lawsuit will be most facilitated; it in no way affects the substantive rights of the transferor or transferee"); 3B J. Moore & J. Kennedy, *Moore's Federal Practice* ¶25.08, at p. 25-84 n.11 (2d ed. 1987) ("[t]he transferee and successor in interest under Rule 25(c) stands in the same position in a *lawsuit* and can assert the same defenses which would have been available to his transferor") (citing Democratic Nat'l Comm. v. McCord, 416 F.Supp. 505 (D.D.C. 1976)). Hence if the Oklahoma corporation is added or substituted by way of Rule 25(c), it can be held liable only to the extent that the Delaware corporation would have been liable.

[3] The Court has already determined, however, that the Delaware corporation cannot be held liable for infringing Mobil's patents. *See* parts II.A. through II.C. of this opinion, *supra*. Thus the Oklahoma corporation likewise cannot be held liable in its capacity as transferee in interest of the Delaware corporation. Accordingly, plaintiff's motion to add (or substitute) the Oklahoma corporation pursuant to Rule 25(c) will be denied.

## IV. *CONCLUSION*

For the reasons set forth in parts II.A. through II.C. of this opinion, *supra*, summary judgment will be entered in favor of the defendant Delaware corporation on Mobil's patent infringement claim. The Court concludes that the Delaware corporation could not, as a matter of law, have infringed Mobil's patents either directly, indirectly via the alter ego doctrine, or vicariously via an agency relationship.

In addition to the patent infringement claim, plaintiff's amended complaint (D.I. 26) contains two other counts. These counts seek declarations that Mobil has not committed acts of unfair competition or violated *antitrust laws* in bringing this patent infringement action. These counts derive from and depend upon the patent infringement claim. As the Delaware corporation's summary judgment motion will be granted as to the patent infringement claim, it follows that summary judgment on the remaining two counts is likewise appropriate.

Although defendants' summary judgment motion is styled in the plural,[15] none of the preceding legal analysis applies to Advo, the second defendant. It is apparently undisputed that Advo used Linear's film products. To the extent that the Linear products used by Advo do in fact infringe Mobil's patents, Advo could be held liable to Mobil under the patent law. Moreover, Advo is a Delaware corporation and as such is properly before this Court. Accordingly, summary judgment will not be entered in favor of Advo. Advo may, of course, choose to *argue* that the stretch film manufactured by Linear and used by Advo does not infringe Mobil's patents, or that Mobil's patents are invalid — but these are questions for another day.

Finally, for the reasons stated in part III. of this opinion, *supra*, plaintiff's motion to add or substitute the Delaware corporation as a party defendant under Rule 25(c) will be denied.

An order will be entered accordingly.

### *ORDER*

For the reasons set forth in the Court's Opinion entered in this action on this date, it is

ORDERED, ADJUDGED, AND DECREED that:

1. The motion to dismiss (D.I. 8) treated as a motion for summary judgment filed by the defendant Delaware corporation Linear Films, Inc., is hereby granted.

2. The motion to dismiss (D.I. 8) treated as a motion for summary judgment filed by defendant Advo-System, Inc., is hereby denied.

3. Plaintiff's motion pursuant to Rule 25(c), Fed.R.Civ.P., to add (or substitute) the Oklahoma corporation Linear Films, Inc., formerly known as Linear Films of Oklahoma, Inc., as a party defendant (D.I. 56), is hereby denied.

[14] Interestingly, the court in *Mabon, Nugent v. Texas American Energy* focused upon the fact that the parent corporation did not yet exist when the debentures were *issued*, notwithstanding that it did exist by the time *default* occurred. Likewise, this Court finds most pertinent the fact that the Delaware corporation did not even exist at the time the alleged infringement began, notwithstanding that the infringement is alleged to have continued after its formation.

[15] *See* D.I. 75 (*Defendants'* Reply Brief in Support of *Their* Motion to Dismiss Treated as a Motion for Summary Judgment [emphasis added]).

---

**District Court, S.D. California**

Ferrari S.p.A. Esercizio Fabbriche Automobili e Corse v. McBurnie

No. 86-1812-B(IEG)

Decided June 1, 1989

## TRADEMARKS AND UNFAIR TRADE PRACTICES

**1. Types of marks — Trade dress as mark — In general (§327.0702)**

Overall design of plaintiff's "Daytona Spyder" sports car, which is non-functional

and which has obtained secondary meaning, in view of unsolicited and extensive coverage of car in periodicals and books, its use in car rallies, and its deliberate and close imitation, constitutes protectable trade dress.

**2. Infringement; conflicts between marks — Likelihood of confusion — In general (§335.0302)**

Likelihood of confusion exists between plaintiff's trade dress for "Daytona Spyder" sports car and defendants' replica car body, *in view of strength of plaintiff's trade dress*, close similarity between cars' appearances, overlap of marketing channels, survey evidence results, and defendants' intent to copy plaintiff's car appearance.

**3. Infringement; conflicts between marks — Contributory infringement (§335.09)**

Manufacturer of infringing replica sports car which encouraged its customers to deceive relevant public by selling them vehicle that is virtually identical to plaintiff's "Daytona Spyder" sports car is liable for contributory infringement.

**4. Infringement; conflicts between marks — Trademark dilution (§335.05)**

Defendants' manufacture of "Daytona Spyder" sports car bodies that copied design of Ferrari "Daytona Spyder," violated California Anti-Dilution Statute, Cal. Bus.& Prof.Code 14330, which applies even in absence of competition between parties and in absence of likelihood of confusion.

**5. Acquisition, assignment, and maintenance of marks — Abandonment — In general (§305.0701)**

Plaintiff which ceased manufacturing its "Daytona Spyder" sports car in 1974 but which continued to manufacture, sell, and license mechanical and body parts for car has not abandoned its trade dress rights in car's body design under 15 USC 1127.

---

Trade dress infringement and dilution action with related cross actions brought by Ferrari S.p.A. *Esercizio Fabbriche Automobili e Corse* against Thomas W. McBurnie and McBurnie Coachcraft Inc. Judgment for plaintiff and permanent injunction issued.

Prior decision: 10 USPQ2d 1278.

Kenneth R. Umans, of Colucci & Umans, New York, N.Y., for plaintiff.

*Michael Duckor, of Duckor & Spradling*, San Deigo, Calif., for defendants.

**Brewster, J.**

The court, having tried this injunction case with an advisory jury, and have heard all the evidence and arguments of counsel for both sides, and having reviewed plaintiff's proposed Findings of Fact and Conclusions of Law, and having received no objections by defendants, and being fully advised in the premises therefor, now enters the following Settled Findings of Fact and Conclusions of Law.

## FINDINGS OF FACT

### A. PARTIES AND JURISDICTION

1. Plaintiff, Ferrari S.p.A. Esercizio Fabbriche Automobili e Corse (hereinafter "Ferrari"), is an Italian corporation having a principal place of business at Modena, Italy. *Support:* Pretrial Order: Admitted Fact No. 1

2. Plaintiff is in the business of manufacturing uniquely designed, high performance sports cars in limited quantities. *Support:* Matteoni Transcript[1] V-48, lines 20-24; p.49, lines 10-15; p.50, line 16 through p.51, line 2; McCormack Transcript III-49, lines 18-20, 25, III-50, lines 1-5.

3. Defendant Thomas W. McBurnie is an individual doing business in Santee, California, and is the sole shareholder, owner, and President of defendant McBurnie Coachcraft, Inc. *Support:* Pretrial Order: Admitted Fact No. 3

4. Defendant McBurnie Coachcraft, Inc., (hereinafter with defendant Thomas W. McBurnie collectively called "the McBurnie defendants") is a California corporation having a principal place of business in Santee, California. *Support:* Pretrial Order: Admitted Fact No.2.

5. The McBurnie defendants specialize in manufacturing kits and completed cars which are called the California Daytona Spyder. The court finds that they are close copies or replications of Ferrari automobiles which ceased to be manufactured in 1974. *Support:* Pretrial Order: Admitted Fact No. 6; Exh. 62; 38(4) para. 34; P-4 Transcript of April 19, 1989 (hereinafter referred to as "Transcript of Decision"), p.4, lines 11-15; McBurnie Transcript III-83, lines 8-23, III-153, lines 3-8.

### B. BACKGROUND FACTS

[1] References to the record are by name of witness followed by volume number and page.

6. In approximately 1966, Ferrari began building a new high-powered V 12 automobile engine and commissioned Pininfarina, a celebrated *Italian firm, to assist in the* design of a unique, distinctive, and beautiful body design to be used in connection with the new engine. *Support:* Bellei Transcript VIII-107, line 7 through p.109, line 25; VIII-110, line 11 through p.111, line 2; VIII-111, lines 6-17; Matteoni Transcript V-51, lines 6-20.

7. After two years of work, the design was completed, and production of the car, called the 365 GTB/4 by Ferrari, began. *Support:* Bellei Transcript VIII-109, lines 10-25.

8. From 1969 to 1974 Ferrari manufactured approximately 1,400 Berlinettas (coupes) and 127 Spyders (convertibles). The 365 GTB/4 was an outstanding racing success, including victories at the Daytona Florida racing track. As a result, the car was popularly known among car enthusiasts as *the* DAYTONA SPYDER. *Support:* Pretrial Order: Admitted Fact No. 5: McCormack Transcript II-51, lines 8-17; Matteoni Transcript V-51, line 21 through p.52, lines 14-16; V-96, lines 11-12.

### C. NON-FUNCTIONALITY

9. It is clear and without dispute that the Ferrari DAYTONA SPYDER design was primarily made for *aesthetic reasons* and that the same function could have been achieved by an endless variety of designs. For this reason, the court finds that the design in question is primarily non-functional. *Support:* Transcript of Decision, p.3, lines 10-14; Bellei Transcript VIII-110, lines 23 through p.111, line 5.

10. The design of the Ferrari DAYTONA SPYDER is unique and distinctive, and even defendants' witnesses admitted that no other car design was, or is, very close. *Support:* Transcript of Decision, p.3, lines 12-13; Gerstenberger Transcript VIII-163, line 11 through p. 164, line 2; VIII-162, lines 20-23; Bellei Transcript VIII-111, lines 15-17. McBurnie Transcript III-168, lines 5-8.

11. The design of the DAYTONA SPYDER is *very beautiful* as also admitted by defendant's witnesses. Numerous magazines and books have, from 1969 to the present, commented on the great beauty of this car. *Support:* McBurnie Transcript III-110, lines 19-20; Exhibits 27(1)-27(20); 29(1)-29(38); 29(41)-29(58); 47 and 48; McCormack Transcript II-57, lines 5-8; II-95, lines 21-24.

### D. SECONDARY MEANING

12. Although the number of sales of the Ferrari DAYTONA SPYDER were relatively limited, the publicity about this car is extensive, including the numerous magazine and newspaper articles written about it from 1969 to the present. In fact, at least three books have been written about the Ferrari DAYTONA SPYDER alone from 1982 to the present; and it has been mentioned along with photographs in numerous other books. The articles and books have been extremely complimentary about this beautiful car design *and have positively* associated it with plaintiff Ferrari. *Support:* Exhibits 27(1), 27(8), 27(9); 27(2)-27(7), 27(10)-27(20); 29(1)-29(38), 29(41)-29(58); 47 and 48.

13a. Publicity about the Ferrari DAYTONA SPYDER was also initially generated by Ferrari's involvement in world class automobile races and later by its customers' participation in vintage automobile races and rallies. *Support:* McCormack Transcript II-58, lines 4-15; Ward, *Transcript* VIII-71, lines 12 through p. 73, line 15; Lay, Transcript VI-190, lines 17-18.

13b. There was also evidence that the Ferrari DAYTONA SPYDERS are currently being sold by their owners for prices of a million dollars and more. These sales have been heavily publicized. *Support:* Exhibits 30(7), 29(2), 29(17), 29(23), 29(37), 29(43), M-1. Mccormack Transcript II-73, lines 18-21.

14. Defendants admittedly intentionally copied Ferrari's DAYTONA SPYDER design in a very close manner. Thomas W. McBurnie, one of the defendants, testified that he, at one point, made splash molds from a genuine Ferrari DAYTONA SPYDER. He further testified that he could not identically copy it because he wished to use a Corvette *chassis which required* slight alterations in the car's dimensions.

However, there is not any dispute in the evidence, and the court finds, beyond a reasonable doubt, (even though only a preponderance of the evidence need be shown), that defendants intended to and did come as close as they possibly could to the lines and the image of the Ferrari DAYTONA SPYDER. (The car built by the defendants is hereinafter referred to as the "Daytona replica" or "replica Daytona"). *Support:* McBurnie Transcript III-153, lines 3-8; IV-42; lines 4-22; IV-153, line 1; IV-157, lines 7-8; Exh. 60 and 62; Transcript of Decision, p.3, line 15 through p.4, line 15.

15. The defendants originally built the replica Daytona for an individual named Albert Mardikian. Mr. Mardikian paid for *four prototypes* from defendants, two of

47

which were ultimately leased and then sold to the Miami Vice television show. *Support*: McBurnie Transcript III-94, lines 3-25; III-100, lines 12-25; III-102, lines 2-8; Exhibits 88, 89(1) and 60.

16. The replica Daytona that appeared on the Miami Vice television show was called "The Ferrari" and bore Ferrari registered logos. The Miami Vice television show further publicized the association of the DAYTONA SPYDER design with Ferrari. *Support*: Exhibit 29(38), 29(42), 29(51), 29(52), 29(53), 29(54), 29(55), 29(56), and 29(58).

17. Mr. Mardikian and defendants had agreed to produce a large number of these replicas. When Mr. Mardikian ultimately ran into legal and business problems, defendants decided to manufacture the Ferrari DAYTONA replicas for themselves. Defendants admittedly used Ferrari logos when initially showing their Daytona replicas at specialty car shows, and used Ferrari logos on photographs of their replica Daytonas in their brochures. Defendants' parts lists also offered "Ferrari or "Ferrari style" instrument clusters and interiors as options for their Daytona replica, and continuously identified the car design with its "Ferrari heritage." *Support*: Exhibits 65; 110A-110F; 99; 100; 60; 51. McBurnie Transcript III-96, line 10; III-97, lines 21-22; III-107, line 13 through p.108, line 22, III-122, lines 14-16; III-123, lines 18-19; III-125, line 16 through p.126, line 4; IV-46, lines 20-24; IV-48, lines 18-20; IV-129, lines 7-11; IV-157, lines 1-8; V-6, lines 4-8.

18. Defendants' replica cars are not toys; the kits sold for between six and ten thousand dollars, and the completed or turn key cars sold for between forty and sixty thousand dollars. Many of defendants' customers placed Ferrari logos on their replica Daytonas afer purchase, the defendants admittedly told these customers where such logos could be purchased. *Support*: Exhibits 98; 34(1A-F); 34(2A-f); 34(3A-D); 71(1-8); 45. McBurnie Transcript III-115, lines 13-15; III-117, lines 5-9. Transcript of Decision, p. 10, lines 14-22.

19. One of defendants' customers bought a brand new 1988 Corvette and requested defendants to remove the entire "skin" or body paneling and replace it with Daytona replica body paneling. This remodeling costs defendants' customer approximately twenty thousand dollars more than the original Corvette. *Support*: McBurnie Transcript III-117, lines 18-25; III-118, lines 18-22.

20. The purchasers of defendants' cars clearly bought them because the design was associated with Ferrari, and they wanted to drive a car that appeared to the relevant public to be a Ferrari. *Support*: Transcript of Decision, p. 11, lines 5-15; McCormack Transcript II-96, lines 2-8; McBurnie Transcript IV-168, lines 18-25; V-3, lines 11-12; V-38, line 20 through p.39, line 2.

21. Both parties submitted surveys at trial which were designed to test whether a relevant universe of consumers associated the DAYTONA SPYDER design with Ferrari. The plaintiff's survey, using a universe of subscribers to popular auto magazines, such as Road & Track, and Car and Driver, found that 73% of respondents, when viewing photographs of the DAYTONA SPYDER design with all indicia removed, identified it as a Ferrari. The defendants' survey taken in three different cities, using a universe of males over the age of 18, revealed an average of approximately 20% of respondents identified the DAYTONA SPYDER design as a Ferrari. *Support*: Exhibits 35(1), 35(3), 35(4), A-I; T. Transcript of Decision, p.6, line 6 through p.7, line 3.

22a. Both surveys were flawed. Plaintiff's universe was, in the court's opinion, too narrow, because *subscribers* to such magazines have perhaps too much interest in cars as compared to more casual readers of such magazines purchased from news vendors. Defendants' universe was probably too broad because it did not screen for people with any particular interest in cars or who might have any particular interest or means of purchasing high performance, uniquely designed, limited production sports cars. *Support*: Transcript of Decision, p.8, line 14 through p.9, line 4.

22b. The credibility of defendants' survey was also placed into question because the raw data, (original questionnaires and answers) upon which the survey results were based, was destroyed during the course of the litigation before plaintiff could review it. Thus plaintiff could not check the accuracy of defendants' results. Further, the photograph of the Ferrari DAYTONA SPYDER was of poor quality and shadowy in certain areas, which could have affected the degree of recognition. *Support*: Transcript of Decision, p.8, lines 1-13; p.6, lines 17-25; Exh. F.

23. In light of defendants' close intentional copying, their failure to introduce any evidence to show that such copying was for any purpose but to associate themselves with the reputation and marketability of the Ferrari DAYTONA SPYDER, the large amount of recognition of said design with Ferrari shown in continuous magazine articles and books about the DAYTONA SPYDER long after the cessation of its manufacture, the showings of the Ferrari DAYTONA SPYDER at vintage car shows, the highly publicized sales of said car by Ferrari customers, and the percentages of recognition in both the plaintiff's and the defendants' surveys, although flawed, the court finds the evidence thorough and convincing that the Ferrari DAYTONA SPYDER design has achieved a strong secondary meaning. *Support*: Transcript of Decision, p.4, lines 11-18; p.5, line 25 through p.6, line 8; p.7, lines 4-16; McBurnie Transcript V-24, line 20 through p. 25, line 4.

### E. *LIKELIHOOD OF CONFUSION*

24. Likelihood of confusion is an issue of fact in this circuit. *Levi Strauss & Co. v. Blue Bell, Inc.*, 778 F.2d 1352, 1356 [228 USPQ 346, 348-349] (9th Cir. 1985); *see also, Fuddruckers, Inc. v. Doc's B.R. Others, Inc.*, 826 F.2d 837, 846 n.12 [4 USPQ2d 1026, 1033 n.12] (9th Cir. 1987).

25. The plaintiff has asserted that it does not consider itself to be in competition with the McBurnie defendants. The testimony by defendants is that some of the purchasers of its automobiles may also purchase Ferrari automobiles. However, although the issue of direct competition is in dispute, the court need not find that the parties are in direct competition in order to find likelihood of confusion. *Maier Brewing Co. v. Fleischmann Distilling Corp.*, 390 F.2d 117, 123 [157 USPQ 76, 80] (9th Cir.), *cert. denied*, 391 U.S. 966 [157 USPQ 720] (1968); *Playboy Enterprises, Inc. v. Baccarat Clothing Co., Inc.*, 692 F.2d 1272, 1274 [216 USPQ 1083, 1084] (9th Cir. 1982); *cf., Grey v. Campbell Soup Co.*, 650 F.Supp. 1166, 1173, 1174 [231 USPQ 562, 566, 567] (C.D. Cal. 1986).

26a. The plaintiff stipulated at trial that the purchaser of a McBurnie automobile would know that he was not purchasing a genuine Ferrari automobile when purchasing directly from the McBurnie defendants. However, he might not know if Ferrari has sponsored, approved, or licensed the defendants' activities. *Support*: Matteoni Transcript V-63, lines 6-12; V-64, lines 1-4.

26b. In *Grey, supra*, at 1173 [231 USPQ at 566-567], the court stated:

> Likelihood of confusion is not limited only to confusion as to the source or origin of the goods. Rather, the appropriate inquiry is whether the average purchaser would be likely to believe that the infringer's product has "some connection" with the trademark owner.

26c. This circuit has long recognized that the universe of relevant consumers who might be confused includes those who would see the trademark or trade dress away from the point of purchase. For example, in *Levi Strauss & Co. v. Blue Bell, Inc.*, 632 F.2d 817 [208 USPQ 713] (9th Cir. 1980), the Court of Appeals stated, at 822 [208 USPQ at 718]:

> [Wrangler] limits its argument to "point of sale" circumstances. However, billboards and other point of sale materials are removed by the purchaser and have no confusion — obviating effect when the pants are worn. Wrangler's use of its [infringing tag] is likely to cause confusion among *prospective* purchasers. (Emphasis in original).

*See also, Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*, 799 F.2d 867, 872-873 [230 USPQ 831, 835] (2d Cir. 1986); *Rolex Watch U.S.A., Inc. v. Canner*, 645 F.Supp. 484, 492 [1 USPQ2d 1117, 1121] (S.D. Fla. 1986) (Lanham "Act endeavors not just to protect a purchaser, but . . . the marketplace at large."); *Rolls-Royce Motors, Ltd. v. A & A Fiberglass, Inc.*, 428 F.Supp. 689, 694 [193 USPQ 35, 42] (N.D. Ga. 1977) (Confusion exists where "the public" would identify defendants' marks as those of the plaintiff).

27. There was evidence presented that the McBurnie defendants put their name on the rocker panel on one side of their cars. However, this name cannot be seen even from reasonably short distances and would almost certainly not be seen when the McBurnie replica Daytona is seen driving down the freeway or parked any distance from the viewer. Moreover, there is evidence that at least some of the kit car customers removed the name from the rocker panel when building their cars. *Support*: Exh. 45; Deposition of Winters, Transcript IX-81, line 23 through p. 82, line 6. Deposition of Copple, Transcript IX-43, lines 14-17. McBurnie Transcript VIII-149, lines 6-9.

29. In this circuit, a deliberate attempt at copying creates a rebutable presumption of deception or confusion. *AMF, Inc. v. Sleekcraft Boat, Inc.*, 599 F.2d 341, 354 [204 USPQ 808, 819] (9th Cir. 1979), *Fuddruckers, Inc. v. Doc's B.R. Others, Inc.*, 826 F.2d 837, 845, 846 [4 USPQ2d 1026, 1032, 1033] (9th Cir. 1987). *Support*: Transcript of Decision, p.7, lines 17-19.

29. The McBurnie defendants carefully, closely, and intentionally copied the overall design of plaintiff's 365 GTB/4 DAYTONA SPYDER, and only an expert who had been pre-briefed and carefully instructed as to what to look for could tell the difference between plaintiff's and defendants' cars. *Support*: Transcript of Decision, p.10, lines 4-13; p.11, lines 12-15; McBur-

nie Transcript IV-153, line 1; IV-157, lines 7-8.

30. Since the Ferrari DAYTONA SPYDER design is unique and distinctive, it constitutes a strong trade dress. *Support*: Transcript of Decision, p.3, lines 11-13; p.7, lines 12-16; McCormack Transcript III-36, lines 3-5.

31. The McBurnie defendants advertised in the Robb Report where Ferrari and other high performance limited production sports cars are advertised. Further the record shows that purchasers of defendants' Daytona replica kits advertised their cars for sale in such places as Hemmings and the Wall Street Journal. Purchasers have also displayed their cars at auto shows where Ferraris and other high performance limited production sports cars were shown. *Support:* Deposition of Mock, Transcript IX-28, lines 2-14; Deposition of Winters, Transcript IX-62, line 24 through p.63, line 1; IX-67, lines 6-10; McBurnie Transcript III-136, lines 3-12; IV-147, lines 21 through IV-148, line 2.

32. Both parties also presented survey evidence on the issue of likelihood of confusion. The same universe was used by each party for the likelihood of confusion survey as was used in their respective secondary meaning surveys. Both confusion surveys were flawed for the same reasons as discussed above. Plaintiff's survey based on photographs of cars indicated a confusion rate of approximately 67%. Defendants' survey based on the showing of actual McBurnie Daytona replicas, even with the McBurnie name attached and Corvette style interiors, indicated confusion ranging from 11% to 23%, depending upon certain variable factors. The defendants failed to take photographs or videotapes of the cars shown to the survey respondents and again destroyed their raw data. Notwithstanding the flaws in both surveys, the court finds clear evidence that a likelihood of confusion is probable. *Support:* Transcript of Decision, p.7, line 20 through p.8, line 13. Exhibits 35(5), 35(6); A-I; T.

33. The evidence is clear that the McBurnie defendants initially supplied Ferrari logos to their customers until receiving a protest from plaintiff's related company Ferrari of North America. Even after receiving this protest, the McBurnie defendants told their customers where they could purchase Ferrari logos and encouraged such customers to use these logos by showing photographs of McBurnie Daytona replicas bearing Ferrari logos in their brochures. Even without Ferrari badges on these replicas, the McBurnie defendants knowingly made it possible for their customers to drive a car which the relevant consumer would believe was a Ferrari. In fact, this is the whole marketing strategy of defendants' business which also provided options for "Ferrari Style" instrument panels and interiors to complete the deception. There is no question from the evidence presented that defendants induced and encouraged their customers to parade their automobiles to the relevant public as genuine Ferrari automobiles. *Support:* Transcript of Decision, p.11, lines 5-9; McBurnie Transcript III-167, lines 11-25; III-133, lines 5-14; III-135, lines 2-17; Exhibits 110A-110F; 99; 100; 65; 45.

F. *DILUTION*

34. The evidence in the record is also clear that Ferrari has gained a well-earned reputation for making uniquely designed automobiles of quality and rarity. The DAYTONA SPYDER design is well-known among the relevant public and exclusively and positively associated with Ferrari. If the country is populated with hundreds, if not thousands, of replicas of rare, distinct, and unique vintage cars, obviously they are no longer distinct, and they are no longer unique. Even if a person seeing one of these replicas driving down the road is not confused, Ferrari's exclusive association with this design has been diluted and eroded. If the replica Daytona looks cheap or in disrepair, Ferrari's reputation for rarity and quality could be damaged, even in the absence of confusion. *Support*: Matteoni Transcript V-64, lines 5-10; V-64, line 15 through p. 65, line 5. Transcript of Decision, p.12, lines 3-14; p. 13, lines 7-21.

G. *ABANDONMENT*

35. At trial, the plaintiff produced extensive evidence that since 1974 when it ceased the manufacture of its 365 GTB/4 DAYTONA SPYDER, it has continuously and extensively manufactured mechanical and body parts for the repair and servicing of its DAYTONA automobiles. The evidence indicated without dispute that Ferrari has manufactured and sold to an exclusive licensee an average of 5 or 6 *entire* front end body parts (everything but the hood, including bumpers), as well as 5 or 6 entire rear end body parts per year since 1974. The evidence clearly showed without dispute, that Ferrari has maintained, used, or replaced all of its original tooling for 365 GTB/4 DAYTONA, and has provided same to its exclusive authorized licensee to manufacture parts as they are needed by DAYTONA

owners. There was unrebutted testimony that Ferrari would manufacture original replacement parts for all its cars, including the 365 GTB/4 DAYTONA, so long as these cars continue to be owned and driven.

From time to time, both Ferrari and its authorized licensee have virtually remade or refurbished entire 365 GTB/4 DAYTONA automobiles. In this manner, there has been continuous commercial use and sale of the DAYTONA design trade dress.

The evidence also shows that the Ferrari DAYTONA SPYDERS are still driven extensively. Unrebutted testimony was given by personnel from Ferrari of North America and Ferrari's exclusive parts licensee that they continuously service DAYTONA SPYDERS, including the recommended 3,000 mile check-ups.

Even independent of such activities by Ferrari, the DAYTONA SPYDER design is strongly associated with Ferrari, and such association is extremely positive. In essence, Ferrari has not only achieved a strong existing goodwill but continues to maintain a residual goodwill in the unique design of the DAYTONA SPYDER.

For these reasons, the court finds that Ferrari never intended to abandon its rights in or use of the DAYTONA SPYDER trade dress and has not abandoned its rights. Ferrari's continuous use of its trade dress has been made in good faith and for valid commercial reasons. *Support*: Transcript of Decision, p.13, lines 21-23. Exhibits 31(5); 32; 44; 67(1)-(3); 69; 79(1)-(7); 80; 81; 82; 83; 84; 85(1)-(3); 86(1); 86(2); 87; 87a; 108 (A-D); Lay Transcript VI-177, line 10 through p.193, line 20, VII-1, line 12 through p.16, line 10; Ward Transcript VIII-66, line 18 through p.73, line 15; Levrini Transcript V-123, line 15 through p.129, line 8; VI-161, line 13 through p.170, line 8; VI-176, lines 18-20.

H. *LACHES AND ESTOPPEL*

36. There is evidence in the record which shows that an attorney for Ferrari of North America, plaintiff's related company, protested the use by the McBurnie defendants of Ferrari logos on their cars. This occurred approximately 9 months prior to the time that plaintiff claimed it found out about defendants and approximately one year before suit was filed. This attorney claimed to represent plaintiff, but plaintiff's witness had never heard of him before this suit was filed. Notwithstanding the above, the defendants testified that even if the attorney in question had requested that defendants cease making the DAYTONA replica in addition to the protest about the use of Ferrari logos, he would not have stopped. Further, defendants, even after this suit was filed, proceeded to replicate another Ferrari model with knowledge that Ferrari had already objected to such replication by the party from whom defendants obtained some of their parts.

The court, therefore, finds that plaintiff did not have knowledge of defendants' activities until Spring of 1986, did not unreasonably delay in filing this suit, did not consent to or acquiesce to defendants' actions, and did not waive any rights. The court also finds that defendants did not reasonably rely to their detriment upon any of plaintiff's actions. *Support:* Matteoni Transcript V-57, lines 1-5; VIII-85, lines 5-19; VIII-90, lines 21-25; Transcript of Decision, p.13, lines 21-23; McBurnie Transcript III-135, lines 1-18; III-165, lines 14-23; IV-94, line 25 through IV-95, line 3; V-18, lines 16-25; V-19, lines 1-17; V-21, lines 8-11.

I. *IRREPARABLE INJURY*

37. The evidence is clear that defendants' replication and sale of plaintiff's 365 GTB/4 DAYTONA has taken plaintiff's reputation out of its own hands and has tarnished plaintiff's reputation for rarity, quality, and uniqueness. Defendants' actions have also eroded Ferrari's valuable goodwill derived from its association with the DAYTONA design.

The damage to Ferrari is irreparable in that it cannot be calculated. Further, the actions of defendants do not just threaten the reputation of the DAYTONA SPYDER, it threatens the reputation of all Ferrari cars. *Support*: Transcript of Decision, p.13, line 24 through p.14, line 7; Matteoni Transcript V-64, lines 15 through p. 65, line 5.

38. Any conclusion of law which is actually a finding of fact, and vice versa, should be considered as such.

## *CONCLUSIONS OF LAW JURISDICTION*

1. Federal jurisdiction exists pursuant to 28 U.S.C. §1338 in that this is an action for trademark infringement, false representation, and false designation of origin, arising under the Trademark Act of July 5, 1946, 15 U.S.C. §1051, *et seq.*, (60 Stat. 427), and particularly §1125(a) thereof (hereinafter Section 43(a)), and which includes a closely related California state law claim for trademark dilution. Federal jurisdiction also exists by reason of the complete diversity of

citizenship of the parties and the fact that the amount in controversy exceeds $10,000.00, exclusive of interest and costs, 28 U.S.C. §1332.

### *TEST FOR TRADE DRESS INFRINGEMENT*

2. The test for trade dress infringement under Section 43(a) in this Circuit is "whether there is a likelihood of confusion resulting from the total effect of the defendant's package on the eye and mind of an ordinary purchaser." *Fabrica Inc. v. El Dorado Corp.*, 697 F.2d 890, 894 [217 USPQ 698, 701] (9th Cir. 1983). *Fuddruckers, Inc. v. Doc's B.R. Other, Inc.*, 826 F.2d 837, 841 [4 USPQ2d 1026, 1029] (9th Cir. 1987). As stated by the Ninth Circuit:

> whether we call the violation infringement, unfair competition, or false designation of origin, the test is identical — is there a "likelihood of confusion?"

*New West Corp. v. NYM Co. of California, Inc.*, 595 F.2d 1194, 1201 [202 USPQ 643, 649] (9th Cir. 1979).

### *PROTECTABILITY*

3. "Trade dress may be protected if it is non-functional and has acquired secondary meaning and if its imitation creates a likelihood of consumer confusion." *Fuddruckers, supra*, at 842 [4 USPQ2d at 1029].

*Non-Functionality*

4. The evidence is clear that plaintiff's trade dress is non-functional. Trade dress must be examined as a whole to determine its functionality; thus, functional elements that may be individually unprotectable can be protected when used together as part of a trade dress. *Fuddruckers, supra*, at 826 [4 USPQ2d at 1030]; *LeSportsac, Inc. v. K Mart Corp.*, 754 F.2d 71, 76 [225 USPQ 654, 657] (2nd Cir. 1985).

*Secondary Meaning*

5. Plaintiff has also established that its DAYTONA SPYDER trade dress achieved significant secondary meaning. Secondary meaning is attained when the relevant public associates the trade dress with a particular source. *Fuddruckers, supra*, at 843 [4 USPQ3d at 1030-1031]; *American Scientific Chemical, Inc. v. American Hospital Supply Corp.*, 690 F.2d 791, 793 [216 USPQ 1080, 1082] (9th cir. 1982).

6. Proof of secondary meaning herein has been shown through unsolicited and extensive coverage of the DAYTONA SPYDER design in periodicals and books, use of the car in vintage car rallies and races, and through the surveys introduced herein. Furthermore, "[t]he fact of deliberate and close imitation often is sufficient to establish secondary meaning." *Grey v. Campbell Soup Co.*, 650 F.Supp. 1166, 1173 [231 USPQ 562, 566] (C.D. Cal. 1986) citing *Audio Fidelity, Inc. v. High Fidelity Recordings, Inc.*, 283 F.2d 551, 558 [127 USPQ 306, 311] (9th Cir. 1960); *St. Ives Laboratories v. Nature's Own Laboratories*, 529 F.Supp. 347, 349-50 (C.D. Cal. 1981); *Clairol, Inc. v. Cosway Co., Inc.*, 184 U.S.P.Q. 583, 586 (C.D. Cal. 1974); *see also, Fuddruckers, supra*, 826 F.2d at 844 [4 USPQ2d 1032] ("in appropriate circumstances, deliberate copying may suffice to support an inference of secondary meaning").

7. Unique or distinctive designs or product shapes do not need a showing of secondary meaning to obtain protection from infringement. The very fact of their distinctiveness causes these unique or distinctive designs to distinguish one person's products from another's. *See, In re International Playtex Corp.*, 153 U.S.P.Q. 377, 378 (TTAB 1967); *cf., Levi Strauss Co. v. Blue Bell, Inc.*, 632 F.2d 817, 820 [208 USPQ 713, 716] (9th Cir. 1980). Since secondary meaning has been proved, the court need not rule on the issue of inherent distinctiveness, but the distinctiveness of plaintiff's design is evidence of its strength.

**[1]** 8. The court concludes that the overall design of the Ferrari DAYTONA SPYDER automobile constitutes protectable trade dress.

### *LIKELIHOOD OF CONFUSION*

**[2]** 9. The court has considered all the factors for determining likelihood of confusion (*see, AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348 [204 USPQ 808, 814] (9th Cir. 1979)), and concludes that the strength of plaintiff's trade dress, the close similarity of the parties' respective trade dresses, the overlap of marketing channels, and defendants' clear intent, coupled with the survey results, clearly indicate that likelihood of confusion is highly probable.[2]

[2] Evidence of actual confusion is difficult to obtain, and failure to prove it is not weighed heavily except where such evidence *should have been available*. *AMF, supra*, 599 F.2d at 353 [204 USPQ at 818]. Degree of care to be exercised by actual purchasers is not relevant since those that may be confused for the most part are found away from the point of purchase. *Rolex Watch, supra*, 645 F.Supp. at 492 [1 USPQ2d at 1121].

### *CONTRIBUTORY INFRINGEMENT*

10. The test for contributory infringement was set out by the United States Supreme Court in *Warner & Co. v. Lily & Co.*, 265 U.S. 526 (1924), wherein the court held that a manufacturer is liable for contributory infringement where it designedly enables or induces another to cause confusion or to pass off, i.e., to commit the unfair trade practice or tort. This circuit, in *Sealy, Inc. v. Easy Living, Inc.*, 743 F.2d 1378, 1381 [224 USPQ 364, 365] (9th Cir. 1984), recognized that a manufacturer may be held liable for contributory trademark infringement "even if it does not itself mislabel goods or deceive consumers."

**[3]** The evidence is clear that defendants have encouraged their customers to deceive the relevant public by selling them a vehicle which is virtually identical to plaintiff's celebrated auto design and which will be paraded as a Ferrari. The court, therefore, concludes that defendants are guilty of contributory infringement.

11. The addition of elements to the infringing product which do not affect the overall appearance will not avoid infringement. *Fleischmann Distilling Corp. v. Maier Brewing Co.*, 314 F.2d 149, 161 [136 USPQ 508, 518-519] (9th Cir. 1963).

### *DILUTION*

12. The California Anti-Dilution Statute, Cal. Bus. & Prof. Code §14330 provides for injunctive relief against the use of a trade dress which is likely to reduce the distinctiveness of a valid common law trade dress or otherwise injure the business reputation of the trade dress owner. This relief is available even in the absence of competition between the parties and in the absence of a likelihood of confusion. *Levi Strauss, supra*, 778 F.2d at 1362 [228 USPQ at 353-354]. The replication of plaintiff's famous DAYTONA SPYDER trade dress by the McBurnie defendants will erode the distinctiveness of such trade dress. "It is precisely this type of injury which §14330 is intended to prevent." *Grey, supra*, 650 F.Supp. at 1175 [231 USPQ at 568]; *Steinway & Sons v. Robert Demars & Friends*, 210 U.S.P.Q. 954, 964 (C.D. Cal. 1981).

**[4]** 13. The defendants' Daytona replicas injure Ferrari's business reputation for quality, uniqueness, and rarity. *See, Grey, supra*, 650 F.Supp. at 1175 [231 USPQ at 568].

### *DEFENSES*

*Abandonment*

14. The 1946 Trademark Act states that:

> A mark shall be deemed to be 'abandoned' (a) when its use has been discontinued with intent not to resume. Intent not to resume may be inferred from circumstances. Non-use for two consecutive years shall be prima facie abandonment. . . .

15 U.S.C. §1127.

Because abandonment of a trademark is in the nature of a forfeiture, it must be strictly proved. *Prudential Ins. Co. v. Gibraltar Financial Corp.*, 694 F.2d 1150, 1156 [217 USPQ 1097, 1101] (9th Cir. 1982), *United States Jaycees v. Philadelphia Jaycees*, 639 F.2d 134, 139 [209 USPQ 457, 462] (3d Cir. 1981).

The evidence in this case clearly shows that Ferrari, although ceasing the manufacture of new DAYTONA SPYDERS in 1974, continued, to the present, to manufacture and sell and to license the manufacture and sale of mechanical and body parts for the DAYTONA. Original molds and tooling have also been maintained. Thus, the Ferrari DAYTONA SPYDERS have continued to be driven, serviced, restored, sold, and exhibited by Ferrari customers. The DAYTONA SPYDER has, therefore, remained in the public eye, and the goodwill symbolized by this design is still strongly associated with Ferrari.

In *Kingsmen v. K-Tel International Ltd.*, 557 F.Supp. 178, 183 [220 USPQ 1045, 1049] (S.D.N.Y. 1983), the court held that a disbanded music group had not abandoned their name and stated, at 183:

> Even though plaintiffs disbanded their group in 1967 and ceased recording new material, there is no evidence suggesting that they failed to use the name Kingsmen during the period from 1967 to the present to promote their *previously recorded albums*.
>
> . . . These plaintiffs have no more abandoned this right to protect the name of Kingsmen than have the Beatles, the Supremes, or any other group that has *disbanded and ceased performing and recording* but continues to collect royalties from the sale of previously recorded material. (Emphasis added).

Likewise, in the case at hand, Ferrari has continued to maintain its goodwill symbolized by the DAYTONA design by extensive and continuous selling of parts, including front and rear body parts that substantially contain the entire design, and by the refur-

bishment and servicing of existing DAYTONA automobiles.

*In American Motors Corp. v. Action-Age, Inc.*, 178 U.S.P.Q. 377 (TTAB 1973) a trademark opposition action, the Trademark Trial and Appeal Board held that the mark RAMBLER had not been abandoned even though the mark had not been used for a period of approximately three years. The Board stated at 378:

> In fact, there is a considerable *reservoir of goodwill* in the mark "*RAMBLER*" in this country that inures to opposer as a consequence of the large number of "RAMBLER" *vehicles on the road*; [and] opposer's activities in supplying "RAMBLER" parts and accessories to owner's of these vehicles; .... (Emphasis added)

[5] The evidence is clear, and the court concludes that Ferrari has not abandoned its DAYTONA SPYDER trade dress, does not intend to abandon its trade dress, and that the goodwill acquired by the DAYTONA SPYDER has remained strong and exclusively associated with Ferrari. Under such *circumstances it would be damaging to* Ferrari and a fraud upon the public to allow defendants to sell their confusingly similar replica Daytona automobiles and kits. The prohibition against the use of another's trademark where the goodwill is still strongly associated with the original owner was long ago recognized in the *Restatement (First) of Torts* §752, Comment (a) even under circumstances where the trademark owner had intentionally abandoned its trademark.

15. "*In actions for infringement of rights* in trade names and trademarks, courts have a duty to protect both the private rights of the original owner and the right of the public to be free from confusion, deception, and mistake." *American Petrofina, Inc. v. Petrofina of California, Inc.*, 189 U.S.P.Q. 67, 83 (C.D. Cal. 1975), *aff'd*, 596 F.2d 896 [202 USPQ 354] (9th Cir. 1979); *Mishawaka Mfg. Co. C. Kresge Co.*, 316 U.S. 203, 205 [53 USPQ 323, 324-325] (1942). The court concludes that the public also has a right to be *protected from confusing or deceiving* trade dress.

*Laches*

16. The defense of laches is available when plaintiff has "slept" on its rights. In order to establish laches a defendant must prove that the plaintiff had knowledge of defendant's activities, that plaintiff's delay was inexcusable, and that the defendant reasonably relied upon plaintiff's delay and was material prejudiced by it. *Golden Door, Inc. v. Odisho*, 437 F.Supp. 956, 967, 968 [196 USPQ 532, 542, 543] (N.D. Cal. 1977), *aff'd*, 646 F.2d 347 [208 USPQ 638] (9th Cir. 1980); *Dolby v. Robertson* 654 F.Supp. 815, 821-822 [1 USPQ2d 1041, 1046] (N.D. Cal. 1986).

Based on the facts set forth, *supra*, defendants failed to meet their burden of proof for any and all of the factors necessary to prove laches. *See, Stork Restaurant v. Sahati*, 166 F.2d 348, 362 [76 USPQ 374, 385, 386] (9th Cir. 1948).

*Estoppel*

17. The defense of estoppel has virtually the same elements as laches except that the defendant must additionally prove that plaintiff, by words or silence, implied its consent to defendants' replication activity, and *defendants need not prove inexcusable* delay.

Based on the facts set forth, *supra*, the court concludes that defendants did not meet their burden of proof and that plaintiff never *consented in any manner to defendants'* replication. *See, Dolby v. Robertson, supra*, at 821-822.

*IRREPARABLE INJURY*

18. Numerous courts have recognized that the damage to goodwill associated with a trademark or trade dress is not capable of precise calculation. "Where there is, then, such high probability of confusion, injury *irreparable in the sense that it may not be* fully compensable in damages almost inevitably follows." *Omega Importing Corp. v. Petri-Kine Camera Co.*, 451 F.2d 1190, 1195 [171 USPQ 769, 772-773] (2d Cir. 1971). *See also, Model Rectifier Corp. v. Takachiko International, Inc.*, 221 U.S.P.Q. 502, 503 (9th Cir. 1983):

> Damages caused by trademark infringement are by their nature irreparable and not susceptible of measurement for a remedy at law.

*See also, Apple Computer, Inc. v. Formula International, Inc.*, 725 F.2d 521, 526 [221 USPQ 762, 768] (9th Cir. 1984) and *Citibank, N.A. v. City Bank of San Franscisco, et al.*, 206 U.S.P.Q. 997, 1007 (N.D.Cal. 1980).

*BALANCE OF EQUITIES*

19. The balance of equities weighs heavily in plaintiff's favor.

*VIOLATIONS OF SECTION 43(a)*

20. Defendants' manufacture and sale of Daytona replicas constitutes a false designation of origin and misleading representation in violation of §43(a) of the Lanham Act, 15 U.S.C. §1125(a).

21. A permanent *injunction is an* appropriate remedy for a violation of §43(a) of the 1946 Trademark Act; for violation of California Business and Professional Code §14330; and for contributory infringement in violation of §43(a).

*INJUNCTIVE RELIEF*

22. Plaintiff is entitled to a permanent injunction enjoining defendants from continuing to manufacture, sell, and falsely designate the origin of *their replica* Daytona, from selling Daytona replicas which will enable customers to mislead and confuse the public, and from diluting the value of the plaintiff's DAYTONA SPYDER trade dress.

On April 24, 1989, this court signed and *filed a judgment of permanent injunction*.

---

**District Court, D. Connecticut**

BOC Group Inc. v. Novametrix Medical Systems Inc.

No. N-86-198 (WWE)

Decided May 19, 1989

**PATENTS**

**1. Infringement — Literal infringement (§120.05)**

Plaintiff's patent claim for automatic "normalization" of electromagnetic data *from blood oximeter* that measured oxygen saturation level in human blood stream without invasive means and that accomplished automatic adjustments by "normalization unit" is literally infringed by defendant's oximeter *with microprocessor*, since plaintiff's "normalization unit" and defendant's microprocessor are equivalent structures which perform same functions.

**2. Patentability/Validity — Anticipation — Prior art (§115.0703)**

*Plaintiff's* patent for oximeter which measured oxygen saturation in human blood system by non-invasive means was not anticipated by prior patent reference that lacked mechanism for automatically compensating for variations in patients' skin thickness and pigmentation.

**3. Patentability/Validity — Obviousness — Relevant prior art (§115.0903)**

Plaintiff's patent for oximeter which measured oxygen saturation in human blood system by *non-invasive means* is not rendered obvious by prior patent reference which did not provide for "normalization" of oximeter data to adjust for differences in skin thickness and pigmentation.

**Particular patents — General and mechanical — Pulse oximeter**

4,407,290, Wilber, blood constituent electromagnetic measuring device and method for measuring oxygen saturation in blood by non-invasive means, valid and infringed.

---

*Patent infringement action brought by* The BOC Group Inc. against Novametrix Medical Systems Inc. Judgment for plaintiff and defendant's counterclaims dismissed.

Keith V. Rockey and Thomas C. Elliott, of Rockey & Rifkin, Chicago, Ill.; Alison L. Bonds, of Murtha, *Cullina*, Richter & Pinney, New Haven, Conn., for plaintiff.

Howard F. Mandelbaum, of Miskin & Mandelbaum, New York, N.Y.; James J. Harrington, of Haythe & Curley, New York; Bennett Last, of Gilbride, Tusa, Last & Spellane, *Greenwich, Conn.*, for defendant.

**Eginton, J.**

This case was tried to the Court without a jury from December 28, 1988 through January 6, 1989. The Court, having heard the testimony of the witnesses examined the documentary evidence introduced during the course of the trial, considered the briefs and arguments of the parties, and being fully advised, now enters the *following findings of* fact and conclusions of law, pursuant to Fed. R.Civ.P. 52(a).

*FINDINGS OF FACT*

Plaintiff BOC Group, Inc. ("BOC") is a *Delaware corporation* with its principal place of business in Montvale, New Jersey. It has among its various operating divisions a health care division called Ohmeda. In mid-1984, BOC acquired Bioximetry Technology, Inc. ("Biox"), *a closely held corporation* based in Boulder, Colorado, which BOC

ot protect knowingly false speech. *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). *Los Angeles Magazine* fabricated an image of Dustin Hoffman using computer digitalization techniques, and then published that image knowing it was false. Defendant, Los Angeles Magazine, Inc., knew that Mr. Hoffman had never worn the designer clothes he was depicted as wearing, and that what they were showing was not even his body. Moreover, Defendant, Los Angeles Magazine, Inc., admitted that it intended to create the false impression in the minds of the public "that they were seeing Mr. Hoffman's body."

**[6]** 11. Defendant, Los Angeles Magazine, Inc.'s copyright preemption defense is unavailing. What Mr. Hoffman seeks to protect — his name, face and persona — are not "writings" or "works of authorship" that come within the subject matter of copyright. 17 U.S.C. § 301. Moreover, the rights that Mr. Hoffman seeks to protect are not "equivalent" to the rights protected by the Copyright Act. The claims asserted by Mr. Hoffman involve extra elements that are different in kind from those in a copyright infringement case. 17 U.S.C. § 301.

12. Defendant, Los Angeles Magazine, Inc.'s "news" or "public affairs" defense to Mr. Hoffman's statutory right of publicity claim does not apply. California Civil Code § 3344(d). The Section 3344(d) exemption to California's statutory right of publicity does not apply when a party uses the name or likeness of another in a knowingly false manner. *Eastwood v. Superior Court*, 149 Cal. App. 3d 409, 425 (1983). Defendant, Los Angeles Magazine, Inc., knew that Mr. Hoffman had never worn the clothes he was depicted as wearing, and that what they were showing was not even his body.

13. Defendant, Los Angeles Magazine, Inc.'s "news" or "public affairs" defense also does not apply because the *Los Angeles Magazine* article is not really a presentation of fashion news or affairs, in that the designer-identified clothes selected for the article were not unified by, or representative of, any particular theme or point of view about fashion. The use of Mr. Hoffman's famous face bears no reasonable (or other) relationship to the fashions themselves, but only serves to attract attention to the magazine. The article does not even constitute "news" about Mr. Hoffman's clothing preferences because Mr. Hoffman never wore those designer clothes.

**[7]** 14. Defendant, Los Angeles Magazine, Inc.'s "news" or "public affairs" defense to the right of publicity permits the use of a person's likeness only to the limited extent reasonably required to convey the news to the public. *See Zacchini v. Scripps-Howard Broadcasting Co.*, 433 U.S. 562, 97 S.Ct. 2849, 53 L.Ed.2d 965 (1977) (holding that television news broadcast of plaintiff's entire human cannonball act violated plaintiff's right of publicity). In this case, no part of Mr. Hoffman's likeness was reasonably required to convey what Defendant, Los Angeles Magazine, Inc., claims was the newsworthy aspect of its article.

**[8]** 15. Defendant, Los Angeles Magazine, Inc.'s "fair use" defense under the Lanham act is unavailing. The use of Mr. Hoffman's name and likeness in *Los Angeles Magazine* was not merely descriptive. Rather, the use suggested Mr. Hoffman's sponsorship and endorsement of *Los Angeles Magazine* and the designer clothes that he appeared to be wearing in the photograph.

16. In connection with each of his four claims. Mr. Hoffman is entitled to compensatory damages in the amount of $1,500,000.00, which represents the fair market value of the right to utilize Mr. Hoffman's name and likeness in the manner in which it was used by *Los Angeles Magazine*.

17. Mr. Hoffman is entitled to punitive damages in an amount to be fixed by the Court after presentation of additional evidence on the ground that Defendant, Los Angeles Magazine, Inc.'s unauthorized use of his name and likeness was wilful and was done in conscious disregard of Mr. Hoffman's rights.

18. Mr. Hoffman is entitled to an award of attorney's fees in an amount to be fixed by the Court after presentation of additional evidence pursuant to California Civil Code Section 3344(a) and Section 35 of the Lanham Act, 15 U.S.C. § 1117(a).

TO THE EXTENT THAT ANY OF THE FINDINGS OF FACT ABOVE ARE DEEMED TO BE CONCLUSIONS OF LAW, THEY SHALL BE CONSIDERED PART OF THIS SECTION.

---

**U.S. District Court**
**Northern District of Illinois**

**Nike Inc. v. Nike Securities L.P.**

Decided February 18, 1999

**TRADEMARKS AND UNFAIR TRADE PRACTICES**

**1. Infringement; conflicts between marks — *Dilution* (§335.05)**

Federal Trademark Dilution Act, 15 U.S.C. §1125(c), should not be retroactively applied to defendant's use of "Nike" and "Nike Securities" marks for financial services, since application of Dilution Act would impair right defendant had when it adopted its "Nike" marks, and would be unfair to defendant, which developed and promoted its marks almost two and one-half years before FTDA became effective, and since allowing dilution claim could require defendant to abandon its investment and accompanying goodwill associated with its name in light of new law which departs from traditional likelihood of confusion standard.

**2. Infringement; conflicts between marks — Dilution (§335.05)**

There is no bright-line rule that Federal Trademark Dilution Act, 15 U.S.C. §1125(c), should be applied to prospective conduct, since retroactivity inquiry is complicated and imprecise, is based on competing considerations and common sense principles, and is not simple or mechanical task, and since any test for retroactivity leaves room for disagreement and cannot classify legal activity with perfect philosophical clarity.

**3. Infringement; conflicts between marks — Dilution (§335.05)**

Defendant had "settled expectations" that its use of "Nike" and "Nike Securities" marks was permissible when it began using them before enactment of Federal Trademark Dilution Act, 15 U.S.C. §1125(c), and FTDA therefore will not be retroactively applied to defendant's conduct, even though Illinois had its own antidilution statute in effect at that time, since relevant inquiry is whether defendant had any expectations with regard to possible federal dilution cause of action.

---

Action by Nike Inc. against Nike Securities L.P. for trademark dilution under 15 U.S.C. §1125(c), trademark and service mark infringement under 15 U.S.C. §1114 and common law, unfair competition under 15 U.S.C. §1125(a), and rectification of trademark registry. On defendant's motion for summary judgment on dilution claim

Alan S. Cooper, Kathy J. McKnight, and Eric J. Fingerhut, of Shaw, Pittman, Potts & Trowbridge, Washington, D.C., Marc S. Cooperman and Christopher J. Renk, of Banner & Witcoff, Chicago, Ill., for plaintiff Nike Inc.

Lawrence M. Jarvis, Richard T. McCaulley Jr., Melissa M. McCaulley, Edward A. Mas II, and Sharon A. Hwang, of McAndrews, Held & Malloy, Chicago, for defendant Nike Securities L.P.

**Nordberg, J.**

Before the court is a motion for partial summary judgment filed by defendant Nike Securities, L.P. ("Securities"). Securities seeks summary judgment on Count I of the complaint filed by plaintiff Nike, Inc. ("Nike"). Count I is a claim for relief under the Federal Trademark Dilution Act of 1995, 15 U.S.C. § 1125(c), which became effective January 16, 1996. Securities argues that application of the Dilution Act in this case constitutes an improper retroactive application of a statute. For the reasons set forth below, this court agrees and grants summary judgment in favor of Securities on Count I of the complaint.

*BACKGROUND*

The following facts are undisputed unless otherwise noted. Defendant Securities is a financial services company located in Chicago. Formed in 1991, Securities is an Illinoi limited partnership and conducts business in two general areas: (1) capital markets; and (2) asset management. This business specifically includes investment banking services, the purchase and resale of fixed income securities, and the sponsoring, underwriting, and distribution of unit investment trusts and mutual funds. Plaintiff Nike is an Oregon corporation which manufactures and sells shoes, athletic clothing and related accessories throughout the United States.

At issue is Securities' use of the marks NIKE and NIKE SECURITIES and the domain name "nikesec.com." The founders of Securities originally adopted the mark "NIKE SECURITIES" for their business because the word "Nikes" (apparently meaning "overcomers" in Greek) was used by them as a battle cry given that they viewed themselves as young entrepreneurs attempting to form a new banking and investment trust firm in an established field. It is undisputed that Securities began using the

its financial products as early as August of 1993.[1]

On May 28, 1991, Securities filed Application Serial No. 74/170,899 in the U.S. Patent and Trademark Office seeking to register its mark. On August 6, 1991, Nike's counsel sent a letter to Securities, objecting to Securities' plan to use the mark NIKE for financial services and asking Securities to discontinue its plan to use the mark. Over the next ten months, there was an exchange of correspondence between Nike and Securities regarding whether Securities' use of its mark violated the Lanham Act or the Illinois trademark dilution statute.

On June 22, 1992, Nike filed an opposition in the U.S. Patent and Trademark Office contesting Securities' application to register the mark NIKE. (Opposition No. 88,485.) The United States Patent and Trademark Office examined Securities' application, determined that Securities' use of the mark was not likely to cause confusion with other registered marks, and then published Securities' mark in the Official Gazette for opposition.

53

## *ANALYSIS*

This motion raises a question concerning the retroactivity of the Federal Trademark Dilution Act of 1995, 15 U.S.C. § 1125(c) (the "Dilution Act"). The Dilution Act was an amendment to the Lanham Act, 15 U.S.C. § 1501 *et seq.*, and became effective on January 16, 1996. Before turning to the specific question in this case, this court first will briefly summarize the structure and purpose of the Dilution Act.

The Dilution Act states, in relevant part:

> The owner of a famous mark shall be entitled, subject to the principles of equity and upon such terms as the court deems reasonable, to an injunction against another person's commercial use in commerce of a mark or trade name, *if such use begins after the mark has become famous* and causes dilution of the distinctive quality of the mark, and to obtain such other relief as is provided in this subsection.

15 U.S.C. § 1125(c)(1). The Act was passed to protect "famous" trademarks against uses that were non-competing but that nevertheless blurred or diluted the distinctiveness of the famous trademarks.[2] Examples of such non-competing uses would include "DuPont shoes, Buick aspirin, and Kodak pianos." *Viacom Inc. v Ingram Enterprises, Inc.*, 141 F.3d 886, 889 [46 USPQ2d 1473] (8th Cir. 1998) *quoting* 141 Cong. Rec. H14317 (statement of Rep. Moorhead). Such uses did not qualify as "classic" trademark infringement because they were non-competing. *Circuit City Stores, Inc. v. Officemax, Inc.*, 949 F. Supp. 409, 412 [42 USPQ2d 1194] (E.D. Va. 1996). Therefore, the Dilution Act "differs from traditional trademark theory in at least one very significant way: *the plaintiff need not show likelihood of confusion between the trademarks at issue.*" *Id.* In sum, under the Dilution Act, a mark may "dilute" a famous mark even though that mark is "used in an entirely different market for an entirely different class of products." *Id.* at 419.

At the time the Dilution Act was passed, some states had already passed a dilution act of their own. *Id.* at 417-18 (noting that at the time of the passage of the Dilution Act, 23 states had dilution statutes). However, the enforcement of such statutes varied, and some states did not have any such act. *Id.* As a result, the Dilution Act provides that an owner of a "famous mark" may obtain a nationwide injunction in addition to monetary damages. 15 U.S.C. § 1125(c).

The parties here agree that the starting point in analyzing the retroactivity of the Dilution Act is *Landgraf v. USI Film Products*, 511 U.S. 244 (1994) — the Supreme Court's most recent statement on the general question of retroactivity of a statute. The Supreme Court held that the Civil Rights Act of 1991 should not be applied retroactively to a case that was pending on appeal when the statute was passed. Although *Landgraf* dealt with the retroactivity of a different statute, it nonetheless contains the relevant principles to analyze this dispute.

In *Landgraf*, the Supreme Court made a number of general comments concerning the nature of the retroactivity inquiry undertaken by a court. The Court generally noted, for example, that "deciding when a statue operates 'retroactively' is not always a simple or mechanical task." *Id.* at 268. The court also generally noted that retroactivity is an area in which judges have "sound instinct" and one in which "familiar considerations" apply:

> The conclusion that a particular rule operates "retroactively" comes at the end of a process of judgment concerning the nature and extent of the change in the law and the degree of connection between the operation of the new rule and a relevant past event. Any test of retroactivity will leave room for disagreement in hard cases, and is unlikely to classify the enormous variety of legal changes with perfect philosophical clarity. However retroactivity is a matter on which judges tend to have sound . . . instinct[s]," *see Danforth v. Groton Water Co.*, 178 Mass. 472, 476, 59 N.E. 1033, 1034 (1901) (Holmes, J.), and familiar considerations of fair notice, reasonable reliance, and settled expectations offer sound guidance.

*Id.* at 270.

The court also noted that there are two "seemingly contradictory" statements of law that courts have used to interpret statutes that "do not specify their temporal reach." *Id.* at 264. One statement is that statutes should not be applied retroactively unless *their language require this result. Id.* The Court explained this rationale as follows:

> the presumption against retroactive legislation is deeply rooted in our jurisprudence, and embodies a legal doctrine centuries older than our Republic. Elementary considerations of fairness dictate that individuals should have an opportunity to know what the law is and to conform their conduct accordingly; settled expectations should not be lightly disrupted. For that reason, the "principle that the legal effect of conduct should ordinarily be assessed under the law that existed when the conduct took place has timeless and universal appeal." *Kaiser*, 494 U.S., at 855, 110 S.Ct., at 1586 (SCALIA, J., concurring). In a free, dynamic society, creativity in both commercial and artistic endeavors is fostered by a rule of law that gives people confidence about the legal consequences of their actions.

*Id.* at 265-66.[3] The other statement is that a court should apply the law in effect at the time it renders its decision.[4] *Id.* at 264.

After discussing the history and purpose of these two general statements of law, the Supreme Court provided the following guideline to be used when "a case implicates a federal statute enacted after the events in suit." *Id.* at 280. First, a court should determine whether Congress intended the statute to have retroactive effect. In this case, the parties agree that the Dilution Act does not contain any express command regarding retroactivity. Absent such intent, the Supreme Court *must determine whether a statute* would have "retroactive effect." If a statute does have such "effect," then the "traditional presumption" against retroactivity applies. To determine whether a statute has "retroactive effect," a court should ask the following questions:

> whether [the statute] would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed.

*Id.*

Before turning to the facts of this case, the court will review the applicable case law on this specific question. The parties point to three district court opinions and one appellate court opinion on point. *Viacom Inc. v. Ingram Enterprises, Inc.*, 141 F.3d 886 [46 USPQ2d 1473] (8th Cir. 1998); *S. Indus., Inc. v. Diamond Multimedia Sys., Inc.*, 991 F. Supp. 1012 [45 USPQ2d 1705] (N.D. Ill. 1998); *Resorts of Pinehurst, Inc. v. Pinehurst Nat'l Dev. Corp.*, 973 F. Supp. 552 [43 USPQ2d 1746] (M.D.N.C. 1997); *Circuit City Stores, Inc. v. Officemax, Inc.*, 949 F. Supp. 409 [42 USPQ2d 1194] (E.D. 1996). These courts have split on this particular question. In *Viacom*, the Eighth Circuit concluded that the dilution Act should be applied, whereas the three district courts concluded that it should not be applied. This court will briefly review these decisions as they provide a thorough summary of the competing arguments on this narrow issue.[5]

---

[1] Securities states that *in fact it* began using ... [illegible] ... as early as

[2] The Act defines "dilution" as the "lessening of the capacity of a famous mark to identify and distinguish goods or services, regardless of the presence or absence of— (1) competition between the owner of the famous mark and other parties, or (2) likelihood of confusion, mistake or decep-

[3] The Court also noted: "[t]he largest category of cases in which we have applied the presumption against statutory retroactivity has involved new provisions affecting contractual or property rights, matters in which predictability and stability are of prime importance." *Id.* at

[4] As part of its discussion of this statement, the Court stated: "Even absent specific legislative authorization, application of new statutes passed after the events in suit is unquestionably proper in many situations. When the intervening statute authorizes or affects the propriety of prospective relief, application of the new provision is not retroactive." *Id.* at 273. As will be noted below, one court has relied on this particular passage as authority in applying the Dilution Act to future conduct.

[5] Although the Eighth Circuit has ruled on this issue, "[n]othing the eighth circuit decides is 'binding' on district courts outside its territory."

...rcuit City Stores, Inc. v. Officemax, ...9 F.Supp. 409 [42 USPQ2d 1194] ...Va. 1996), the district court granted ...l summary judgment on a Dilution Act ..., finding that it was barred by retroacti... principles. OfficeMax filed a Dilution ... counterclaim against CarMax. Office...x sold office supplies and began promot...g its "OfficeMax" service mark in 1988. In ... eight-year period, OfficeMax grew from ... fledgling business operated from the base...ent of its founder to a corporation with ...nnual sales exceeding $3 billion" and with ...0 locations throughout the country Id. at ...10. In contrast, CarMax sold and operat...ed cars and trucks and owned and operat... five retail stores in the southeastern part ... the United States. Beginning in 1993, ...arMax owned federal trademark registra...ons that included "CarMax."

The district court relied on the principles ... forth by the Supreme Court in Landgraf ...d concluded that it would be unfair to ...ply the Dilution Act retroactively in this ...se.[6] The court noted that this was one of ...ose "hard cases" referred to in Landgraf ...here there is "room for disagreement" on ...e question of retroactivity. Id. at 414-15. ...he court ultimately concluded that it would ...unfair to apply the Dilution Act to Car...ax because this federal claim did not exist ... September of 1993 when CarMax "chose ... service mark and opened its first store." ... at 415. "During this two-and-one-half ...ear period before this new claim was cre...ed, CarMax spent millions of dollars ad...rtising its marks and expanding its busi...ess operations." Id. Therefore, applying the ...ilution Act — either through money dam...ges for past misconduct or through an in...nction — would cause CarMax to "lose its ...ery identity, achieved as the result of con...uct and commercial investment, which was ...erfectly lawful at the time." Id.

The court then considered the argument ...hat OfficeMax was seeking only prospective ...junctive relief, affecting only future activi...es. Id. at 416. OfficeMax first argued that ...he retroactivity principles of Landgraf ...hould not even apply to a claim for prospec...ive relief based on the following language in ...Landgraf.

Even absent specific legislative authorization, application of new statutes passed after the events in suit is unquestionably proper in many situations. When the intervening statute authorizes or affects the propriety of prospective relief, application of the new provision is not retroactive.

511 U.S. at 273. The court in Circuit City concluded that this argument "goes too far" and that the passage is "dicta" and "speaks solely to cases in which the relevant conduct was already illegal before the effective date of the intervening statute." 949 F. Supp. at 417.

OfficeMax also argued that even if the principles of Landgraf were applied, it would not be unfair to apply the Dilution Act. Specifically, OfficeMax argued that CarMax could not be surprised by the assertion of a federal Dilution Act claim given that, at the time CarMax began using its mark, twenty-free states (including CarMax's home state of Georgia) had passed anti-dilution statutes. OfficeMax thus argued that CarMax could not have had any "settled expectation" regarding its mark. In rejecting this argument, the court first noted that there was no evidence concerning CarMax's "actual" expectations and that, in any event, the relevant inquiry for retroactivity purposes should focus on the "expectations . . . grounded in the law controlling conduct at the time it occurred." Id. at 418. The court then noted that the federal Dilution Act was passed to "harmonize and nationalize" the often conflicting and sometimes nonexistent state laws in effect at the time. Id. As a result, the court concluded that it would be "manifestly inequitable" to apply the Dilution Act because to do so would cause CarMax "to abandon its investment" and "to start all over at great expense." Id. at 419.

Two other district courts subsequently came to similar conclusions on similar facts and did so primarily relying on the arguments set forth in Circuit City. First, in Resorts of Pinehurst Inc. v. Pinehurst Nat'l Dev. Corp., 973 F. Supp. 552 [43 USPQ2d 1746] (M.D.N.C. 1997), the court considered this issue in a case involving competing golf courses in the famous Pinehurst region of North Carolina. Although the plaintiff argued that it was only seeking to proscribe future conduct, the district court nonetheless concluded that the conduct sought to be ... "occurred well before" the enact...tion Act and that it would ... the Dilution Act

...of other circuits." Unit... 1216 (7th Cir. ... other

to it.' Id. at 558. Second, in S Indus., Inc. v. Diamond Multimedia Sys., Inc., 991 F. Supp. 1012 [45 USPQ2d 1705] (N.D. Ill. 1998), a district court in this district concluded that application of the Dilution Act would be "manifestly unfair" because it would require the defendant to "abandon its investment" when the defendant had begun using the mark in 1991 and had "spent a significant amount of money publicizing" it over a four-year period. Id. at 1021.

In contrast to these decisions, the Eighth Circuit in Viacom came to the opposite conclusion. 141 F.3d 886 [46 USPQ2d 1473]. Plaintiffs Viacom and Blockbuster entertainment (collectively, "Viacom"), who owned trademarks relating to BLOCKBUSTER VIDEO, sued defendant Ingram Enterprises, Inc. ("Ingram"), who owned and operated fireworks stands and used a trademark of BLOCKBUSTER FIREWORKS. Id. at 887-88. The Eighth Circuit focused on the same question in this case — i.e., whether injunctive relief under the Dilution Act may be granted for "on-going dilution that began before the [Dilution Act's] enactment in January 1996." Id. at 888. The Eighth Circuit considered the arguments in Circuit City but did not find them persuasive.

The Eighth Circuit first noted that the language in Landgraf, which is quoted above and which was relied upon by OfficeMax in the Circuit City case, supported the argument that the Dilution Act could apply to prospective injunctive relief. The Eighth Circuit disagreed with the conclusion in Circuit City that this statement was only dicta and instead held that the statement was a part of a "carefully crafted holding" on retroactivity that is "binding on this court." Id. at 889. In addition, the Eighth Circuit held that fairness did not prevent application of the Dilution Act. The Eighth Circuit came to this conclusion, however, not by holding that the question of unfairness was not important. In fact, the court stated that "fairness is important in considering retroactivity issues." Id. Instead, the Eighth Circuit concluded that the issue of fairness could be addressed in § through the equity clause contained in the Dilution Act, which states 1125(c)(1) of the Dilution Act, which states that relief is "subject to the principles of

equity." Id. at 890. Relying on this equity clause, the Eighth Circuit held:

If Ingram's non-competing, non-confusing use of its BLOCKBUSTER mark prior to the [Dilution Act's] enactment was lawful and resulted in Ingram acquiring a valuable and legitimate property interest of its own, Viacom will presumably not be entitled to an anti-dilution injunction granting it a nationwide monopoly in the use of this rather common word.

Id. Thus, in practical effect, the Eighth Circuit's decision allows for a similar result as in Circuit City but does so through a slightly different route.

These decisions amply frame the relevant issue and set forth the competing argument of the parties in this case. On the one hand, Circuit City provides support for Securities while Viacom may provide support for Nike. Ultimately, this court finds that the reasoning of Circuit City more persuasive. As a result, this court finds that the Dilution Act should not be applied in this case.

The facts here are not complicated. Securities began using its marks several years before the Dilution Act became effective and has built its business based on such marks. At the time Securities began using its marks, it was aware of Nike's prior use of similar marks. Nike does not object to the basic facts above, and this court finds that they are sufficient to decide this motion.

[1] Applying the principles of Landgraf, this court finds that application of the Dilution Act would impair a right Securities possessed when it acted. In addition, application of the Act would be unfair to Securities which developed and promoted its mark at a time when it was legal to do so — almost two and a half years before the Dilution Act became effective. These facts are similar to those in the district court decisions discussed above. See, e.g., Circuit City, 949 F. Supp. at 415 (CarMax developed its mark for two and a half years). To allow a Dilution Act claim could require Securities to "abandon its investment and accompanying goodwill associated with its name in light of a new law which departs from the traditional 'likelihood of confusion' standard." S Indus., 991 F. Supp. at 1021. Although Nike argues at length that the facts in those district court cases are different, Nike fails to point to any significant or meaningful distinction. In this court's opinion, the facts here are the same basic facts as in those cases.[8]

[7] The court stated that the cases cited by the Supreme Court for the proposition that prospective relief is permissible involved situations in which the conduct was already illegal before the passage of the intervening statute and also involved situations in which the intervening statute "merely furnished a new remedy for conduct already prohibited under the statutory regime." Id at 558-59.

[8] Alternatively, this court finds that the re... would be the same even following the approac... the Eighth Circuit. Specifically, as pointed o... Viacom, § 1125(c)(1) ...

In addition to arguing that this case is ent factually, Nike makes two addi- arguments. First, Nike points to the age relied upon by the Eighth Circuit *icom* to the effect that statutes should plied to prospective conduct. This court ately agrees with the court in *Circuit* which analyzed this issue and conclud- at this language was dicta. Although ighth Circuit argues that the statement *Landgraf* is part of a "carefully crafted ;," the statement does not specifically to the issue decided in that case. More rtantly, if interpreted as a bright-line as Nike apparently seeks to do here, statement is contrary to the overall t of *Landgraf.* In that opinion, the Su- e Court repeatedly emphasized that the ictivity inquiry was a complicated and cise inquiry based on competing con- itions and common sense principles. Supreme Court stated, among other s, that the retroactivity analysis "is not /s a simple or mechanical task," that est of retroactivity "leave[s] room for reement" and cannot classify legal ac- with "perfect philosophical clarity," hat judges have "sound instincts" in rea and should rely on "familiar consid- ons." 511 U.S. at 268, 270.

Second, Nike argues that there is a ine issue of material fact as to whether rities had "settled expectations" that its of the marks was permissible when it n using them before the enactment of Dilution Act. Nike points out that Illi- ad its own anti-dilution statute in effect e time Securities began using these s. 765 ILCS 1035/15 (1994). Nike also s out that it repeatedly informed Securi- that Nike believed Securities was in tion of the Illinois statue as well as the am Act. Thus, argues Nike, there is er surprise nor unfairness in applying ederal Dilution Act here even though it not in effect at the time.

is court does not find this argument iasive. It is the same argument consid- and rejected in *Circuit City*, 949 F. at 418-19, and this court agrees with easoning in that opinion. Although the es here debate the various differences een the Illinois statute and the federal tion Act, this court believes that the ant inquiry is whether Securities had expectations with regard to a possible federal cause of action.[9] In this regard, the court agrees with Securities when it asks the following rhetorical question in its brief: "if the Illinois Dilution Act were identical to the Federal Dilution Act in every way, why would [Nike] be adamant about asserting a claim under the Federal Dilution Act and yet not have made any claim under the Illinois Dilution Act?" (Sec. Reply Br. at 10.) In its opening brief (at 3), Nike itself stated that the Dilution Act was passed because relief under state law was "questionable." Moreover, even if Securities were liable under the Illinois statute, the Supreme Court has stated that any possible "increase" in a party's liability is sufficient to trigger the "traditional presumption" against retroactivity. *Landgraf*, 511 U.S. at 280.[10]

*CONCLUSION*

For the reasons set forth above, this court grants defendant Securities' motion for partial summary judgment on Count I of the complaint, entering judgment for defendant against plaintiff on Count I.

---

o the principle of equity." Therefore, under principles of equity, this court believes the [illegible]

[9] This court thus agrees with the analysis in *Circuit City* that the inquiry into "settled expectations" is one relating to the expectations regarding the possible applications of a federal cause of action at the time the party began using its mark. 949 F.Supp. at 418. On this issue, Nike does not raise a genuine issue of material fact as to settled expectations. Instead, Nike attempts to frame the inquiry as one relating to Securities' expectations that its marks would face *any* legal challenges and then argues that there are material issues of fact on that question. Because this court finds that the latter question is not the relevant inquiry, this court does not find a genuine issue of material fact in this case.

[10] As noted previously, the Supreme Court in *Landgraf* stated (*id.* at 280):

> When a case implicates a federal statute enacted after the events in suit, the court's first task is to determine whether Congress has expressly prescribed the statute's proper reach. If Congress has done so, of course, there is no need to resort to judicial default rules. When, however, the statute contains no such express command, the court must determine whether the new statute would have retroactive effect, i.e., whether it would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed. If the statute would operate retroactively, our traditional presumption teaches that it does not govern absent clear congressional intent favoring such a result.

**U.S. Patent and Trademark Office**
**Trademark Trial and Appeal Board**

In re Azteca Restaurant Enterprises Inc.

Serial No. 74/666,488

Decided January 29, 1999
Released March 3, 1999

**TRADEMARKS AND UNFAIR TRADE PRACTICES**

**1. Infringement; conflicts between marks — Likelihood of confusion — Relatedness of goods or services — Similar (§335.0305.03)**

Applicant's Mexican restaurant services and registrant's Mexican foods must be considered related for purposes of assessing likelihood of confusion between applicant's "Azteca Mexican Restaurant" mark and registrant's "Azteca" marks, since Mexican food items are principal items or entrees served by Mexican restaurants, and since average consumer would therefore be likely to view Mexican food items and Mexican restaurant services as emanating from same source if such goods and services are sold under same or substantially similar marks.

**2. Infringement; conflicts between marks — Likelihood of confusion — Particular marks — Confusion likely (§335.0304.03)**

Applicant's "Azteca Mexican Restaurant" mark is substantially similar in sound, appearance, and connotation to registrant's "Azteca" marks, when marks are considered in their entireties, since marks convey essentially same commercial impression, namely ethnic sounding term suggesting Mexican food; however, term "Azteca" is not so highly suggestive that scope of protection accorded to registrant's marks for Mexican food items would not extend to use of "Azteca" in connection with restaurants featuring Mexican cuisine.

**3. Infringement; conflicts between marks — Likelihood of confusion — Evidence of Actual confusion (§335.0303.04)**

Absence of evidence of actual confusion between applicant's "Azteca Mexican Restaurant" mark and registrant's "Azteca" marks for Mexican food items weighs in applicant's favor in likelihood of confusion analysis, but does not warrant conclusion that confusion is not likely, since any doubt raised as to ultimate conclusion on confusion issue must be resolved in favor of prior registrant.

Appeal from refusal of trademark registration application (Anthony R. Masiello, examining attorney; Sidney Moskowitz, managing attorney).

Application of Azteca Restaurant Enterprises Inc. for registration of trademark ("Azteca Mexican Restaurant," for restaurant services), serial no. 74/666,488, filed April 26, 1995. From final refusal of registration, applicant appeals. Affirmed.

KiSong Kim Lang-Caditz, of Christensen, O'Connor, Johnson & Kindness, Seattle, Wash., for applicant.

Before Hanak, Quinn, and Walters, administrative trademark judges.

**Quinn, administrative trademark judge.**

An application has been filed by AZTECA MEXICAN RESTAURANT in typed form for "restaurant services."[1]

The Trademark Examining Attorney has refused registration under Section 2(d) of the Act on the ground that applicant's mark, when applied to applicant's services, so resembles the following previously registered marks, all owned by the same entity, as to be likely to cause confusion: AZTECA in typed form for "partially prepared Mexican foods, namely tortillas";[2] the mark shown below

AZTECA

for "flour taco shells, flour tortillas, corn tortillas, chunky salsa"[3] and "all-purpose

---

[1] Application Serial No. 74/666,488, filed April 26, 1995, alleging dates of first use of December 7, 1977. The words "Mexican Restaurant" are disclaimed apart from the mark. The application includes the statement that "'Azteca' is translated as the noun or adjective Aztec."

[2] Registration No. 956,581, issued April 3, 1973; renewed.

[3] Registration No. 1,445,441, issued June 30, [illegible]

T&B's Rule 60(b) motion is VACATED, and this case is REMANDED for further proceedings consistent with this opinion.

---

**U.S. District Court**
**Southern District of Texas**

*Polo Ralph Lauren L.P. v. Schuman*

No. H-97-1855

*Decided February 9, 1998*

**TRADEMARKS AND UNFAIR TRADE PRACTICES**

**1. Infringement; conflicts between marks — *Dilution* (§335.05)**

**REMEDIES**

**Non-monetary and injunctive — Equitable relief — Permanent injunctions — Trademarks and unfair trade practices (§505.0709.09)**

Defendant's use of "Polo" in name of adult entertainment establishment is likely to dilute plaintiff's "Polo" trademark by tarnishment, since tarnishment can be shown when mark is used in connection with obscenity, unwholesome wares, or sexual or *illegal activity, and since defendant's use of* mark to promote adult entertainment business dilutes distinctive quality of plaintiff's *famous mark; plaintiff is entitled to injunc*tive relief under both Federal Anti-dilution Act, 15 USC 1125(c), and Texas law, Tex. *Bus. & Comm. Code Section 16.29., since* plaintiff has established that it will suffer irreparable harm if relief is not granted, that there is no adequate remedy at law, and that injunction will not disserve public interest.

**TRADEMARKS AND UNFAIR TRADE PRACTICES**

**2. *Infringement; conflicts between marks* — Willful (§335.11)**

**REMEDIES**

**Non-monetary and injunctive — Equitable relief — Permanent injunctions — Trademarks and unfair trade practices (§505.0709.09)**

Defendant's use of term "Polo" in conjunction with name of adult entertainment establishment was act of willful infringement, since, following preliminary injunction hearing, defendant signed written agreement pledging not to use "Polo" or similar marks in connection with his adult entertainment business, and thereby implicitly acknowledged that dilution to plaintiff's mark results from such use, and since defendant, after signing stipulated order, began using misleading exterior sign incorporating term "Polo," and displayed two signs inside his business that infringe plaintiff's mark.

**3. Monetary — Damages — Trademarks and unfair trade practices — Profits (§510.0508.03)**

*Trademark infringement and dilution* plaintiff is entitled to recover monetary damages under Lanham Act's Section 35(a), 15 USC 1117(a), in form of defendant's profits, since defendant's actions after signing stipulated order, in which he implicitly acknowledged that dilution of plaintiff's famous "Polo" mark results from his use of term "Polo" in name of his adult entertainment establishment, were willful, and since de*fendant was unjustly enriched as result of* those acts.

**4. Monetary — Attorneys' fees; costs — Trademarks and unfair trade practices — Exceptional case (§510.0907.03)**

Action for trademark infringement and dilution is "exceptional case" in which plaintiff is entitled to recover attorneys' fees pursuant to Lanham Act's Section 35(a), 15 USC 1117(a), *since defendant's conduct in* using plaintiff's "Polo" mark in name of his adult entertainment establishment, despite *having signed stipulated order in which he* implicitly acknowledged that dilution of plaintiff's mark would result from such use, *was willful.*

---

Action by Polo Ralph Lauren L.P. against Mark Schuman for trademark infringement and dilution in violation of Lanham Act, 15 USC 1117 and 1125(c), and violation of Texas' anti-dilution statute, Tex. Bus. & *Comm. Code Section 16.29. Following entry* of preliminary injunction, plaintiff moved for order of contempt, and for permanent *injunction and monetary damages. Motion* for permanent injunction and monetary damages granted.

*Anthony F. Lo Cicero and Nancy M. Dodderidge, of Amster, Rothstein & Ebenstein, New York, N.Y.; Stephen Michael Abbott, Houston, Texas, for plaintiff.*

Martin Earl McVey, Houston, for defendant.

**Milloy, U.S. magistrate judge.**

## MEMORANDUM AND ORDER GRANTING PERMANENT INJUNCTIVE AND MONETARY RELIEF

On June 27, 1997, this *matter was transferred* to this court upon the parties' written consent to proceed before a United States *magistrate judge under* 28 U.S.C. § 636(c), for all purposes, including trial and final judgment. (Docket Entry #11). On July 9, 1997, the court entertained evidence and testimony *on the motion by Plaintiff* PRL Holdings, Inc., as successor-in-interest to Polo Ralph Lauren, L.P. ("Plaintiff" or "*Polo Ralph Lauren*") for a temporary injunction. Following the *presentation of evi*dence, an agreed order was entered on those matters. The order was to take effect July 11, 1997, *at 5:00 p.m. (Agreed Order*, Docket Entry #20). Some weeks later, Plaintiff moved for a finding of contempt against *Defendant* Mark Schuman, individually, and doing business as THE POLO CLUB ("Defendant" or "Schuman"), and for a permanent injunction and monetary dam*ages. (Docket Entry #21)*. On October 9, 1997, this court issued an order *for Defend*ant to show cause why he should not be held in contempt. (Docket Entry #25). The issue of *contempt was joined, by agreement of the* parties, with the matters to be heard in support and defense of Plaintiff's motion for *a permanent injunction* and monetary damages. That hearing took place on *November* 12, 1997. At the close of the evidence, Defendant was given the opportunity to supplement the record, *if necessary. No such sup*plementation has taken place. On December 3, 1997, Plaintiff filed its proposed findings *of fact and conclusions of law* on its requests for a permanent injunction and *monetary* relief, as well as on its request that Defend*ant* be held in contempt of court. To date, Defendant has made *no written response to* either issue.

After a review of the pleadings, the evi*dence admitted, the testimony*, and the applicable law, the court GRANTS Plaintiff's motion for a permanent injunction and monetary damages. (Docket Entry #21). The *precise terms of that order of permanent* injunction are set out in a separate order filed this date. Further, having determined *that the law may be unclear*, at present, in regard to this court's authority *to enter an* order of contempt, a separate recommendation and proposed findings of fact are submitted to the Honorable Venessa D. Gilmore *recommending that Schuman* be found in contempt of this court's July 11, 1997, order.

### BACKGROUND

Through the years, Polo Ralph Lauren has *obtained* a number of registered marks on a wide variety of goods. In these *proceedings*, Defendant has presented no evidence to controvert that, from 1967, Polo Ralph Lauren has continuously *and extensively used the* Polo Trademarks, and that these have become "inherently distinctive and famous throughout *the world as a symbol of the high* quality standards and exclusivity that it maintains for its products" and related services. (*Plaintiff's Motion for Permanent* Injunction and for Judgment of Contempt ["Plaintiff's Motion"], Docket Entry #21).

*In May of 1997*, Polo Ralph Lauren filed this action complaining *that Defendant's* business utilized its name, or aspects of its protected trademark, in an unlawful manner. Plaintiff *complained, specifically*, that Schuman had incorporated the famous Polo trademark in connection with his adult enter*tainment enterprise, then known as* "THE POLO CLUB". Evidence has shown that Schuman's business, located at 2816 Green*ridge*, Houston, Texas ("the business"), is a free standing building that *purports to offer* adult entertainment, in the nature of "games", to fee-paying male customers. To play these games — *limited to darts at the* time of the November 1997 hearing — on the premises, customers are required to pay an *hourly fee which entitles them* to the company of a female to "assist them playing a game." (Transcript of the July 9, 1997 *Preliminary Injunction Hearing* ["Transcript"], p. 45, Docket Entry # 23). The customer and his female companion then *have access to* various private rooms located within the business. (Transcript, p. 44). These females, who have been described by *Schuman* as "independent contractors", work under such names as "Bambi", "Hollywood", and "Tiffany". (Transcript p. 44). The testimony and exhibits show that the rooms, and *companionship, are subject to* an hourly "room fee" of $30.00 for games of a 30 minute duration, or $50.00 for an hour's *diversion. Customers are advised* that "tipping" should not exceed $200.00, and that "contact" is prohibited. Other than those *conditions, customers are* urged to "treat her well and have a good time". (Plaintiff's Exhibit #16).

When Plaintiff learned that Schuman was using the name THE POLO CLUB for his

adult entertainment establishment, this action, understandably, followed. In its request for relief, Plaintiff cites violations of its rights under federal and state law. It has invoked the Lanham Act provisions set out at 15 U.S.C. § 1117 and § 1125(c), regarding trademark infringement and dilution, and the Texas anti-dilution statute, codified at § 16.29 of the Texas Business & Commerce Code, in support of its claim under the Texas Anti-Dilution statute. Plaintiff argues that Defendant has violated its trademark rights, and that these violations were willful ones which entitle it to monetary damages and an award of its attorneys' fees and costs, in addition to injunctive relief. Finally, Plaintiff contends that, after agreeing to the terms of an order for a preliminary injunction, Defendant willfully violated that order by persisting in infringing acts, and that he should be found in contempt of court and sanctioned for that activity. The court agrees with Plaintiff's *arguments and grants the* remedies that it is seeking. The bases for this court's ruling are set out specifically in the Findings of Facts and Conclusions of Law, consistent with Rule 52 of the Federal Rules of Civil Procedure, that are incorporated in this memorandum order.

INJUNCTIVE RELIEF

[1] The court finds that Polo Ralph Lauren has demonstrated that it is the owner of a famous trademark and that Defendant's use of the name THE POLO CLUB and/or "Polo Executive Retreat" commenced after that mark became famous. Here, the Court is persuaded of the likelihood of dilution to Plaintiff's trademark by tarnishment through Defendant's use of the name THE POLO CLUB and/or "Polo Executive Retreat" for an adult entertainment establishment located at 2816 Greenridge Drive, in Houston, Texas. *Sunbeam Prods., Inc. v. West Bend Co.*, 123 F.3d 246, 260 [44 USPQ2d 1161] (5th Cir. 1997). Tarnishment can be shown when Plaintiff's mark is used in connection with shoddy goods and services, or an association with obscenity, unwholesome wares, or sexual or illegal activity. *A famous trademark can also suffer* dilution that results from an unauthorized use which degrades, tarnishes, or dilutes the mark's distinctive quality. *Haas Outdoors, Inc. v. Oak Country Camo, Inc.*, 957 F. Supp. 835 [42 USPQ2d 1407] (N.D.Miss. 1997); *Clinique Labs., Inc. v. Dep Corp.*, 945 F. Supp. 547, 562 (S.D.N.Y. 1996). Defendant's use of the name THE POLO CLUB and/or "Polo Executive Retreat" to promote an adult entertainment business dilutes the distinctive quality of Plaintiff's famous Polo trademark. The court also concludes that such use by *Defendant, if permitted in the* future, will cause Plaintiff's mark to continue to suffer negative associations. *Hormel Foods Corp. v. Jim Henson Prods.*, 73 F.3d 497, 507 [37 USPQ2d 1516] (2d Cir. 1996).

The court finds, in this instance, that Polo Ralph Lauren has established that it will *suffer irreparable harm if relief is not granted* under the Federal Anti-dilution Act, 15 U.S.C. § 1125(c). *Clinique Labs.*, 945 F. Supp. at 550; *Deere & Co. v. MTD Prods., Inc.*, 860 F. Supp. 113 (S.D.N.Y.), *aff'd*, 41 F.3d 39 [32 USPQ2d 1936] (2d Cir. 1994). From the facts and evidence presented, Polo *Ralph Lauren has met its burden to show* that (1) there exists a substantial threat of irreparable harm to Plaintiff that outweighs any harm that the relief would impose on Defendant; (2) that there is no adequate remedy at law; and (3) that in granting a permanent injunction the public interest is *not disserved. 15 U.S.C. § 1116 (1994 &* Supp. 1996); *Union Nat'l Bank of Texas, Laredo v. Union Nat'l Bank of Texas, Austin*, 909 F.2d 839, 844 [16 USPQ2d 1129] (5th Cir. 1990); *Elvis Presley Enterprises, Inc. v. Capece*, 950 F. Supp. 783, 803 (S.D.Tex. 1996); see also J. Thomas McCarthy, *McCarthy On Trademarks and Unfair Competition* § 301. For all of those reasons stated in regard to Plaintiff's right to relief under the Federal Antidilution statute, Plaintiff is also entitled to relief under Texas law. The Texas anti-dilution statute provides that a plaintiff is entitled to injunctive relief *to remedy an ongoing dilution if there is a* likelihood that such acts will result in a blurring or tarnishment of its trademark. Tex. Bus. & Comm. Code Ann. § 16.29 (West. Supp. 1996). That is so without regard to whether the claimant is in competition with the infringer, and even in the ab*sence of a likelihood of consumer confusion. Exxon Corp. v. Oxford Clothes, Inc.*, 109 F.3d 1070, 1080-81 [42 USPQ2d 1417] (5th Cir.), *cert. denied*, 118 S. Ct. 299 (1997). Polo Ralph Lauren has shown ample evidence that there is a likelihood of dilution due to tarnishment by Defendant in this case. *Therefore, Polo is entitled to the injunc*tive relief requested under Texas law as well. 1996); *Exxon*, 109 F.3d at 1080. Tex. Bus. & Comm. Code Ann. § 16.29 (West. Supp. 1996); *Exxon*, 109 F.3d at 1080.

[2] In July 1997, following the preliminary injunction hearing, and pursuant to his *written agreement, Defendant* was ordered to refrain from use of "the name THE POLO CLUB or Plaintiff's Polo Player Symbol, or any marks similar thereto" in connection with the conduct of his adult

entertainment business. (Agreed Order, *Docket Entry # 20). Having made such* agreement, Schuman implicitly acknowledged that a dilution to Plaintiff's mark results from such use in connection with his adult entertainment business. The court finds, therefore, that Schuman's attempt to garner business by using the term "Polo" in conjunction *with the name* "Executive Retreat" constitutes an act of willful infringement in this instance. In that regard, a defendant who has been enjoined from acts that dilute a trademark has a heavier burden than one not so enjoined from engaging in like activity. *Howard Johnson Co., Inc. v. Khimani*, 892 F.2d 1512, 1517 [13 USPQ2d 1808] (11th Cir. 1990). There is no question that, in this circuit, one previously found "guilty of infringing the trademark rights of others, should thereafter be required to keep a safe distance away from the dividing line between violation of and compliance with the injunction. [One] must do more than see how close [he] can come with safety to that which [he] [was] enjoined from doing". *Eskay Drugs v. Smith Kline & French Labs.*, 188 F.2d 430, 432, 89 U.S.P.Q. 202, 203-04 (5th Cir. 1951). In order to insure that the court's broad discretion is utilized appropriately, and to "insure that the Lanham Act is not frustrated" by those who might wish to circumvent an injunction with a subsequent but relatively meaningless modification, the fifth Circuit has observed that " '[a] competitive business, once convicted of unfair competition in a particular, should thereafter be required to keep a *safe distance from the* margin line — even if that requirement involves a handicap as compared with those who have not disqualified themselves.' " *Sunbeam Prods., Inc. v. West Bend Co.*, 123 F.3d 246, 260 [44 USPQ2d 1161] (5th Cir. 1997) (*citing Chevron Co. v. voluntary Purchasing Groups, Inc.*, 659 F.2d 695, 705 [212 USPQ 904] (5th Cir. Unit A 1981) (*quoting Broderick & Bascom Rope Co. v. Manoff*, 41 F.2d 353 [6 USPQ 8] (6th Cir. 1930)). Indeed, in July 1997, Schuman agreed that he had previously crossed the "line of fair competition", and he is now ordered to "stand well back" from *it. Sunbeam*, 123 F.2d at 261.

The court concludes from the evidence that Schuman began use of a misleading sign which incorporated the term "Polo" into the business's purported name, "Executive Retreat". Schuman created this sign even after he had stipulated to the terms of the Agreed Order, in which he voluntarily expressed his intent to avoid such a use. He should now be held liable and accountable for those actions and will not be heard to complain if he is enjoined from further use of the term "Polo" *in connection with the business. Clearly*, there is no inconvenience, harm, or damage to Defendant if he is enjoined from using the name "Polo Executive Retreat", or any combination of these terms, in the operation of his adult entertainment establishment. The harm to Polo Ralph Lauren from Defen*dant's actions in the use of that, or a similar* name, clearly outweighs any inconvenience the Defendant will suffer. The court finds that Defendant's use of that misleading sign, after July 11, 1997, which announced his business as "Executive Retreat", and noted "Polo Players Welcome", is evidence of a *willful violation of Plaintiff's rights.* (Plaintiff's Exhibit #15). In July 1997, Defendant obtained two different certificates to do business at the 2816 Greenridge location. On those was in the name of "Polo Execut... Retreat," and the other in the name of "Executive Retreat and Game Parlor". It is *obvious that Plaintiff was hoping to elude* this court's attention and/or the consequences of a violation of the Agreed Order by securing two different certificates so that a non-infringing name could be substituted if his infringing acts were detected.

The court finds further that, in direct *violation of his agreement, and this court's* order, Schuman displayed two signs inside his business that infringe on Plaintiff's Exhibit 14 and Exhibit 16). These signs, both reciting fees and instructions to customers utilized the name "The Polo Club" and were openly displayed after the Agreed Order *became effective on July 11, 1997. The court* finds that the display of these two signs is further evidence of a willful violation of Plaintiff's rights.

MONETARY DAMAGES

[3] The court concludes that as a re... *Defendant's infringing use, Plaintiff has suf*fered a tarnishment of its reputation in its protected trademark. 15 U.S.C. § 1125(c). Having heard the evidence, the court also concludes that Defendant's acts of infringement, after July 11, 1997, were willful and that injunctive relief alone will not satisfy *the equities of this case. See Champion Spark Plug Co. v. Sanders*, 331 U.S. 125 [73 USPQ 133] (1947); *Bandag, Inc. v. Al Bolser's Tire Stores, Inc.*, 750 F.2d 903 [223 USPQ 982] (Fed. Cir. 1984).

Because Defendant's actions after July 11, 1997, were willful and from those acts he *was unjustly enriched, Plaintiff is entitled* damages, under the Lanham Act, in the form of an accounting of Defendant's profits. 15 U.S.C. § 1117(a); *see Texas Pig Stands v. Hard Rock Cafe Int'l, Inc.*, 966 F.2d 956

[23 USPQ2d 1639] (5th Cir. 1992); *Maltina Corp. v. Cawy Bottling Co., Inc.*, 613 F.2d 582 [205 USPQ 489] (5th Cir. 1980); *Pebble Beach Co. v. Tour 18 I, Ltd.*, 942 F. Supp. 1513 (S.D.Tex. 1996); *Elvis Presley Enterprises, Inc. v. Capece*, 950 F. Supp. 783 (S.D.Tex. 1996). Here, Schuman has not disputed the testimony that was produced concerning his profits and has offered no proof to the contrary. *See Lindy Pen Co. v. Bic Pen Co.*, 982 F.2d 1400 [25 USPQ2d 1570] (9th Cir.) *cert. denied*, 510 U.S. 815 (1993); *Louis Vuitton S.A. v. Spencer Handbags Corp.*, 765 F.2d 966 [227 USPQ 377] (2d Cir. 1985). Plaintiff need only introduce credible proof of the total amount of a Defendant's sales from its infringing conduct and Schuman has the burden to show evidence of any costs or deductions that should be considered in mitigation of that sum. *Martin's Herend Imports, Inc. v. Diamond & Gem Trading USA Co.*, 112 F.3d 1296 [42 USPQ2d 1801] (5th Cir. 1997) (*citing Holiday Inns, Inc. v. Alberding*, 683 F.2d 931 [216 USPQ 568] (5th Cir. 1982)). Schuman has not done so. Generally, damages under the Lanham Act are meant to represent those profits that are "demonstrably attributable to the unlawful use of the trademark", but in this case, Schuman's testimony persuades the court that he chose the name of the business, after July 11, 1997, in the hope of trading on the goodwill and reputation that is vested in the Polo Ralph Lauren trademarks. As there was no evidence to controvert Plaintiff's showing, the court accepts Schuman's own statements about his profits as the measure of damages in this case. (Transcript of the November 12, 1997 Show Cause Hearing, pp. 38-39, Docket Entry #33); *Texas Pig Stands, Inc. v. Hard Rock Cafe Int'l, Inc.* 966 F.2d 956. 957 [23 USPQ2d 1639] (5th Cir. 1992) (*citing Mishakawa Rubber & Woolen Mfg. Co. v. S.S. Kresge Co.*, 316 U.S. 203, 206 [53 USPQ 323] (1941)).

## ATTORNEY'S FEES

[4] Having determined that Defendant's conduct, after July 11, 1997, was willful, the court finds further that this is an "exceptional case" under the Lanham Act. Plaintiff is therefore entitled to recover the reasonable attorney's fees it expended in pursuing its rights. 15 U.S.C. § 1117(a). Polo Ralph Lauren has presented uncontroverted evidence on the reasonable number of hours and fees engendered in prosecuting its claims. (Declarations by Anthony Lo Cicero and Steven Abbott, Docket Entry #27). Defendant has contested, in no way, this "lodestar" figure of $46,528.00. *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974). The court has been given no reason to dispute that these fees, as reflected in the billable hours expended, are not reasonable. However, the court declines to grant Plaintiff's suggestion that it should adjust that amount upward.

## FINDINGS OF FACT

1. PRL USA Holdings, Inc., is the successor-in-interest to Plaintiff Polo Ralph Lauren, L.P. ("Plaintiff" or "Polo Ralph Lauren"). Plaintiff is the owner of numerous registrations for the POLO trademark. These registrations include Registration No. 1,363,458, for the POLO trademark for diverse items of apparel; Registration No. 276,855, for the POLO trademark for collars; Registration No. 1,446,173, for the POLO trademark for prescription and nonprescription frames and sunglasses; Registration No. 1,468,420, for the POLO trademark for men's, women's, and children's athletic shoes; Registration No. 1,532,557, for the POLO trademark for non-medicated toilet preparations, which include bath salts, talcum and face powders, face cream, scalp stimulating preparations and after-shave lotions, cosmetic preparations, including lipstick, brilliantine, hair lotion, shampoos, dental creams, soaps, perfumes, and other body oils; Registration No. 1,671,466, for the POLO trademark for beverage ware and china, including plates, saucers, cups, bowls, servers and platters; Registration No. 1,798,814, for the POLO trademark for sporting goods, which include basketballs, volleyballs, golf balls, and golf bags.

2. These registrations date from as early as 1930, through October of 1993, and are hereafter collectively referred to as the "POLO Trademarks".

3. Plaintiff has used the POLO Trademarks continuously and extensively since 1967, and Defendant did not present evidence to controvert that those POLO Trademarks have become inherently distinctive and famous throughout the world. Likewise, Defendant has not controverted that this symbol is one of the "highest quality standards and exclusivity" for Plaintiff's products and services.

4. Plaintiff filed its complaint and motion for preliminary injunction on May 28, 1997. Following a hearing, at which Defendant appeared in person and through his counsel, the parties agreed to the terms of a preliminary injunction.

5. Following that hearing, the court issued an Agreed Order which enjoined Defendant

Mark Schuman, individually, and doing business as The Polo Club, from the following activities:

a. Using THE POLO CLUB mark and the Polo Player Symbol, or any marks similar thereto, in connection with the sale of any unauthorized goods or the rendering of any unauthorized services, including an adult establishment or any advertising for such unauthorized goods or services;

b. Diluting the distinctive quality of THE POLO CLUB and Polo Player Symbol trademark;

c. Taking any other action which has the effect of injuring Plaintiff's business reputation or harming or tarnishing Plaintiff's *reputation and goodwill in the POLO* Trademarks.

That order was signed on July 17, 1997, and its terms were to take effect on July 11, 1997, at 5:00 p.m. (Agreed Order, Docket Entry #20).

6. To date, Defendant has shown no evidence that he would be harmed if permanently enjoined from engaging in the acts or omissions specified in the preliminary injunction order. Indeed, Defendant agreed to refrain from engaging in such acts and further stipulated, in answer to Plaintiff's complaint for trademark dilution, that he would "not use the name THE POLO CLUB, or any copy of the Polo Player Symbol." (Defendant's Amended Answer, Docket Entry #17).

7. It is beyond dispute that Defendant had notice of the terms of the order on preliminary injunction that was entered and effective July 11, 1997.

8. On November 12, 1997, this court granted *Plaintiff a trial amendment* to allow it to move to permanently enjoin Defendant's use of the term "Polo Executive Retreat", in connection with Defendant's adult entertainment business. Plaintiff added the allegation that the use of the term "Polo Executive Retreat" in connection with the business located at 2816 Greenridge in Houston, Texas, is also a dilution of POLO's trademark, and a violation of the federal and Texas statutes. Plaintiff alleged further, by way of its trial amendment, that such use was a willful violation of Plaintiff's rights.

9. The court allowed that trial amendment after finding that Defendant would not be unduly prejudiced or surprised by that additional allegation, and that it was in the best interests of the parties, as well as the interests of justice, to entertain evidence and testimony on the expanded allegations. Fed. R. Civ. P. 15(b). Moreover, Defendant was allowed the opportunity to supplement the record should any prejudice to his right to defend against that allegation occur because of the amendment.

10. After Defendant expressed an intention to take the deposition of counsel for Westchester Media Corporation, he was allowed the opportunity, through November 21, 1997, to conduct a deposition and to supplement the record. To date, Defendant has not supplemented the record by affidavit or deposition testimony.

11. Defendant did not object to the trial amendment, and did not take advantage of the opportunity to supplement the record.

12. Defendant has made no objection to the declarations submitted by attorneys for Plaintiff in regard to the reasonableness of the attorneys' fees and the related costs and expenses that it seeks. Those declarations and exhibits were received without objection, and without contravention, and the court will consider those declarations as true in all respects.

13. On some date after July 11, 1997, Defendant obtained two different certificates to do business at the location on Greenridge Drive. One of these certificates was in the name "Polo Executive Retreat"; the other was *for a business to be called "Executive* Retreat and Game Parlor".

14. In contravention of his agreement, and in violation of this court's order endorsing that agreement, on or about July 17, 1997, Defendant began using an outdoor sign in connection with his adult entertainment establishment which alluded to the business as "Polo Executive Retreat". (Plaintiff's Exhibit #15).

15. On the date of the permanent injunction hearing, November 12, 1997, Defendant's business prominently displayed term "Polo" in connection with the purported name of his business, "Executive Retreat", on the only signpost that is located outside the entrance. The sign displays the word "POLO" in large letters, although it also displays the words "Players Welcome", in significantly smaller letters. That "invitation" to polo players is located on the same line as the word "POLO", but it is written in markedly smaller letters. The court finds that the placement of the words and lettering on the sign leads a reader to conclude, from a distance, that the name of the business is "Polo Executive Retreat". (*See* Plaintiff's Exhibit #15).

16. Defendant's use of Plaintiff's POLO Trademarks began after the trademarks became world famous.

17. Defendant's unauthorized use of Plaintiff's POLO Trademarks in connection with

an adult entertainment establishment degrades, tarnishes, and dilutes the distinctive quality of the famous Polo trademark, in violation of both federal and Texas anti-dilution statutes. Moreover, it is a violation of the terms of the Agreed Order to which Defendant has been subject since July 11, 1997. (Docket Entry #20).

18. *Having reviewed the evidence and the* law applicable to Plaintiff's motion, the court finds that Defendant is properly enjoined from further acts that have the effect of diluting the distinctive quality of the POLO trademark, or in injuring Plaintiff's business and reputation, or tarnishing Plaintiff's *reputation and goodwill in the POLO* trademark. The precise terms of the permanent injunction are rendered in a separate order of this date.

19. The court finds that the threatened and actual harm to Plaintiff outweighs any harm that may result to Defendant. Moreover, *Defendants has brought forward no* evidence, or argument, that any harm would result should the injunction be made permanent.

20. The injunctive relief to be granted in this court will not undermine the public's interests.

21. *Defendant violated the terms of the* injunction entered on July 9, 1997, and the terms of the Agreed Order that were effectively July 11, 1997. The court concludes from the evidence produced at the permanent injunction hearing that Defendant's violation of Plaintiff's rights, after July 11, *1997, were willful acts. The court finds further* that Schuman's willful intent to trade on the reputation of the POLO trademarks has been demonstrated on more than one occasion.

22. Defendant misled the court during the course of these proceeding in stating that the only use of the name "*THE POLO CLUB*" was on a sign located outside of the adult entertainment establishment located at 2816 Greenridge Drive, Houston, Texas. In fact, Plaintiff has presented evidence to demonstrate that, while this case was pending, and even subsequent to Schuman's testimony before this court *in July, there were two signs* displayed inside the business that bore the words "THE POLO CLUB". (Plaintiff's Exhibits #14 and #16).

23. Evidence before this court shows that one of these signs was openly displayed as recently as July 17, 1997. (Plaintiff's Exhibit *#14). The other one was displayed inside the* club as recently as August 13, 1997. (Plaintiff's Exhibit #16).

24. The court finds that Defendant was aware that the signs were openly displayed in July and August of 1997, following the entry *of this court's order.*

25. From this record, the court restricts the finding of willfulness to July 11, 1997, the date upon which Defendant conceded an unlawful use of Plaintiff's trademark and agreed to the terms of a preliminary injunction. From this finding of willfulness, the *court concludes that Plaintiff is entitled to* monetary damages. Because the court finds that Defendant violated its order, and that such violation was willful, from July 11, 1997, Plaintiff is entitled to an award of Defendant's profits.

26. Accepting as true the evidence that *Defendant's profits are Eight Thousand Dol*lars ($8,000.00) per month, Plaintiff is hereby awarded an amount that is equal to Defendant's profits from July 1997, through January 1998, or Fifty-six Thousand Dollars ($56,000.00). Defendant has offered no evidence of expenses or costs that would miti*gate this amount. 15 U.S.C. § 1116.*

27. The court finds further that, in this case, Defendant's willful violations constitute proof of an "exceptional case" under the Lanham Act. 15 U.S.C. § 1117(a). Accordingly, the court finds that Plaintiff is entitled to recover the attorneys' fees it expended to *prosecute this claim. 15 U.S.C. § 1117(a).*

28. As Defendant has not controverted, in any regard, the submissions by Plaintiff's counsel, the court concludes that those fees are reasonable and fully recoverable.

29. Plaintiff is entitled to recover attorney's fees in the amount of Forty-six Thousand *Five Hundred and Twenty-eight Dol*lars ($46,528.00).

30. Plaintiff is also entitled to recover its costs in the amount of Twenty-two Thousand One Hundred Ten Dollars and Fifteen cents ($22,110.15).

31. Plaintiff is entitled to interest on all sums awarded from the date this order is entered. 28 U.S.C. § 1961(a).

32. The court finds further that Plaintiff's motion for a judgment of contempt and sanctions should be granted. (Docket Entry #21). The court's findings in that regard are set out separately in its Memorandum and Recommendation under 28 U.S.C. § 636(b). Should any of these findings of fact be found more appropriate as conclusions of law, they are hereby deemed to be such.

## CONCLUSIONS OF LAW

1. This court has jurisdiction over the subject matter of this action under 28 U.S.C. § 636(c); 15 U.S.C. § 1121, an 28 U.S.C. § 1338.

2. Venue is proper in this judicial district under *28 U.S.C. § 1391.*

3. Defendant's use of the term "POLO" in connection with his adult entertainment establishment is not, as he conceded in the Agreed Order entered in July of 1997, consistent with its usage as a common word. (Docket Entry #20); *see also, Polo Fashions, Inc. v. Fernandez*, 655 F. Supp. 664 (D. Puerto Rico, 1987); *Polo Fashions, Inc. v. Extra-Special Products, Inc.*, 451 F. Supp. 555 [200 USPQ 161] (S.D.N.Y. 1978).

4. The use of the POLO trademark in connection with Defendant's adult entertainment business is a dilution of the POLO trademark. *Clinique Labs., Inc. v. Dep Corp.*, 945 F. Supp. 547 (S.D.N.Y. 1996); *Pebble Beach Co. v. Tour 18 I, Ltd.*, 942 F. Supp. 1513, 1564 (S.D. Tex. 1996). (Agreed Order, Docket Entry #20).

5. In issuing its Agreed Order on preliminary injunction, the court found that Plaintiff need not issue any *security as Defendant* agreed to its terms and there was no proof of a likelihood of harm to him by the terms of the injunction. The court concludes that it is unnecessary, still, that Plaintiff provide any security in regard to the injunctive relief granted in July of 1997. This finding is retroactive to the court's order entered July 17, 1997. *International Controls Corp. v. Vesco*, 490 F.2d 1394 (2d Cir.), *cert. denied*, 417 U.S. 932 (1974).

6. Under the federal Anti-dilution Act, set out at 15 U.S.C. § 1125(c), Plaintiff has shown that it is entitled to a permanent injunction from Defendant's unlawful use of its registered trademark, as well as monetary damages. That injunction will issue by separate order and it shall enjoin Defendant and his officers, agents, servants, employees, attorneys, and those persons acting in active concert of participation with him, and who receive actual notice of this order, by personal service or otherwise, from engaging in any of the following acts or omissions:

A. From using Plaintiff's POLO trademark, or any variations or combinations thereof, including the name THE POLO CLUB or Plaintiff's Polo Player Symbol, or any marks *similar thereto, including* "Polo Executive Retreat," in connection with (1) the sale of any unauthorized goods or the rendering of any unauthorized services, including without limitation any adult entertainment establishment such as that which currently exists under *the name "Polo Executive Retreat"*/"Executive Retreat and Game Room", and which previously existed under the name "THE POLO CLUB", at 2816 Greenridge Drive, Houston, Texas 77057, or (2) any print advertising, including, but not *limited to magazines such as* "Nightmoves", "Scandalous Quest" and the like, or brochures, for such unauthorized goods or services, including without limitation, on any signs, billboards, price sheets, or advertisements located inside, at, or around the business, and that otherwise *promote the adult entertainment estab*lishment that currently exists at 2816 Greenridge Drive, Houston, Texas 77057; or on any stationery, napkins, menus, posters, apparel, liers, dinnerware, flatware, glassware, or other items that promote such business; and

B. *From diluting the distinctive quality* of Plaintiff's THE POLO CLUB and Polo Player Symbol trademarks or taking an[illegible] other action which has the effect of inj[illegible] ing the Plaintiff's business reputation [illegible] harming or tarnishing Plaintiff's reputation and goodwill in the Polo Trademarks; *and*

(C) From using Plaintiff's POLO trademark, or any variations or combinations thereof, including the name THE POLO CLUB or Plaintiff's Polo Player Symbol, or any marks similar thereto, including "Polo Executive Retreat," in connection *with (1) the advertisements, telephone* book entries, or any print or other media source, whether fee paying or not, to advertise the sale of any unauthorized goods or services, including without limitation any adult entertainment establishment such as that which currently exists under *the name "Polo Executive Retreat"*/"Executive Retreat and Game Room", and which previously existed under the name "THE POLO CLUB", at 2816 Greenridge Drive, Houston, Texas, or (2) a[illegible] advertising for such unauthorized good services which includes, without limita*tion, any signs or billboards located at, or* around, inside or out, that location and which otherwise promotes the adult entertainment establishment currently operating at 2816 Greenridge Drive, Houston, Texas 77057.

*Roho, Inc. v. Marquis*, 902 F.2d 356, 358 [15 USPQ2d 1057] *(5th Cir. 1990); Allied Marketing Group, Inc. v. CDL Marketing, Inc.*, 878 F.2d 806, 809 [11 USPQ2d 1605] (5th Cir. 1989); *Mississippi Power and Light Co. v. United Gas Pipeline Co.*, 760 F.2d 618, 621 (5th Cir. 1985).

7. The facts presented by Plaintiff support *the conclusion that Defendant willfully in*tended to trade upon the reputation of Plaintiff's POLO trademark after July 1997. That finding entitles Plaintiff to the recovery of monetary damages. 15 U.S.C. § 1117. *Texas*

59

*Pig Stands v. Hard Rock Cafe Int'l, Inc.*, 966 F.2d 956 [23 USPQ2d 1639] (5th Cir. 1992); *Maltina Corp. v. Cawy Bottling Co., Inc.*, 613 F.2d 582 [205 USPQ 489] (5th Cir. 1980).

8. The court has found that Defendant violated Section 43(a) of the Lanham Act and, therefore, Plaintiff is entitled to recover Defendant's profits as the measure of damages to be recovered, in addition to the costs of the action, pursuant to Section 35(a) of the Lanham Act. 15 U.S.C. § 1117(a); *Texas Pig Stands v. Hard Rock Cafe Int'l, Inc.*, 966 F.2d 956 [23 USPQ2d 1639] (5th Cir. 1992); *Maltina Corp. v. Cawy Bottling Co., Inc.* 613 F.2d 582 [205 USPQ 489] (5th Cir. 1980).

9. Defendant's behavior in violating this court's order, his flagrant disregard of the Agreed Order, and his continued willful conduct in the violation of Plaintiff's rights, *exhibits a bad faith intent to trade on the* reputation of Plaintiff's POLO trademarks. Accordingly, these facts support a finding that this is an "exceptional case" under 15 U.S.C. § 1117(a). As an exceptional case, Plaintiff is entitled to a recovery of its reasonable attorney's fees. *Seven-Up Co. v. Coca Cola Co.*, 86 F.3d 1379, 1390 [39 USPQ2d 1411] (5th Cir. 1996); *Moore Business Forms, Inc. v. Ryu*, 960 F.2d 486 [22 USPQ2d 1773] (5th Cir. 1992). *See also, Neles-Jamesbury, Inc. v. Bill's Valves*, 974 F. Supp. 979 (S.D.Tex. 1997).

10. Plaintiff has presented evidence that it is entitled to recover Forty-six Thousand Five Hundred and Twenty Eight Dollars ($46,528.00) in attorney's fees through November 1997. It has presented further evidence that its costs and justifiable disbursements amount to Twenty-two Thousand One Hundred and Ten Dollars and Fifteen Cents ($22,110.15), through the same period. Defendant has not presented any evidence to contest or mitigate this amount. Accordingly, Plaintiff is entitled to the full recovery of fees and expenses in the amount of $68,638.15, plus interest from the date this order *is entered. 28 U.S.C. § 1961(a).*

If any of these Conclusions of Law are found to be Findings of Fact, they shall be deemed to be such.

The Clerk of court is to file this order and provide a true copy to all counsel of record.

## PERMANENT INJUNCTION ORDER

On November 12, 1997, the court considered the evidence and testimony on the motion by Plaintiff PRL USA Holdings, Inc., as successor-in-interest to Polo Ralph Lauren, L.P. ("Plaintiff" or "Polo Ralph Lauren") for a permanent injunction against Mark Schuman, individually, and doing business as THE POLO CLUB ("Defendant" or "Schuman"). Defendant appeared in person and through his counsel of record. *On that* date, the court granted Plaintiff's trial amendment to incorporate allegations of infringing acts by Defendant in the use of the name "Polo Executive Retreat". Evidence of infringement included photographs of signage located at 2816 Greenridge, Houston, Texas, as well as testimony regarding Schu*man's use of the term "Polo" in the connec*tion with the promotion of his adult entertainment business at that address.

By separate order, Plaintiff's motion for monetary damages and attorney's fees has been GRANTED. Accordingly, Defendant is ORDERED to pay Plaintiff the total amount of Fifty-six Thousand Dollars *($56,000.00) for a willful infringement of* Plaintiff's trademark in the Polo name. Defendant is further ORDERED to pay to Plaintiff Forty-six Thousand Five Hundred Twenty-eight Dollars ($46,528.00) in attorney's fees and Twenty-two Thousand One Hundred Ten and 15/100 Dollars ($22,110-.15) in costs, as this is an "exceptional case" under the Lanham Act. 15 U.S.C. § 1117(a). Those amounts will accrue interest from the date this order is entered. 28 U.S.C. § *1961(a).*

The court having considered Plaintiff's motion, all exhibits annexed to the parties' pleadings, all exhibits that have been admitted into evidence, the memoranda of law submitted, and the arguments of counsel, found by separate memorandum and order that Plaintiff is entitled to permanent injunc*tive relief. That finding is based on the fol*lowing factors:

1. Plaintiff owns the trademarks, service marks, and trade names POLO, THE POLO CLUB, USA POLO CLUB, and a fanciful representation of a polo player on a horse (the "Polo Player Symbol"), hereinafter collectively referred to as the "Polo Trade*marks," and several U.S. Trademark Regis*trations for the Polo Trademarks including, among others, Registration No. 1,271,213, for THE POLO CLUB trademark for retail clothing store services; Registration No. 1,363,459, of the POLO trademark for diverse items of apparel; Registration No. 1,448,580, for the Polo Player Symbol trade*mark for diverse articles of home furnishing* products; Registration No. 1,512,754, for the Polo Player Symbol trademark for diverse articles of apparel and accessories; Registration No. 1,671,466, for the POLO trademark for diverse articles of home furnishing products; and Registration No. 1,846,817, for the USA POLO CLUB trademark for diverse items of apparel, hereinafter collectively referred to as the "Polo Registrations".

2. *Plaintiff has continuously and exten*sively used the Polo Trademarks since 1967, and the Polo Trademarks have become inherently distinctive and famous throughout the world as symbols of the highest quality standards and exclusivity that the Plaintiff maintains for its products and services.

3. Without Plaintiff's knowledge or con*sent, Defendant Mark Schuman began oper*ating an adult entertainment establishment on or about November, 1995, under the name "THE POLO CLUB," which is located at 2816 Greenridge Drive, Houston, Texas 77057, and which incorporated a virtually identical copy of Plaintiff's Polo Player Symbol into the principal sign on its front *entrance.*

4. Defendant's unauthorized use of Plaintiff's THE POLO CLUB and Polo Player Symbol trademarks began after these trademarks became world famous.

5. Defendant's unauthorized use of Plaintiff's THE POLO CLUB and Polo Player Symbol trademarks in connection with his business establishment likely degrades, tarnishes and dilutes the distinctive quality of these famous trademarks.

6. The court finds, upon review of *all* evidence, that a permanent injunction is warranted to prevent further injury to or dilution of the Polo Trademark. The court finds further that no harm to Defendant could occur that outweighs the harm that may result to Plaintiff if this injunctive relief is not granted, and that such relief will not undermine the public interest.

It is therefore,

ORDERED that Plaintiff Polo Ralph Lauren is entitled to the following permanent injunctive relief:

Defendant and his officers, agents, servants, employees, attorneys, and those persons acting in active concert or participation *with him, and who receive actual notice of* this order, by personal service or otherwise, are restrained and enjoined from engaging in any of the following acts or omissions:

A. From using Plaintiff's POLO Trademark, or any variation or combinations thereof, including the name THE POLO CLUB or Plaintiff's Polo Player Symbol, *or any marks similar thereto including* "Polo Executive Retreat," in connection with (1) the sale of any authorized goods or the rendering of any unauthorized services, including without limitation any adult entertainment established such as that which currently exists under the name "Polo Executive Retreat"/"Executive Retreat and Game Room", and which previously existed under the name "THE POLO CLUB", at 2816 Greenridge *Drive, Houston, Texas 77057, or (2)* any print advertising, including, but not limited to magazines such as "Nightmoves", "Scandalous Quest" and the like, or brochures, for such unauthorized goods or services, including without limitation, on any signs, billboards, price sheets, or advertisements located inside, at, or around *the business, and that otherwise promote,* the adult entertainment establishment that currently exists at 2816 Greenridge Drive, Houston, Texas 77057; or on any stationery, napkins, menus, posters, apparel, fliers, dinnerware, flatware, glassw[illegible] or other items that promote such busin[illegible] and

B. *From diluting the distinctive quality* of Plaintiff's THE POLO CLUB and Polo Player Symbol trademarks or taking any other action which has the effect of injuring the Plaintiff's business reputation or harming or tarnishing Plaintiff's reputation and goodwill in the Polo Trademarks; and

C. From using Plaintiff's POLO trademark, or any variations or combinations thereof, including the name THE POLO *CLUB* or Plaintiff's Polo Player Symbol, or any marks similar thereto, including "Polo Executive Retreat," in connection with (1) the advertisements, telephone book entries, or any print or other media source, whether fee paying or not, to advertise the sale of any unauthorized goods or services, including without limitation any *adult entertainment establishment* such as that which currently exists u[illegible] the name "Polo Executive Retreat"/"[illegible]cutive Retreat and Game Room", and which previously existed under the name "THE POLO CLUB", at 2816 Greenridge Drive, Houston, Texas, or (2) any advertising for such unauthorized goods or *services which includes, without limita*tion, any signs or billboards located at, or around, inside or out, that location and which otherwise promotes the adult entertainment establishment currently operating at 2816 Greenridge Drive, Houston, Texas 77057.

It is further ORDERED that Defendant *Schuman is to tender to Plaintiff, within five* (5) days of his receipt of this order, all existing advertising media, including napkins, stationery, menus, posters, apparel, fliers, dinnerware, flatware, glassware, price sheets, interior signs or instructions, or other

items that promote the adult entertainment business and which detail any use of Plaintiff's Polo Trademark, as described in A, B, or C, above.

It is further ORDERED that Defendant is to supply to Plaintiff proof, by way of affidavit or other means, that all billboards, signage, banners, or other uses or allusions to Plaintiff's Polo Trademark, as described in A, B, or C above, either inside or outside the business located at 2816 Greenridge Drive, Houston, Texas, have been destroyed. A copy of this verification is to be filed with the court. This destruction must be accomplished within five (5) days of his receipt of this order.

IT IS SO ORDERED.

The Clerk of court is to file this permanent injunction and provide a true copy to all counsel of record.

---

**U.S. District Court**
**District of Kansas**

Kustom Signals Inc. v. Applied Concepts Inc.

No. 96-2296-EEO

Decided February 9, 1998

61

PATENTS

**1. Patent construction — Claims — Defining terms (§125.1305)**

Term "or," in asserted claims of patent for traffic radar device, is properly construed to mean "a choice between either one of two alternatives, but not both," since there is no indication in patent documents that inventor intended term to have meaning other than its ordinary and accustomed meaning, since ordinary meaning of "or" does not include choice of both alternatives, since specification and prosecution history support this construction, and since construction is consistent with notice function of patents and language of related claims.

**2. Patent construction — Claims — Defining terms (§125.1305)**

Terms "criteria" and "preselected," as used in claims of patent for traffic radar device which requires search in memory for component that meets "preselected" magnitude and frequency "criteria," are properly construed to mean "standards used to search and find a single fastest or strongest target, depending on the mode selected by the operator," and "a selection of criteria which have been programmed into the software and cannot be altered by the operator," since this interpretation is consistent with language of claims, which refer to searching for single component, and since interpretation comports with ordinary meaning of terms and is supported by patent's specification.

**3. Infringement — Literal infringement (§120.05)**

Claims of patent for traffic radar device do not read exactly on accused radars, since claims disclose method and apparatus for search and display of single fastest or strongest target, depending on mode selected by operator, whereas accused radars always perform search for both fastest target and strongest target; fact that claims use "comprising" in opening clauses and therefore are considered "open-ended" does not warrant finding that function of accused radars in searching and displaying both fastest and strongest targets constitutes "extraneous" limitation.

**4. Infringement — Doctrine of equivalents — In general (§120.0701)**

Defendants have failed to establish as matter of law that accused traffic radar devices do not infringe asserted claims of patent under doctrine of equivalents, since there is factual dispute as to whether differences between elements of patented and accused radars are "substantial" for purposes of equivalents analysis, since conflicting evidence raises genuine issue of fact as to whether patented and accused devices perform substantially same functions in substantially same ways to achieve substantially same results, and since record does not support defendants' contention that prosecution history estoppel bars plaintiff from claiming coverage of radars, such as accused devices, which search both strongest and fastest targets.

**Particular patents — Electrical — Traffic radar detectors**

5,528,246, Henderson, Kusek, and Bradrick, traffic radar with digital signal processing, claims 1, 16, and 20 not literally infringed.

---

Action by Kustom Signals Inc. against Applied Concepts Inc. and John L. Aker for patent infringement. On plaintiff's motion in limine, on defendants' motions for partial summary judgment of non-infringement and to strike portions of plaintiff's proposed claim constriction findings, and on both parties' requests for claim interpretation by court. Claims construed; defendants' motion for partial summary judgment granted as to literal infringement, but denied as to infringement under doctrine of equivalents; remaining motions denied.

Michael Yakimo Jr., D.A.N. Chase, and Ginnie C. Derusseau, of Chase & Yakimo, Overland Park, Kansas, for plaintiff.

Douglas R. Richmond, Gerald A. King, and Thomas H. Stahl, of Armstrong, Teasdale, Schlafly & Davis, Kansas City, Kansas; Ronald Craig Fish, of Falk, Vestal & Fish, Morgan Hill, Calif., for defendants.

**O'Connor, S.J.**

This matter is before the court on defendants' motion for partial summary judgment (Doc. #39), plaintiff's motion in limine (Doc. #59), defendants' motion to strike portions of plaintiff's proposed claim construction findings (Doc. #65), and the request by all parties for the court's interpretation of certain disputed terms of the claims in suit of plaintiff's patent. The court held a hearing on December 2 and 3, 1997, pursuant to the principles set forth in *Markman v. Westview Instruments, Inc.*, 517 U.S. 370 [38 USPQ2d 1461] (1996). The court has reviewed the parties' briefs and submissions and is now prepared to rule. For the reasons set forth below, defendants' motion for summary judgment will be granted in part and denied in part, plaintiff's motion in limine will be denied, and defendants' motion to strike will be denied.

*Factual Background*

For purposes of defendants' motion, the following is a brief summary of the material facts that are uncontroverted, deemed admitted or, where controverted, viewed in the light most favorable to the non-movant, pursuant to Federal Rule of Civil Procedure 56 and District of Kansas Rule 56.1.

Plaintiff Kustom Signals, Inc. ("Kustom") and defendant Applied Concepts, Inc. ("ACI") manufacture and sell traffic radar and other equipment used by law enforcement agencies. Defendant John L. Aker is an independent contractor who has designed traffic radar for ACI since 1978. Kustom alleges that ACI's Stalker Dual radars infringe Kustom's patent for such a radar device, specifically, U.S. Patent 5,528,246 (the "'246 patent" or "Kustom radar"[1]).

On a very general level, both the Kustom and Stalker Dual radars (1) measure the Doppler shift of vehicles within the radar's range, (2) convert the Doppler shift of a reflected signal from an analog signal to a digital signal, (3) use a method called a fast fourier transform to analyze the digital data and transform it into the frequency domain, (4) employ various measures to qualify the data so as to eliminate false signals or noise, and (5) display the speed of the target vehicle for the operator.

On June 30, 1994, Kustom submitted an application to the Patent and Trademark office ("PTO") for the '246 patent, a traffic radar with digital signal processing, which contained 21 claims. The PTO rejected Kustom's original 21 claims for obviousness. On June 5, 1995, Kustom filed an amend patent application adding 21 new claims a deleting the original 21 claims. On June 18, 1996, the PTO issued the '246 patent to Kustom, as the sole owner of the patent by assignment from the inventors. The '246 patent discloses a traffic radar device which processes Doppler return information in an effort to improve target identification and minimize interference and unwanted harmonics.

Original independent claim 1 of the '246 patent disclosed:

> A method of processing Doppler return information in a traffic radar comprising the steps of:
>
> (a)[2] receiving Doppler return information containing at least one return signal derived from a target vehicle,
>
> (b) presenting said Doppler return information as digital data,
>
> (c) transforming said data into the frequency domain to provide a spectrum that includes frequency components cor sponding to Doppler return signals c tained in said information,
>
> (d) validating said frequency components present in said spectrum by determining if each component has a greater magnitude than an average magnitude representative of the sensitivity of the spectrum, and
>
> (e) determining the magnitude and frequency of each valid component.

New claim 1 did not include original clauses (d) and (e) but added the following:

[1] The court's reference to "Kustom radar" refers to the device disclosed by the claims of the '246 patent, not the actual radar Kustom developed pursuant to the patent.

[2] Many of the claim paragraphs in the original and amended '246 patent do not contain paragraph letters. The court has added paragraph letters to many of the claims for convenience in referencing particular portions of the claims.

must protect rights which are qualitatively different from the copyright rights.").[3]

For these reasons, Defendants' Motion to Dismiss is GRANTED[4] and Plaintiff's Motion to Consolidate is DISMISSED as moot.

## JUDGMENT

For the reasons set forth in the contemporaneously filed *Memorandum Opinion*,

IT IS ORDERED that Defendants' Motion to Dismiss [Doc. #5] is GRANTED; and

IT IS FURTHER ORDERED that Plaintiff's Motion to Consolidate [Doc. #9] is DISMISSED as moot; and

IT IS FURTHER ORDERED that this case is DISMISSED.

---

[3] Plaintiff's reliance upon cases in which constructive trusts have been used in relation to intellectual property rights is misplaced. In those cases, the plaintiffs were not attempting to use state law to define ownership. Further, to the extent preemption does not apply, the claim fails because Plaintiff has alleged no beneficial interest in the subject property as required under North Carolina's constructive trust doctrine. *See Leatherman v. Leatherman*, 297 N.C. 618, 256 S.E.2d 793 (1979).

[4] As Plaintiff cannot show copyright ownership, its infringement claim fails.

---

**U.S. District Court**
**Western District of Washington**

Hasbro Inc. v. Internet Entertainment Group Ltd.

No. C96-130WD

Decided February 9, 1996

### TRADEMARKS AND UNFAIR TRADE PRACTICES

**1. Infringement; conflicts between marks — Dilution (§335.05)**

### *REMEDIES*

**Non-monetary and injunctive — Equitable relief — Preliminary injunctions — Trademarks and unfair trade practices (§505.0707.09)**

Preliminary injunction is warranted prohibiting defendants from using domain name "candyland.com" to identify sexually explicit Internet site, since plaintiff is owner of registered trademark "Candy Land," since plaintiff has demonstrated probability of proving that defendants' use of "candyland.-com" to identify Internet site and as Internet domain name has diluted value of plaintiff's mark, since plaintiff has demonstrated likelihood of success on its claims that defendants' conduct violates federal trademark anti-dilution statute, 15 USC 1125(c), and Washington's trademark anti-dilution statute, Wash. Rev. Code 19.77.160, since plaintiff has shown that defendants' use of domain name "candyland.com" is causing plaintiff irreparable injury, since probable harm to plaintiff from defendants' conduct outweighs any inconvenience defendants will experience if required to stop using "candyland.com," and since public interest favors entry of preliminary injunction.

---

Action by Hasbro Inc. against Internet Entertainment Group Ltd., Brian Cartmell, and Internet Entertainment Group Inc. for temporary restraining order prohibiting use of domain name "candyland.com" for sexually explicit Internet site. Following oral argument, court treats motion as one for preliminary injunction. Granted.

Kenneth B. Wilson and Lisa G. Meckfessel, of Wilson, Sonsini, Goodrich & Rosati, Palo Alto, Calif.; Jill Diane Bowman, of Stoel, Rives, Boley, Jones & Grey, Seattle, Wash., for plaintiff.

John D. Lowery and E. Russell Tarleton, of *Graham & James/Riddell Williams*, Seattle, for defendants.

**Dwyer, J.**

On February 5, 1996, the application of plaintiff Hasbro, Inc. ("Hasbro") for a temporary restraining order came on for hearing by the court. Plaintiff appeared through Kenneth B. Wilson and Lisa G. Meckfessel of the law firm of Wilson, Sonsini, Goodrich & Rosati, and Jill D. Bowman of the law firm of Stoel Rives LLP. Defendants Internet Entertaining Groups, Ltd., Brian Cartmell and Internet Entertainment Group, Inc. appeared through John D. Lowery and E. Russell Tarleton of the law firm of Graham & James LLP/Riddell Williams P.S. After the oral decision was announced, the parties agreed that the ruling should be entered on a preliminary injunction rather than merely as a temporary restraining order.

*Having considered all papers submitted in* support of said motion and in opposition

thereto, and having heard oral argument in open court, the court finds that:

[1] 1. Hasbro is the owner of the trademark "CANDY LAND," which has been registered on the Principal Register of the United States Patent and Trademark Office since 1951.

2. Hasbro has demonstrated a probability of proving that defendants Internet Entertainment Group, Ltd., Brian Cartmell and Internet Entertainment Group, Inc. (collectively referred to as "defendants") have been diluting the value of Hasbro's CANDY LAND mark by using the name CANDYLAND to identify a sexually explicit Internet site, and by using the name string "candyland.com" as an Internet domain name which, when typed into an Internet-connected computer, provides Internet users with access to that site.

3. Hasbro has demonstrated a likelihood of prevailing on its claims that defendants' conduct violates the federal trademark anti-dilution statute, 15 U.S.C. §1125(c), and the Washington State trademark anti-dilution statute, RCW 19.77.160.

4. Hasbro has shown that defendants' use of the CANDY LAND name and the domain name candyland.com in connection with their Internet site is causing irreparable injury to Hasbro.

5. The probable harm to Hasbro from defendants' conduct outweighs any inconvenience that defendants will experience if they are required to stop using the CANDYLAND name.

6. The public interest favors entry of a preliminary injunction on the facts of this case.

THEREFORE, IT IS HEREBY ORDERED that Hasbro's motion for preliminary injunction is granted. Defendants Internet Entertainment Group, Ltd., Brian Cartmell, and Internet Entertainment Group, Inc., and their officers, agents, servants, employees and attorneys, and those persons in active concert and participation with defendants who receive actual notice of this preliminary injunction, are enjoined from directly or indirectly using the name CANDYLAND or the Internet domain name "candyland.com," or any similar name which is likely to dilute the value of Hasbro's CANDYLAND mark, in connection with the advertising, operation or maintenance of any Internet site, including but not limited to any Internet site containing sexually explicit material or other pornographic content. Defendants are directed to immediately make affirmative efforts to stop, cancel or discontinue any previously purchased advertising which refers to the name CANDY LAND or the Internet domain name "candyland.com."

IT IS FURTHER ORDERED that defendants shall immediately remove all content from the "candyland.com" site. However, defendants shall be allowed to post a "referral notice" at the URL address "http://www.candyland.com" until May 5, 1996, which shall provide the new location of defendants' Internet site. The referral notice shall not contain any hyperlink to defendants' new site or sites, or to any other site. After the expiration of the 90 day referral period, defendants must remove the referral notice and thereafter discontinue any use, either direct or indirect, of the name domain name "candyland.comm."

IT IS FURTHER ORDERED that Hasbro shall not be required to post a bond pursuant to Federal Rule of Civil Procedure 65(c) in connection with this preliminary injunction, as defendants expressly waived any bond requirement relating to this order at the preliminary injunction hearing.

The clerk is directed to send copies of this order to all counsel of record.

YOUNG & QUIGG, Washington, D. C., for applicant.

Before LEACH, WALDSTREICHER, and SHRYOCK, Members.

LEACH, Member.

An application has been filed to register "ELASTOTHERM" for rigid calendered plastic sheet, either clear, translucent or opaque, decorated or plain, for packaging and general fabrication purposes.

The Examiner of Trademarks has refused registration under Section 2(d) of the Trademark Act on the basis of a prior issued registration of "ELASTOTHANE" for crude synthetic rubber.

In support of his refusal of registration, the examiner states:

> "Synthetic rubber is very definitely a product of the plastics industry, and the differences between synthetic resins and synthetic rubber would often be hard to distinguish when in the form of sheets, films, castings, extrusions, and so forth. The manufacturer of the chemically-derived synthetic rubber is in many instances also the source of various types of plastics; and the processor of synthetic rubber into a variety of commercial products (whether cast, extruded, stamped, or pressed) may also very well be the processor of plastics. Therefore the examiner cannot accept the applicant's argument that the goods are non-competitive, are sold to entirely different types of manufacturers and fabricators, and move in different channels of trade".

Assuming for present purposes that manufacturers of crude synthetic rubber may also make plastic materials of one kind or another, it does not necessarily follow that all such goods are competitive, or that their sale under the same or closely similar marks would be likely to cause confusion or mistake or to deceive.

[1] In the present case, it is apparent that the goods identified in applicant's application and the reference registration are distinctly different products having distinctly different uses, and on the record presented in this case there is no reason to suppose that they would be likely to move through the same trade channels to the same average purchasers, or that they are otherwise related in any manner likely to cause confusion or mistake or deception were they to be sold under the marks here involved.

*Decision*

The refusal of registration is reversed.

New York Supreme Court, Special Term, New York County

UNITED MERCHANTS AND MANUFACTURERS INC. v. MILLER BROS. HAT CO., INC., et al.

Decided Oct. 31, 1967

TRADEMARKS

1. **Injunction—Trademarks** (§ 40.7)

**Laches—Trademarks** (§ 44.25)

Plaintiff's knowledge of defendants' use of allegedly infringing trademark for three years and plaintiff's inaction constitute basis for denial of preliminary injunction; harm to defendant from issuance of injunction outweighs possible damage to plaintiff; plaintiff's acquiescence coupled with lack of proof of direct competition between involved goods is sufficient to defeat relief sought.—United Merchants & Mfrs. Inc. v. Miller Bros. Hat Co., Inc. (NY SupCt NYCty) 156 USPQ 61.

---

Action by United Merchants and Manufacturers Inc. against Miller Bros. Hat Co., Inc., and Miller Bros. Industries Inc. for trademark infringement. On plaintiff's motion for preliminary injunction. Motion denied.

ALVIN K. HELLERSTEIN and GERALD D. FISCHER (STROOCK & STROOCK & LEVAN of counsel) all of New York, N. Y., for plaintiff.

ALEX FRIEDMAN and MARTIN J. BERAN (BLUM, MOSCOVITZ, FRIEDMAN, BLUM & KAPLAN of counsel) all of New York, N. Y., for defendants.

MURPHY, Justice.

Plaintiff, United Merchants and Manufacturers, Inc., moves for a preliminary injunction restraining defendants Miller Bros. Hat Co., Inc., and Miller Bros. Industries Inc., pendente lite, from using the designation "Contact" in connection with the advertising and sale of their goods. Specifically, at issue are the slacks manufactured and sold by defendants.

Plaintiff, a large corporation, has many divisions, among them are Robert Hall Clothes, Inc., which manufactures and sells wearing apparel, Cohn-Hall-Marx, Inc., a leading converter of fabrics, and Comark Plastics, which is engaged in the manufacture and sale of plastic decorative materials and apparel. Among the materials manufactured and widely sold by the Comark Plastics division is a self-adhesive decorative plastic with the trademark "Con-Tact."

The instant action arises out of plaintiff's claim that there is, at least, a substantial likelihood of confusion among the public and others in the industry if

defendants are not restrained from use of the name "Contact" in connection with the sale and distribution of their slacks. Plaintiff contends that even if there is no likelihood of confusion between the products (the self-adhesive plastic manufactured by plaintiff and the slacks manufactured by defendant) due to their dissimilarity, that there is the possiblity that those in the trade as well as customers will believe "Contact" slacks are manufactured by plaintiff.

[1] In addition to denying any intent to appropriate or copy plaintiff's mark, defendants deny the likelihood of confusion and point to plaintiff's knowledge of defendants' use of the name "Contact" since 1964. Such knowledge and inaction apparent from the papers submitted would, by itself, constitute a basis for denial of the drastic relief requested. See International Latex Corp. v. Revlon Products Corp., 3 Misc. 2d 487, 107 USPQ 336. The harm to defendants from issuance of the injunction far outweighs the possible damage to plaintiff —which potential damage plaintiff has been subjected to, knowingly, for several years. Plaintiff's acquiescence coupled with the lack of proof of direct competition between the goods concerned is sufficient to defeat the relief sought. See Stix Products, Inc. v. United Merchants & Manufacturers, Inc., 154 USPQ 477, wherein a preliminary injunction was denied plaintiff in a suit where the goods were similar. Accordingly, the instant application is denied.

---

**Patent Office Trademark Trial and Appeal Board**

In re SMITH OIL CORPORATION

Decided Nov. 29, 1967

TRADEMARKS

**1. Acquisition of marks—Character and extent of use—In general (§ 67.0731)**

**Registration—Service marks (§ 67.761)**

**It is not essential that service mark be used in connection with services rendered in more than one state in order to satisfy "use in commerce" requirement of section 3 of Trademark Act; thus, while indicating the view that services rendered by restaurant, largely concerned with serving of food to interstate travelers, satisfy requirement, Board holds that, in view of 1964 Civil Rights Act, restaurants serving food to interstate travelers are engaged in commerce which may lawfully be regulated by commerce; hence, mark for such services is "used in commerce" within meaning of section 3.—In re Smith Oil Corp. (PO TM TAppBd) 156 USPQ 62.**

---

Appeal from Examiner of Trademarks.

Application for registration of service mark of Smith Oil Corporation, Serial No. 227,713. From decision refusing registration, applicant appeals. Reversed.

THOMAS M. SMALL (WOLFE, HUBBARD, VOIT & OSANN of counsel) both of Chicago, Ill., for applicant.

Before LEACH, WALDSTREICHER, and SHRYOCK, Members.

LEACH, Member.

An application has been filed to register "WAYSIDE CHIEF" for restaurant services.

Applicant owns and operates a restaurant located on Interstate Highway 180 near LaSalle-Peru, Illinois, in which it serves approximately 1,600 persons a day, many, if not the majority, of whom are interstate travelers.

The Examiner of Trademarks has refused registration on the ground that applicant's mark is not used "in commerce within the meaning of the Act of 1946".

Section 1 of the Trademark Act of 1946 provides that the "owner of a trademark *used in commerce* may register his trademark under this Act on the Principal Register hereby established" upon complying with certain requirements of no moment here; and Section 3 of the Act provides that: "* * * service marks *used in commerce* shall be registrable in the same manner * * * as are trademarks * * *. (Italics added).

The examiner has taken the position that to satisfy the "use in commerce" requirement of Section 3, a service mark must be used in connection with services "rendered in more than one state", and, in support thereof, has cited as being "controlling" on the question the case of In re Bookbinder's Restaurant, Inc., (112 USPQ 326), wherein the Court of Customs and Patent Appeals affirmed the refusal of this Office to register a mark for restaurant services rendered within a single state on the ground that the applicant therein "failed to establish that the services for which registration is sought are ren-

65

the marks do not present a similar sound, meaning, or commercial impression. The MAGNIVISION mark is a single word; the MAGNA·DOT mark consists of two words separated by a darkened circle. The MAGNIVISION mark has four syllables; the MAGNA·DOT mark has three. The MAGNIVISION mark displays eleven letters, the last seven of which do not appear in the MAGNA·DOT mark; the MAGNA·DOT mark has eight letters and a dot.

The only similarity between the marks is the MAGNA/MAGNI prefix. The record shows, however, that the MAGNA-/MAGNI prefix as well as the VISION suffix enjoy wide use in the eyeglass industry on similar goods and services. This evidence included a number of registered trademarks for magnification lenses and eyeglasses (i.e., MAGNA ADD, MAGNA THIN, MAGNA-BAR, MAGNA-COM, MAGNA-LITE, MAGNA-PAGE, MAGNA-RULE, MAGNA-SIGHTER, MAGNATEL, MAGNI-FOCUSER, MAGNI-LENS, MAGNI-SPECS, MAGNI-STAT, MAGNI-VIEWER, COOPERVISION, VALLEN VISION, ACURAVISION, CLEAR VISION, COOP VISION, COYOTE VISION, CRYSTAL VISION, POWER VISION, SELECT-A-VISION, TRUVISION, ULTRAVISION). The common usage of these descriptive terms weighs strongly against a finding of likelihood of confusion. *See, e.g., Sun Banks of Fla., Inc., v. Sun Fed. Sav. & Loan Ass'n*, 651 F.2d 311, 316, 211 USPQ 844, 849 (5th Cir. 1981) ("[W]e find the extensive third-party use of the word 'Sun' impressive evidence that there would be *no* likelihood of confusion between Sun Banks and Sun Federal.").

The record shows that these trademarks appeared side-by-side on similar products and in similar retail outlets over a period of several years. Magnivision's own documents allege that MAGNIVISION "has become the generic term for [over-the-counter] reading glasses." Also, Magnivision made extensive advertising expenditures to promote the recognition of its mark. Nonetheless, the record contains no showing of actual confusion between the two marks.

The differences in the marks, the absence of actual confusion despite several years of simultaneous use in an identical market, the absence of evidence that VSI intended to copy Magnivision's mark, and the weakness of the descriptive MAGNIVISON mark add up to a finding of noninfringement as a matter of law. Accordingly, this court holds that no reasonable juror could have found infringement of the MAGNIVISION trademark by the MAGNA·DOT mark.

Unfair Competition

Because the only evidence of unfair competition in this case was Magnivision's claims of trademark and trade dress infringement, the jury's finding of unfair competition lacks substantial evidence. Unfair competition provides an additional degree of protection above that provided by trademark and trade dress law. *See Freedom Sav. & Loan Ass'n v. Way*, 757 F.2d 1176, 1186, 226 USPQ 123, 130 (11th Cir. 1985). Although trademark and trade dress infringement may be the basis for a claim of unfair competition, it frequently requires the court to examine additional conduct that would not give rise to a claim of trademark infringement. *See id.*

In this case, the only evidence in support of the unfair competition claims was the trademark and trade dress infringement claims. As stated earlier, no reasonable juror could find a likelihood of confusion between the trade dress and trademarks of VSI and Magnivision. Therefore, on the evidence presented, no reasonable juror could find that VSI engaged in unfair competition with Magnivision.

Personal Liability of Myron Orlinsky

Title 35 authorizes a finding that an officer of a corporation is personally liable for the corporation's acts of infringement. *See* 35 U.S.C. § 271(a) (1994); *Manville Sales Corp. v. Paramount Sys., Inc.*, 917 F.2d 544, 552, 16 USPQ2d 1587, 1593 (Fed. Cir. 1990). Personal liability under § 271(a), however, requires sufficient evidence to justify piercing the corporate veil. *See id.* The corporate entity deserves respect and legal recognition unless specific, unusual circumstances justify disregarding the corporate structure. *See id.* The most common reason for disregarding the corporate structure is that the "corporation was merely the alter ego of its officers." *Id.*

**[14]** The record shows that Myron Orlinsky made the sole decision to continue using the hanger tags after VSI received cease and desist letters from Magnivision. The record, however, shows no further evidence of personal activity by Mr. Orlinsky. This evidence does not establish that Mr. Orlinsky overstepped his authority as CEO of VSI. Rather the record shows that Mr. Orlinsky acted consistent with his authority as CEO. Therefore, the record only supports the conclusion that Mr. Orlinsky acted within and according to the strictures of the corporate structure. The record shows no instance of the corporation operating as Mr. Orlinsky's alter ego. Thus, the record contains no evidence to justify piercing the corporate veil. *See, e.g., id.* at 553 ("Although these facts support the conclusion that the officers had knowledge of their acts, these acts were within the scope of their employment and thus were protected by the corporate veil.")

Furthermore, after VSI received the cease and desist letter, Mr. Orlinsky consulted counsel before continuing to produce the Version 1 and 2 hanger tags. The record thus shows that Mr. Orlinsky acted pursuant to a good faith belief of noninfringement engendered by advice of counsel. Once again, this evidence does not justify rejecting legal recognition of the corporate structure. *See id.* at 553. In sum, the record does not contain sufficient evidence that Mr. Orlinsky acted outside of the scope of his employment or that he continued to manufacture the hanger tags knowing that they infringed Magnivision's patents.

IV.

In conclusion, although the district court erred in its construction of the claims of the '345, '726 and '911 patents, these errors were harmless because of the jury's finding of infringement under the doctrine of equivalents. This court therefore affirms the district court's decision not to grant judgment as a matter of law of non-infringement. The jury's findings with respect to trademark and trade dress infringement, however, are unsupported by substantial evidence. Furthermore, because the finding of unfair competition rested solely on the findings of trademark and trade dress infringement, that finding is also unsupported by substantial evidence. The district court therefore erred in failing to grant judgment as a matter of law that VSI did not infringe Magnivision's asserted trademark and trade dress and that it did not engage in unfair competition. This court therefore reverses the decision of the district court not to grant judgment as a matter of law with respect to the absence of trademark and trade dress infringement and the absence of unfair competition. Additionally, because the jury findings of trademark and trade dress infringement and unfair competition lacked substantial evidence, the district court's entry of a permanent injunction was an abuse of discretion. The district court's entry of the permanent injunction is thus vacated to the extent it prohibited VSI from using its accused trademark, display cards and hanger tag color coding scheme. Furthermore, there is insufficient evidence to support holding Mr. Orlinsky personally liable for the damage award. The district court's conclusion to the contrary is therefore reversed.

COSTS

Each party shall bear its own costs.

*AFFIRMED-IN-PART and REVERSED-IN-PART.*

---

U.S. Supreme Court

Kumho Tire Co. v. Carmichael

No. 97-1709

Decided March 23, 1999

**JUDICIAL PRACTICE & PROCEDURE**

**1. Procedure — Evidence — Expert testimony (§410.3703)**

Holding in *Daubert v. Merrell Dow Pharmaceuticals Inc.*, 509 U.S. 579, 27 USPQ2d 1200 (1993), that Fed. R. Evid. 702 imposes special "gatekeeping" obligation on trial court to ensure that "scientific" testimony is both relevant and reliable, applies to testimony based on "technical" and "other specialized" knowledge as well as "scientific" knowledge, since language of Rule 702 makes no relevant distinction between these types of knowledge, since evidentiary rationale that underlay basic "gatekeeping" determination is not limited to "scientific" knowledge, and since it would prove difficult for courts to administer evidentiary rules under which gatekeeping obligation depended upon distinction between "scientific" and "technical" or "other specialized" knowledge.

**2. Procedure — Evidence — Expert testimony (§410.3703)**

Federal district court, in determining admissibility of engineering expert's testimony under Fed. R. Evid. 702, may consider several specific factors that might bear on court's general "gatekeeping" obligation, including whether theory or technique can be tested, whether it has been subjected to peer review and publication, whether it is associated with high known or potential rate of error, and whether it enjoys general acceptance within relevant scientific community; foregoing factors do not constitute definitive checklist or test, since Rule 702 inquiry is flexible one,

and factors may or may not be pertinent in assessing reliability of testimony in any given case.

3. **Procedure — Evidence — Expert testimony (§410.3703)**

**Procedure — Judicial review — Standard of review — In general (§410.4607.01)**

Federal district court's decision whether to admit or exclude expert testimony is subject to review under abuse of discretion standard, which applies to district court's decisions about how to determine reliability of proposed testimony, as well as to its ultimate conclusion.

---

On writ of certiorari to the U.S. Court of Appeals for the Eleventh Circuit.

Product liability action filed by Patrick M. Carmichael, et al. against Kumho Tire Co. Ltd., et al. in the U.S. District Court for the Southern District of Alabama. Plaintiffs appealed from order that declared testimony of plaintiffs' expert witness inadmissible and granted defendants' motion for summary judgment. The U.S. Court of Appeals for the Ninth Circuit reversed, and defendants sought review. Reversed.

Joseph P.H. Babington, Warren C. Herlong Jr., and John T. Dukes, of Helmsing, Sims & Leach, Mobile, Ala.; Kenneth S. Geller, Alan E. Untereiner, and Michael E. Lackey Jr., of Mayer, Brown & Platt, Washington, D.C., for petitioners.

Sidney W. Jackson III and Robert J. Hedge, of Jackson, Taylor & Martino, Mobile; Michael D. Hausfeld, Richard S. Lewis, Joseph M. Sellers, Jennifer A. Gundlach, and Anthony Z. Roisman, of Cohen, Milstein, Hausfeld & Toll, Washington, for respondents.

Jeffrey P. Minear, assistant to solicitor general, Seth P. Waxman, solicitor general, Frank W. Hunger, assistant attorney general, Lawrence G. Wallace, deputy solicitor general, Anthony J. Steinmeyer, and John P. Schnitker, U.S. Department of Justice, Washington, for United States as amicus curiae.

Syllabus

When a tire on the vehicle driven by Patrick Carmichael blew out and the vehicle overturned, one passenger died and the others were injured. The survivors and the decedent's representative, respondents here, brought this diversity suit against the tire's maker and its distributor (collectively Kumho Tire), claiming that the tire that failed was defective. They rested their case in significant part upon the depositions of a tire failure analyst, Dennis Carlson, Jr., who intended to testify that, in his expert opinion, a defect in the tire's manufacture or design caused the blow out. That opinion was based upon a visual and tactile inspection of the tire and upon the theory that in the absence of at least two of four specific, physical symptoms indicating tire abuse, the tire failure of the sort that occurred here was caused by a defect. Kumho Tire moved to exclude Carlson's testimony on the ground that his methodology failed to satisfy Federal Rule of Evidence 702, which says: "If scientific, technical, or other specialized knowledge will assist the trier of fact ..., a witness qualified as an expert ... may testify thereto in the form of an opinion." Granting the motion (and entering summary judgment for the defendants), the District Court acknowledged that it should act as a reliability "gatekeeper" under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U. S. 579, 589 [27 USPQ2d 1200], in which this Court held that Rule 702 imposes a special obligation upon a trial judge to ensure that scientific testimony is not only relevant, but reliable. The court noted that *Daubert* discussed four factors-testing, peer review, error rates, and "acceptability" in the relevant scientific community-which might prove helpful in determining the reliability of a particular scientific theory or technique, *id.*, at 593-594, and found that those factors argued against the reliability of Carlson's methodology. On the plaintiffs' motion for reconsideration, the court agreed that *Daubert* should be applied flexibly, that its four factors were simply illustrative, and that other factors could argue in favor of admissibility. However, the court affirmed its earlier order because it found insufficient indications of the reliability of Carlson's methodology. In reversing, the Eleventh Circuit held that the District Court had erred as a matter of law in applying *Daubert*. Believing that *Daubert* was limited to the scientific context, the court held that the *Daubert* factors did not apply to Carlson's testimony, which it characterized as skill- or experience-based.

*Held:*

1. The *Daubert* factors may apply to the testimony of engineers and other experts who are not scientists.

(a) The *Daubert* "gatekeeping" obligation applies not only to "scientific" testimony, but to all expert testimony. Rule 702 does not distinguish between "scientific" knowledge and "technical" or "other specialized" knowledge, but makes clear that any such knowledge might become the subject of expert testimony. It is the Rule's word "knowledge," not the words (like "scientific") that modify that word, that establishes a standard of evidentiary reliability. 509 U. S., at 589-590. *Daubert* referred only to "scientific" knowledge because that was the nature of the expertise there at issue. *Id.*, at 590, n. 8. Neither is the evidentiary rationale underlying *Daubert*'s "gatekeeping" determination limited to "scientific" knowledge. Rules 702 and 703 grant all expert witnesses, not just "scientific" ones, testimonial latitude unavailable to other witnesses on the assumption that the expert's opinion will have a reliable basis in the knowledge and experience of his discipline. *Id.*, at 592. Finally, it would prove difficult, if not impossible, for judges to administer evidentiary rules under which a "gatekeeping" obligation depended upon a distinction between "scientific" knowledge and "technical" or "other specialized" knowledge, since there is no clear line dividing the one from the others and no convincing need to make such distinctions.

(b) A trial judge determining the admissibility of an engineering expert's testimony *may* consider one or more of the specific *Daubert* factors. The emphasis on the word "may" reflects *Daubert*'s description of the Rule 702 inquiry as "a flexible one." 509 U. S., at 594. The *Daubert* factors do *not* constitute a definitive checklist or test, *id.*, at 593, and the gatekeeping inquiry must be tied to the particular facts, *id.*, at 591. Those factors may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony. Some of those factors may be helpful in evaluating the reliability even of experience-based expert testimony, and the Court of Appeals erred insofar as it ruled those factors out in such cases. In determining whether particular expert testimony is reliable, the trial court should consider the specific *Daubert* factors where they are reasonable measures of reliability.

(c) The court of appeals must apply an abuse-of-discretion standard when it reviews the trial court's decision to admit or exclude expert testimony. *General Electric Co. v. Joiner*, 522 U. S. 136, 138-139. That standard applies as much to the trial court's decisions about how to determine reliability as to its ultimate conclusion. Thus, whether *Daubert*'s specific factors are, or are not, reasonable measures of reliability in a particular case is a matter that the law grants the trial judge broad latitude to determine. See *id.*, at 143. The Eleventh Circuit erred insofar as it held to the contrary.

2. Application of the foregoing standards demonstrates that the District Court's decision not to admit Carlson's expert testimony was lawful. The District Court did not question Carlson's qualifications, but excluded his testimony because it initially doubted his methodology and then found it unreliable after examining the transcript in some detail and considering respondents' defense of it. The doubts that triggered the court's initial inquiry were reasonable, as was the court's ultimate conclusion that Carlson could n[ot] reliably determine the cause of the failure [of] the tire in question. The question was not the reliability of Carlson's methodology in general, but rather whether he could reliably determine the cause of failure of *the particular tire at issue*. That tire, Carlson conceded, had traveled far enough so that some of the tread had been worn bald, it should have been taken out of service, it had been repaired (inadequately) for punctures, and it bore some of the very marks that he said indicated, not a defect, but abuse. Moreover, Carlson's own testimony cast considerable doubt upon the reliability of both his theory about the need for at least two signs of abuse and his proposition about the significance of visual inspection in this case. Respondents stress that other tire failure experts, like Carlson, rely on visual and tactile examinations of tires. But there is no indication in the record that other experts in the industry use Carlson's *particular* approach or that tire experts normally make the very fine distinctions necessary to support his conclusion[s,] nor are there references to articles or pap[ers] that validate his approach. Respondents' a[r]gument that the District Court too rigidly applied *Daubert* might have had some validity with respect to the court's initial opinion, but fails because the court, on reconsideration, recognized that the relevant reliability inquiry should be "flexible," and ultimately based its decision upon Carlson's failure to satisfy either *Daubert*'s factors *or any other* set of reasonable reliability criteria.

131 F. 3d 1433, reversed.

Breyer, J., delivered the opinion of the Court, in which Rehnquist, C.J., and O'Connor, Scalia, Kennedy, Souter, Thomas, and Ginsburg, JJ., joined, and in which Stevens, J., joined as to Parts I and II. Scalia, J., filed a concurring opinion, in which O'Connor and Thomas, JJ., joined. Stevens, J., filed an

opinion concurring in part and dissenting in part.

**Breyer, J.**

In *Daubert* v. *Merrell Dow Pharmaceuticals, Inc.*, 509 U. S. 579 [27 USPQ2d 1200] (1993), this Court focused upon the admissibility of scientific expert testimony. It pointed out that such testimony is admissible only if it is both relevant and reliable. And it held that the Federal Rules of Evidence "assign to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Id.*, at 597. The Court also discussed certain more specific factors, such as testing, peer review, error rates, and "acceptability" in the relevant scientific community, some or all of which might prove helpful in determining the reliability of a particular scientific "theory or technique." *Id.*, at 593-594.

This case requires us to decide how *Daubert* applies to the testimony of engineers and other experts who are not scientists. We conclude that *Daubert*'s general holding setting forth the trial judge's general "gatekeeping" obligation-applies not only to testimony based on "scientific" knowledge, but also to testimony based on "technical" and "other specialized" knowledge. See Fed. Rule Evid. 702. We also conclude that a trial court *may* consider one or more of the more specific factors that *Daubert* mentioned when doing so will help determine that testimony's reliability. But, as the Court stated in *Daubert*, the test of reliability is "flexible," and *Daubert*'s list of specific factors neither necessarily nor exclusively applies to all experts or in every case. Rather, the law grants a district court the same broad latitude when it decides *how* to determine reliability as it enjoys in respect to its ultimate reliability determination. See *General Electric Co.* v. *Joiner*, 522 U. S. 136, 143 (1997) (courts of appeals are to apply "abuse of discretion" standard when reviewing district court's reliability determination). Applying these standards, we determine that the District Court's decision in this case not to admit certain expert testimony-was within its discretion and therefore lawful.

I

On July 6, 1993, the right rear tire of a minivan driven by Patrick Carmichael blew out. In the accident that followed, one of the passengers died, and others were severely injured. In October 1993, the Carmichaels brought this diversity suit against the tire's maker and its distributor, whom we refer to collectively as Kumho Tire, claiming that the tire was defective. The plaintiffs rested their case in significant part upon deposition testimony provided by an expert in tire failure analysis, Dennis Carlson, Jr., who intended to testify in support of their conclusion.

Carlson's depositions relied upon certain features of tire technology that are not in dispute. A steel-belted radial tire like the Carmichaels' is made up of a "carcass" containing many layers of flexible cords, called "plies," along which (between the cords and the outer tread) are laid steel strips called "belts." Steel wire loops, called "beads," hold the cords together at the plies' bottom edges. An outer layer, called the "tread," encases the carcass, and the entire tire is bound together in rubber, through the application of heat and various chemicals. See generally, *e.g.*, J. Dixon, Tires, Suspension and Handling 68-72 (2d ed. 1996). The bead of the tire sits upon a "bead seat," which is part of the wheel assembly. That assembly contains a "rim flange," which extends over the bead and rests against the side of the tire. See M. Mavrigian, Performance Wheels & Tires 81, 83 (1998) (illustrations).

Radial-Ply Tire Construction

A. Markovich, How To Buy and Care For Tires 4 (1994)

Carlson's testimony also accepted certain background facts about the tire in question. He assumed that before the blowout the tire had traveled far. (The tire was made in 1988 and had been installed some time before the Carmichaels bought the used minivan in March 1993; the Carmichaels had driven the van approximately 7,000 additional miles in the two months they had owned it.) Carlson noted that the tire's tread depth, which was 11/32 of an inch when new, App. 242, had been worn down to depths that ranged from 3/32 of an inch along some parts of the tire, to nothing at all along others. *Id.*, at 287. He conceded that the tire tread had at least two punctures which had been inadequately repaired. *Id.*, at 258-261, 322.

Despite the tire's age and history, Carlson concluded that a defect in its manufacture or design caused the blowout. He rested this conclusion in part upon three premises which, for present purposes, we must assume are not in dispute: First, a tire's carcass should stay bound to the inner side of the tread for a significant period of time after its tread depth has worn away. *Id.*, at 208-209. Second, the tread of the tire at issue had separated from its inner steel-belted carcass prior to the accident. *Id.*, at 336. Third, this "separation" caused the blowout. *Ibid.*

Carlson's conclusion that a defect caused the separation, however, rested upon certain other propositions, several of which the defendants strongly dispute. First, Carlson said that if a separation is *not* caused by a certain kind of tire misuse called over deflection (which consists of under inflating the tire or causing it to carry too much weight, thereby generating heat that can undo the chemical tread/carcass bond), then, ordinarily, its cause is a tire defect. *Id.*, at 193-195, 277-278. Second, he said that if a tire has been subject to sufficient over deflection to cause a separation, it should reveal certain physical symptoms. These symptoms include (a) tread wear on the tire's shoulder that is greater than the tread wear along the tire's center, *id.*, at 211; (b) signs of a "bead groove," where the beads have been pushed too hard against the bead seat on the inside of the tire's rim, *id.*, at 196-197; (c) sidewalls of the tire with physical signs of deterioration, such as discoloration, *id.*, at 212; and/or (d) marks on the tire's rim flange, *id.*, at 219-220. Third, Carlson said that where he does not find *at least two* of the four physical signs just mentioned (and presumably where there is no reason to suspect a less common cause of separation), he concludes that a manufacturing or design defect caused the separation. *Id.*, at 223-224.

Carlson added that he had inspected the tire in question. He conceded that the tire to a limited degree showed greater wear on the shoulder than in the center, some signs of "bead groove," some discoloration, a few marks on the rim flange, and inadequately filled puncture holes (which can also cause heat that might lead to separation). *Id.*, at 256-257, 258-261, 277, 303-304, 308. But, each instance, he testified that the symptoms were not significant, and he explained why he believed that they did not reveal over deflection For example, the extra shoulder wear, he said, appeared primarily on one shoulder, whereas an over deflected tire would reveal equally abnormal wear on both shoulders. *Id.*, at 277. Carlson concluded that the tire did not bear at least two of the four overdeflection symptoms, nor was there any less obvious cause of separation; and since neither overdeflection nor the punctures caused the blowout, a defect must have done so.

Kumho Tire moved the District Court to exclude Carlson's testimony on the ground that his methodology failed Rule 702's reliability requirement. The court agreed with Kumho that it should act as a *Daubert*-type reliability "gatekeeper," even though one might consider Carlson's testimony as "technical," rather than "scientific." See *Carmichael* v. *Samyang Tires, Inc.*, 923 F. Supp. 1514, 1521-1522 (SD Ala. 1996). The court then examined Carlson's methodology in light of the reliability-related factors that *Daubert* mentioned, such as a theory's testability, whether it "has been a subject of peer review or publication," the "known or potential rate of error," and the "degree of acceptance . . . within the relevant scientific community." 923 F. Supp., at 1520 (citing *Daubert*, 509 U. S., at 592-594). The District Court found that all those factors argued against the reliability of Carlson's methods, and it granted the motion to ex-

clude the testimony (as well as the defendants' accompanying motion for summary judgment).

The plaintiffs, arguing that the court's application of the *Daubert* factors was too "inflexible," asked for reconsideration. And the Court granted that motion. *Carmichael v. Samyang Tires, Inc.*, Civ. Action No. 93-0860-CB-S (SD Ala., June 5, 1996), App. to Pet. for Cert. 1c. After reconsidering the matter, the court agreed with the plaintiffs that *Daubert* should be applied flexibly, that its four factors were simply illustrative, and that other factors could argue in favor of admissibility. It conceded that there may be widespread acceptance of a "visual-inspection method" for some relevant purposes. But the court found insufficient indications of the reliability of

> "the component of Carlson's tire failure analysis which most concerned the Court, namely, the methodology employed by the expert in analyzing the data obtained in the visual inspection, and the scientific basis, if any, for such an analysis." *Id.*, at 6c.

It consequently affirmed its earlier order declaring Carlson's testimony inadmissable *and granting the defendants'* motion for summary judgment.

The Eleventh Circuit reversed. See *Carmichael v. Samyang Tire, Inc.*, 131 F. 3d 1433 (1997). It "review[ed] . . . *de novo*" the "district court's legal decision to apply *Daubert*." *Id.*, at 1435. It noted that "the Supreme Court in *Daubert* explicitly limited its holding to cover only the 'scientific context,'" adding that "a *Daubert* analysis" applies only where an expert relies "on the application of scientific principles," rather than "on skill- or experience based observation." *Id.*, at 1435-1436. It concluded that Carlson's testimony, which it viewed as relying on experience, "falls outside the scope of *Daubert*," that "the district court erred as a matter of law by applying *Daubert* in this case and that the case must be remanded for further (non-*Daubert*-type) consideration under Rule 702. *Id.*, at 1436.

Kumho Tire petitioned for certiorari, asking us to determine whether a trial court "may" consider *Daubert*'s specific "factors" when determining the "admissibility of an engineering expert's testimony." Pet. for Cert. i. We granted certiorari in light of uncertainty among the lower courts about whether, or how, *Daubert* applies to expert testimony that might be characterized as based not upon "scientific" knowledge, but rather upon "technical" or "other specialized" knowledge. Fed. Rule Evid. 702; compare, *e.g.*, *Watkins v. Telsmith, Inc.*, 121 F. 3d 984, 990-991 (CA5 1997), with, *e.g.*, *Compton v. Subaru of America, Inc.*, 82 F. 3d 1513, 1518-1519 (CA10), cert. denied, 519 U. S. 1042 (1996).

## II

### A

**[1]** In *Daubert*, this Court held that Federal Rule of Evidence 702 imposes a special obligation upon a trial judge to "ensure that any and all scientific testimony . . . is not only relevant, but reliable." 509 U. S., at 589. The initial question before us is whether this basic gatekeeping obligation applies only to "scientific" testimony or to all expert testimony. We, like the parties, believe that it applies to all expert testimony. See Brief for Petitioners 19; Brief for Respondents 17.

For one thing, Rule 702 itself says:

> "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise."

This language makes no relevant distinction between "scientific" knowledge and "technical" or "other specialized" knowledge. It makes clear that any such knowledge might become the subject of expert testimony. In *Daubert*, the Court specified that it is the Rule's word "knowledge," not the words (like "scientific") that modify that word, that "establishes a standard of evidentiary reliability." 509 U. S., at 589-590. Hence, as a matter of language, the Rule applies its reliability standard to all "scientific," "technical," or "other specialized" matters within its scope. We concede that the Court in *Daubert* referred only to "scientific" knowledge. But as the Court there said, it referred to "scientific" testimony "because that [wa]s the nature of the expertise" at issue. *Id.*, at 590, n. 8.

Neither is the evidentiary rationale that underlay the Court's basic *Daubert* "gatekeeping" determination limited to "scientific" knowledge. *Daubert* pointed out that Federal Rules 702 and 703 grant expert witnesses testimonial latitude unavailable to other witnesses on the "assumption that the expert's opinion will have a reliable basis in the knowledge and experience of his discipline." *Id.*, at 592 (pointing out that experts may testify to opinions, including those that are not based on firsthand knowledge or

observation). The Rules grant that latitude to all experts, not just to "scientific" ones.

Finally, it would prove difficult, if not impossible, for judges to administer evidentiary rules under which a gatekeeping obligation depended upon a distinction between "scientific" knowledge and "technical" or "other specialized" knowledge. There is no clear line that divides the one from the others. Disciplines such as engineering rest upon scientific knowledge. Pure scientific theory *itself may depend for its development upon* observation and properly engineered machinery. And conceptual efforts to distinguish the two are unlikely to produce clear legal lines capable of application in particular cases. Cf. Brief for National Academy of Engineering as *Amicus Curiae* 9 (scientist seeks to understand nature while the engineer seeks nature's modification); Brief for Rubber Manufacturers Association as *Amicus Curiae* 14-16 (engineering, as an "applied science," relies on "scientific reasoning and methodology"); Brief for John Allen et al. as *Amici Curiae* 6 (engineering relies upon "scientific knowledge and methods").

Neither is there a convincing need to make such distinctions. Experts of all kinds tie observations to conclusions through the use of what Judge Learned Hand called "general truths derived from . . . specialized experience." Hand, Historical and Practical Considerations Regarding Expert Testimony, 15 Harv. L. Rev. 40, 54 (1901). And whether the specific expert testimony focuses upon specialized observations, the specialized translation of those observations into theory, a specialized theory itself, or the application of such a theory in a particular case, the expert's testimony often will rest "upon an experience confessedly foreign in kind to [the jury's] own." *Ibid.* The trial judge's effort to assure that the specialized testimony is reliable and relevant can help the jury evaluate that foreign experience, whether the testimony reflects scientific, technical, or other specialized knowledge.

We conclude that *Daubert*'s general principles apply to the expert matters described in Rule 702. The Rule, in respect to all such matters, "establishes a standard of evidentiary reliability." 509 U. S., at 590. It "requires a valid . . . connection to the pertinent inquiry as a precondition to admissibility." *Id.*, at 592. And where such testimony's factual basis, data, principles, methods, or their application are called sufficiently into question, see Part III, *infra*, the trial judge must determine whether the testimony has "a reliable basis in the knowledge and experience of [the relevant] discipline." 509 U. S., at 592.

### B

**[2] The petitioners ask more specifically whether a trial judge determining the "admissibility of an engineering expert's testimony" *may* consider several more specific factors that *Daubert* said might "bear on" a judge's gatekeeping determination.** These factors include:

> —Whether a "theory or technique . . . can be (and has been) tested";
> —Whether it "has been subjected to peer review and publication";
> —Whether, in respect to a particular technique, there is a high "known or potential rate of error" and whether there are "standards controlling the technique's operation"; and
> —Whether the theory or technique enjoy "general acceptance" within a "relevant scientific community." 509 U. S., at 592-594.

Emphasizing the word "may" in the question, **we answer that question yes.**

**Engineering testimony rests upon scientific foundations, the reliability of which will be at issue in some cases. See, *e.g.*, Brief for Stephen Bobo et al. as *Amici Curiae* 23 (stressing the scientific bases of engineering disciplines). In other cases, the relevant reliability concerns may focus upon personal knowledge or experience.** As the Solicitor **General points out, there are many different kinds of experts, and many different kinds of expertise. See Brief for United States as *Amicus Curiae* 18-19, and n. 5 (citing cases involving experts in drug terms, handwriting analysis, criminal *modus operandi*, land valuation, agricultural practices, railroad procedures, attorney's fee valuation, and others). Our emphasis on the word "may" the reflects *Daubert*'s description of the Ru 702 inquiry as "a flexible one." 509 U. S., at 594. *Daubert* makes clear that the factors it mentions do *not* constitute a "definitive checklist or test." *Id.*, at 593. And *Daubert* adds that the gatekeeping inquiry must be "'tied to the facts'" of a particular "case." *Id.*, at 591 (quoting *United States v. Downing*, 753 F. 2d 1224, 1242 (CA3 1985)). We agree with the Solicitor General that "[t]he factors identified in *Daubert* may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony." Brief for United States as *Amicus Curiae* 19. The conclusion, in our view, is that we can neither rule out, nor rule in, for all cases and for all time the applicability of the factors mentioned in *Daubert*, nor can we now do so for subsets of cases categorized by**

69

category of expert or by kind of evidence. Too much depends upon the particular circumstances of the particular case at issue.

*Daubert* itself is not to the contrary. It made clear that its list of factors was meant to be helpful, not definitive. Indeed, those factors *do not* all necessarily apply even in every instance in which the reliability of scientific testimony is challenged. It might not be surprising in a particular case, for example, that a claim made by a scientific witness has never been the subject of peer review, for the particular application at issue may never previously have interested any scientist. Nor, on the other hand, does the presence of *Daubert*'s general acceptance factor help show that an expert's testimony is reliable where the discipline itself lacks reliability, as, for example, do theories grounded in any so-called generally accepted principles of astrology or *necromancy*.

At the same time, and contrary to the Court of Appeals' view, some of *Daubert*'s questions can help to evaluate the reliability even of experience-based testimony. In certain cases, it will be appropriate for the trial judge to ask, for example, how often an engineering expert's experience based methodology has produced erroneous results, or *whether such a method* is generally accepted in the relevant engineering community. Likewise, it will at times be useful to ask even of a witness whose expertise is based purely on experience, say, a perfume tester able to distinguish among 140 odors at a sniff, whether his preparation is of a kind that others in the field would recognize as acceptable.

We must therefore disagree with the Eleventh Circuit's holding that a trial judge may ask questions of the sort *Daubert* mentioned only where an expert "relies on the application of scientific principles," but not where an expert relies "on skill- or experience-based observation." 131 F. 3d, at 1435. We do not believe that Rule 702 creates a schematism that segregates expertise by type while mapping certain kinds of questions to certain kinds of experts. Life and the legal cases that it generates are too complex to warrant so definitive a match.

To say this is not to deny the importance of *Daubert's gatekeeping requirement*. The objective of that requirement is to ensure the reliability and relevancy of expert testimony. It is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field. Nor do we deny that, as stated in *Daubert*, the particular questions that it mentioned will often be appropriate for use in determining the reliability of challenged expert testimony. Rather, *we conclude that* the trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable. That is to say, a trial court should consider the specific factors identified in *Daubert* where they are reasonable measures of the reliability of expert testimony.

## C

[3] The trial court must have the same kind of latitude in deciding *how* to test an expert's reliability, and to decide whether or when special briefing or other proceedings are needed to investigate reliability, as it enjoys when it decides *whether or not* that expert's relevant testimony is reliable. Our opinion in *Joiner* makes clear that a court of appeals is to apply an abuse-of-discretion standard when it "review[s] a trial court's decision to admit or exclude expert testimony." *522 U. S., at 138-139. That standard* applies as much to the trial court's decisions about how to determine reliability as to its ultimate conclusion. Otherwise, the trial judge would lack the discretionary authority needed both to avoid unnecessary "reliability" proceedings in ordinary cases where the reliability of an expert's methods is properly taken for granted, and to require appropriate *proceedings in the less usual* or more complex cases where cause for questioning the expert's reliability arises. Indeed, the Rules seek to avoid "unjustifiable expense and delay" as part of their search for "truth" and the "jus[t] determin[ation]" of proceedings. Fed. Rule Evid. 102. Thus, whether *Daubert*'s specific factors are, or are not, reasonable measures of reliability in a particular case is a matter that the law grants the trial judge broad latitude to determine. See *Joiner, supra*, at 143. And the Eleventh Circuit erred insofar as it held to the contrary.

## III

We further explain the way in which a trial judge "may" consider *Daubert*'s factors by applying these considerations to the case at hand, a matter that has been briefed exhaustively by the parties and their 19 *amici*. The District Court did not doubt Carlson's qualifications, which included a *masters degree in mechanical engineering*, 10 years' work at Michelin America, Inc., and testimony as a tire failure consultant in other tort cases. Rather, it excluded the testimony because, despite those qualifications, it initially doubted, and then found unreliable, "the methodology employed by *the expert in analyzing* the data obtained in the visual inspection, and the scientific basis, if any, for such an analysis." Civ. Action No. 93-0860-CB-S (SD Ala., June 5, 1996), App. to Pet. for Cert. 6c. After examining the transcript in "some detail," *923 F. Supp.*, at 1518-519, n. 4, and after considering respondents' defense of Carlson's methodology, the District Court determined that Carlson's testimony was not reliable. It fell outside the range where experts might reasonably differ, and where the jury must decide among the conflicting views of different experts, even though the evidence is "shaky." *Daubert, 509 U. S.*, at 596. In our view, the doubts that triggered the District Court's initial inquiry here were reasonable, as was the court's ultimate conclusion.

For one thing, and contrary to respondents' suggestion, the specific issue before the court was not the reasonableness *in general* of a tire expert's use of a visual and tactile inspection to determine whether overdeflec*tion had caused the tire's tread to separate* from its steel-belted carcass. Rather, it was the reasonableness of using such an approach, along with Carlson's particular method of analyzing the data thereby obtained, to draw a conclusion regarding *the particular matter to which the expert testimony was directly relevant*. That matter concerned the likelihood that a defect in the *tire at issue caused its tread to separate from* its carcass. The tire in question, the expert conceded, had traveled far enough so that some of the tread had been worn bald; it should have been taken out of service; it had been repaired (inadequately) for punctures; and it bore some of the very marks that the expert said indicated, not a defect, but abuse through overdeflection. See *supra*, at 3-5; App. 293-294. The relevant issue was whether the expert could reliably determine the cause *of this* tire's separation.

Nor was the basis for Carlson's conclusion simply the general theory that, in the ab*sence of evidence of abuse, a defect will* normally have caused a tire's separation. Rather, the expert employed a more specific theory to establish the existence (or absence) of such abuse. Carlson testified precisely that in the absence of *at least two* of four signs of abuse (proportionately greater tread wear on the shoulder; signs of grooves caused by the beads; discolored sidewalls; marks on *the rim flange*) he concludes that a defect caused the separation. And his analysis depended upon acceptance of a further implicit proposition, namely, that his visual and tactile inspection could determine that the tire before him had not been abused despite some evidence of the presence of the very signs for which he looked (and two punctures).

For another thing, the transcripts of Carlson's depositions support both the trial court's initial uncertainty and its final conclusion. Those transcripts cast considerable doubt upon *the reliability of both the explicit* theory (about the need for two signs of abuse) and the implicit proposition (about the significance of visual inspection in this case). Among other things, the expert could not say whether the tire had traveled more than 10, or 20, or 30, or 40, or 50 thousand miles, adding that 6,000 miles was "about how far" he could "say with any certainty." *Id., at 265. The court could reasonably have* wondered about the reliability of a method of visual and tactile inspection sufficiently precise to ascertain with some certainty the abuse-related significance of minute shoulder/center relative tread wear differences, but insufficiently precise to tell "with any certainty" from the tread wear whether a tire had traveled less than 10,000 or more *than 50,000 miles. And these concerns might* have been augmented by Carlson's repeated reliance on the "subjective[ness]" of his mode of analysis in response to questions seeking specific information regarding how he could differentiate between a tire that actually had been overdeflected and a tire that merely looked as though it had been. *Id.*, at 222, 224-225, 285-286. They would have been further augmented by the fact that Carlson said he had inspected the tire itself for the first time the morning of his first deposition, and then only for a few hours. (His initial conclusions were based on photographs.) *Id.*, at *180*.

Moreover, prior to his first deposition, Carlson had issued a signed report in which he concluded that the tire had "not been overloaded or underinflated," not because the absence of "two of four" signs of abuse, but simply because "the rim flange impressions . . . were normal." *Id.*, at 335-336. That report also said that the "tread depth re*maining was 3/32 inch," id., at 336, though* the opposing expert's (apparently undisputed) measurements indicate that the tread depth taken at various positions around the tire actually ranged from .5/32 of an inch to 4/32 of an inch, with the tire apparently showing greater wear along *both* shoulders than along the center, *id.*, at 432-433.

Further, in respect to one sign of abuse, bead grooving, the expert seemed to deny the sufficiency of his own simple visual-inspection methodology. He testified that most tires have some bead groove pattern, that where there is reason to suspect an abnormal



bead groove he would ideally "look at a lot of [similar] tires" to know the grooving's significance, and that he had not looked at many tires similar to the one at issue. *Id.*, at 212-213, 214, 217.

Finally, the court, after looking for a defense of Carlson's methodology as applied in these circumstances, found no convincing defense. Rather, it found (1) that "none" of the *Daubert* factors, including that of "general acceptance" in the relevant expert community, indicated that Carlson's testimony was reliable, 923 F. Supp., at 1521; (2) that its own analysis "revealed no countervailing factors operating in favor of admissibility which could outweigh those identified in *Daubert*," App. to Pet. for Cert. 4c; and (3) that the "parties identified no such factors in their briefs," *ibid*. For these three reasons *taken together*, it concluded that Carlson's testimony was unreliable.

Respondents now argue to us, as they did to the District Court, that a method of tire failure analysis that employs a visual/tactile inspection is a reliable method, and they point both to its use by other experts and to Carlson's long experience working for Michelin as sufficient *indication that that is so*. But no one denies that an expert might draw a conclusion from a set of observations based on extensive and specialized experience. Nor does anyone deny that, as a general matter, tire abuse may often be identified by qualified experts through visual or tactile inspection of the tire. See Affidavit of H. R. Baumgardner 1-2, cited in Brief for National Academy of Forensic Engineers as *Amici Curiae* 16 (Tire engineers rely on visual examination and process of elimination to analyze experimental test tires). As we said before, *supra*, at 14, the question before the trial court was specific, not general. The trial court had to decide whether this particular expert had sufficient specialized knowledge to assist the jurors "in deciding the particular issues in the case." 4 J. McLaughlin, Weinstein's Federal Evidence ¶702.05[1], p. 702-33 (2d ed. 1998); see also Advisory Committee's Note on Proposed Fed. Rule Evid. 702, Preliminary Draft of Proposed Amendments to the Federal Rules of Civil Procedure and Evidence: Request for Comment 126 (1998) (stressing that district courts must "scrutinize" whether the "principles and methods" employed by an expert "have been properly applied to the facts of the case").

The particular issue in this case concerned the use of Carlson's two-factor test and his related use of visual/tactile inspection to draw conclusions on the basis of what seemed small observational differences. We have found no indication in the record that other experts in the industry use Carlson's two-factor test or that tire experts such as Carlson normally make the very fine distinctions about, say, the symmetry of comparatively greater shoulder tread wear that were necessary, on Carlson's own theory, to support his conclusions. Nor, despite the prevalence of tire testing, does anyone refer to any articles or papers that validate Carlson's approach. Compare Bobo, Tire Flaws and Separations, in Mechanics of Pneumatic Tires 636-637 (S. Clark ed. 1981); C. Schnuth et al., Compression Grooving and Rim Flange Abrasion as Indicators of Over-Deflected Operating Conditions in Tires, presented to Rubber Division of the American Chemical Society, Oct. 21-24, 1997; J. Walter & R. Kiminecz, Bead Contact Pressure Measurements at the Tire-Rim Interface, presented to Society of Automotive Engineers, Feb. 24-28, 1975. Indeed, no one has argued that Carlson himself, were he still working for Michelin, would have concluded in a report to his employer that a similar tire was similarly defective on grounds identical to those upon which he rested his conclusion *here*. Of course, Carlson himself claimed that his method was accurate, but, as we pointed out in *Joiner*, "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." 522 U. S., at 146.

Respondents additionally argue that the District Court too rigidly applied *Daubert*'s criteria. They read its opinion to hold that a failure to satisfy any one of those criteria automatically renders expert testimony inadmissible. The District Court's initial opinion might have been vulnerable to a form of this argument. There, the court, after rejecting respondents' claim that Carlson's testimony was "exempted from *Daubert*-style scrutiny" because it was "technical analysis" rather than "scientific evidence," simply added that "none of the four admissibility criteria outlined by the *Daubert* court are satisfied." 923 F. Supp., at 1522. Subsequently, however, the court granted respondents' motion for reconsideration. It then explicitly recognized that the relevant reliability inquiry "should be 'flexible,'" that its "'overarching subject [should be] ... validity' and reliability," and that "*Daubert* was intended neither to be exhaustive nor to apply in every case." App. to Pet. for Cert. 4c (quoting *Daubert*, 509 U. S., at 594-595). And the court ultimately based its decision upon Carlson's failure to satisfy either *Daubert*'s factors *or any other* set of reasonable reliability criteria. In light of the record as developed by the parties, that conclusion was within the District Court's lawful discretion.

In sum, Rule 702 grants the district judge the discretionary authority, reviewable for its abuse, to determine reliability in light of the particular facts and circumstances of the particular case. The District Court did not abuse its discretionary authority in this case. Hence, the judgment of the Court of Appeals is

*Reversed.*

**Scalia, J., with whom O'Connor and Thomas, JJ., join, concurring.**

I join the opinion of the Court, which makes clear that the discretion it endorses-trial-court discretion in choosing the manner of testing expert reliability-is not discretion to abandon the gatekeeping function. I think it worth adding that it is not discretion to perform the function inadequately. Rather, it is discretion to choose among *reasonable* means of excluding expertise that is *fausse* and science that is junky. Though, as the Court makes clear today, the *Daubert* factors are not holy writ, in a particular case the failure to apply one or another of them may be unreasonable, and hence an abuse of discretion.

**Stevens, J., concurring in part and dissenting in part.**

The only question that we granted certiorari to decide is whether a trial judge "[m]ay ... consider the four factors set out by this Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U. S. 579 [27 USPQ2d 1200] (1993), in a Rule 702 analysis of admissibility of an engineering expert's testimony." Pet. for Cert. i. That question is fully and correctly answered in Parts I and II of the Court's opinion, which I join.

Part III answers the quite different question whether the trial judge abused his discretion when he excluded the testimony of Dennis Carlson. Because a proper answer to that question requires a study of the record that can be performed more efficiently by the Court of Appeals than by the nine Members of this Court, I would remand the case to the Eleventh Circuit to perform that task. There are, of course, exceptions to most rules, but I firmly believe that it is neither fair to litigants nor good practice for this Court to reach out to decide questions not raised by the certiorari petition. See *General Electric Co. v. Joiner*, 522 U. S. 136, 150-151 (1997) (STEVENS, J., concurring in part and dissenting in part).

Accordingly, while I do not feel qualified to disagree with the well-reasoned factual analysis in Part III of the Court's opinion, I do not join that Part, and I respectfully dissent from the Court's disposition of the case.

---

**U.S. District Court**
**Southern District of New York**

World Film Services Inc. v. RAI Radiotelevisione Italiana S.p.A.

No. 97 Civ. 8627 (LMM)

Decided February 3, 1999

## JUDICIAL PRACTICE AND PROCEDURE

**1. Jurisdiction — Personal jurisdiction (§405.11)**

Defendant Italian corporation is "doing business" in New York within meaning of New York's long-arm statute, N.Y. C.P.L.R. 301, in view of presence and activities of defendant's wholly-owned subsidiary in New York, since subsidiary distributes defendants' programs, acquires television rights, rents time on cable, radio, and television stations, and procures leasehold improvements on parent's behalf in New York, and since this amounts to showing that subsidiary essentially does all business parent could do if it were in New York, and that these activities are sufficiently important that defendant would have to perform them itself if its subsidiary were not in New Yo[illegible]

**2. Jurisdiction — Personal jurisdicti[illegible] (§405.11)**

Assertion of personal jurisdiction over Italian corporation by federal court in New York copyright infringement action is reasonable, since plaintiff has interest in litigating in New York, where it is incorporated and maintains its principal place of business, since claimed infringement is alleged to have taken place in New York, and forum therefore has interest in adjudicating case, since litigation will be as efficient in New York as it would be elsewhere, and since burden that litigating in New York may place on defendant is insufficient to overcome plaintiff's showing of minimum contacts.

**3. Jurisdiction — Venue; transfer of action — Minimum contacts (§405.1905)**

New York is proper venue for copyright infringement claim brought against Italian